**2014-1633, -1643, -1670**

# United States Court of Appeals
# for the Federal Circuit

ARLINGTON INDUSTRIES, INC,

*Plaintiff – Cross-Appellant*,

*v.*

BRIDGEPORT FITTINGS, INC.,

*Defendant – Appellant.*

*Appeal from the United States District Court for the Middle District of Pennsylvania in case no. 02-CV-0134, Judge A. Richard Caputo.*

## BRIEF FOR DEFENDANT-APPELLANT BRIDGEPORT FITTINGS, INC.

ALAN M. ANDERSON
MATTHEW R. PALEN
  *OF COUNSEL*
AARON C. NYQUIST
ALAN ANDERSON LAW FIRM LLC
Crescent Ridge Corporate Center
11100 Wayzata Boulevard, Suite 545
Minneapolis, MN 55305
Telephone: (612) 756-7000
Facsimile: (612) 756-7050
aanderson@anderson-lawfirm.com
anyquist@anderson-lawfirm.com
mattpalen@comcast.net
*Counsel for Defendant-Appellant*

October 20, 2014

## CERTIFICATE OF INTEREST

Counsel for Appellant Bridgeport Fittings, Inc. hereby certifies the following:

1. The full name of every party represented by me is:

   Bridgeport Fittings, Inc.

2. The name of the real party in interest represented by me is:

   Bridgeport Fittings, Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

   None.

4. The names of all law firms and the partners or associates that appeared for any of the parties represented by me in the trial court or are expected to appear in this Court are:

   Alan Anderson Law Firm LLC: Alan M. Anderson, Matthew R. Palen, Aaron C. Nyquist

   Rosenn, Jenkins & Greenwald, L.L.P.: Robert N. Gawlas Jr.

   Fulbright & Jaworski L.L.P.: Mark E. Ungerman, Renee L. Jackson, C. Erik Hawes

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES .....................................................................v

STATEMENT OF RELATED CASES ................................................... viii

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF THE ISSUES...............................................................2

INTRODUCTION AND STATEMENT OF THE CASE........................................3

STATEMENT OF FACTS ........................................................................7

   A.   The Original Litigation. .................................................................9

   B.   Bridgeport Designs Around the '488 Patent. .................................10

   C.   Arlington Distinguishes Between Cylindrical and Frustroconical Electrical Connectors. ...................................................................13

   D.   The Parties' Prior Unrelated Patent Actions. .................................13

   E.   Arlington Files this Contempt Action. ...........................................14

   F.   Arlington's Faulty Analysis...........................................................14

   G.   Bridgeport's Analysis. ..................................................................19

   H.   Claim Construction.......................................................................21

   I.   The District Court's Contempt Order.............................................24

   J.   Arlington's Lost Profits. ...............................................................25

   K.   Arlington's Attorneys' Fees and Costs...........................................28

SUMMARY OF ARGUMENT ...............................................................30

STANDARD OF REVIEW .....................................................................32

ARGUMENT .......................................................................................................33

I.  THE DISTRICT COURT ERRONEOUSLY HELD THAT
    BRIDGEPORT'S NEW CONNECTORS WERE COLORABLE
    IMITATIONS OF ITS OLD CONNECTORS. ............................................33

    A.  Different Limitations Are Now at Issue. ...............................................36

    B.  The New Connectors Are More than Colorably Different. ...................37

        1.  The New Connectors are a Drastically Different Shape. ................37

        2.  The New Connectors are Significantly Easier to Use. ....................39

        3.  The Adaptor on the New Connectors is Attached in a Different
            Way and Creates a More Reliable Electrical Connection. ...............41

        4.  The Grommet on the New Connectors is Carried by the
            Frustroconical Adaptor. ..................................................................45

    C.  The District Court Improperly Relied on Rahn's Calculations. ............45

        1.  Rahn's Concocted Methodology. ...................................................46

        2.  The District Court Wrongly Conflated Three Surfaces to
            Form One. .......................................................................................49

        3.  Rahn's Irrelevant Millivolt Drop Tests. ...........................................55

    D.  Bridgeport's New Connectors are Protected by Patents. .......................56

II. THE DISTRICT COURT'S CLAIM CONSTRUCTIONS AND
    FINDING OF INFRINGEMENT WERE ERRONEOUS. ...........................56

    A.  "An External Cylindrical Surface" .......................................................56

        1.  The District Court failed to apply the indefinite article rule. ...........57

        2.  The District Court impermissibly broadened "cylindrical,"
            inconsistent with the intrinsic and extrinsic evidence. .....................60

        3.  The District Court erroneously considered its construction of the
            phrase "cylindrical outbound end" in an unrelated patent...............65

    B.  "Spring Steel Adaptor Surrounding Said Leading End External
        Cylindrical Surface"................................................................................66

    C.  The District Court's Finding of Infringement Must Be Reversed.........68

iii

III.  THE DISTRICT COURT ENTERED AN OVERBROAD
      INJUNCTION..............................................................................................69

IV.   THE DISTRICT COURT ERRED WHEN IT AWARDED
      ARLINGTON 100% OF ITS LOST PROFITS. ..........................................71

V.    THE DISTRICT COURT ERRONEOUSLY AWARDED
      ARLINGTON ALL OF ITS CLAIMED COSTS. .......................................74

CONCLUSION ...................................................................................................76

ADDENDUM ....................................................................................................A1

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott Labs.v. Torpharm, Inc.*,
    503 F.3d 1372 (Fed. Cir. 2007) ..........................................................36

*Advanced Fiber Tech. (AFT) Trust v. J & L Fiber Servs., Inc.*,
    674 F.3d 1365 (Fed. Cir. 2012) ...........................................................61

*Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*,
    340 F.3d 1298 (Fed. Cir. 2003) ...........................................................63

*Arbek Mfg. v. Moazzam*,
    55 F.3d 1567 (Fed. Cir. 1995) ..................................................... 34, 37

*Arlington Indus. v. Bridgeport Fittings*, Inc.,
    759 F.3d 1333 (Fed. Cir. 2014) ........................................... viii, 10, 70

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
    2014 U.S. App. LEXIS 16697 (Fed Cir., Aug. 29, 2014) ...................65

*Arlington Industries, Inc. v. Bridgeport Fittings, Inc.*,
    2007 U.S. Dist. LEXIS 88968 (M.D. Pa. Dec. 4, 2007) ....................66

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
    512 F.3d 1338 (Fed. Cir. 2008) ................................................. 50, 57

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*,
    262 F.3d 1258 (Fed. Cir. 2001) ...........................................................61

*Cover v. Potter*,
    2008 U.S. Dist. LEXIS 66753 (S.D.N.Y. Aug. 29, 2008)..................75

*Creative Internet Advertising Corp. v. Yahoo!, Inc.*,
    476 Fed. Appx. 724 (Fed. Cir. 2011)..................................................58

*Cybor Corp. v. FAS Techs., Inc.*,
    138 F.3d 1448 (Fed. Cir. 1998) (en banc) .........................................32

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993)........................................................... 46, 47, 48

*Eli Lilly & Co. v. Medtronic, Inc.*,
   915 F.2d 670 (Fed. Cir. 1990) ............................................................69

*Ferguson Beauregard v. Mega Sys., LLC*,
   350 F.3d 1327 (Fed. Cir. 2003) .........................................................62

*General Electric Co. v. Joiner*,
   522 U.S. 136 (1997)................................................................... 46, 49

*Grain Processing Corp*. v. Am. Maize-Prods. Co.,
   185 F.3d 1341 (Fed. Cir. 1999) .........................................................72

*Halliburton Energy Servs. v. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008) .........................................................49

*International Rectifier Corp. v. IXYS Corp.*,
   361 F.3d 1363 (Fed. Cir. 2004) ............................................ 64, 65, 70

*Joy Techs., Inc. v. Flakt, Inc.*,
   6 F.3d 770 (Fed. Cir. 1993) ...................................................... 32, 69

*KSM Fastening Sys. v. H.A. Jones Co.*,
   776 F.2d 1522 (Fed. Cir. 1985) ................................................. 35, 36

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)........................................................................47

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
   134 S.Ct. 2111 (2014)............................................................... 68, 69

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) ................................................. 68, 69

*Medrad, Inc. v. MRI Devices Corp.*,
   401 F.3d 1313 (Fed. Cir. 2005) .........................................................66

*Micro Chem. Inc. v Lextron, Inc.*,
   318 F.3d 1119 (Fed. Cir. 2003) .........................................................71

*Perri v. Resorts Int'l Hotel, Inc.*,
   2014 U.S. Dist. LEXIS 6223 (D.N.J. Jan. 16, 2014).........................75

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ................................................ 60, 61

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
711 F.3d 1348 (Fed. Cir. 2013) ...................................................60

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
674 F.3d 158 (3rd Cir. 2012) .......................................................32

*Shum v. Intel Corp.*,
629 F.3d 1360 (Fed. Cir. 2010) ...................................................32

*Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*,
637 F.3d 1269 (Fed. Cir. 2011) ...................................................32

*Smithkline Diagnostics, Inc. v. Helena Laboratories Corp.*,
926 F.2d 1161 (Fed. Cir. 1991) ...................................................72

*Stover v. Riley*,
30 F. Supp. 2d 501 (E.D. Pa. 1998) .............................................75

*Stumbo v. Eastman Outdoors, Inc.*,
508 F.3d 1358 (Fed. Cir. 2007) ...................................................63

*Sullivan v. Chrysler Motors Corp.*,
1997 U.S. Dist. LEXIS 2503 (D.N.J. Feb. 28, 1997) .....................75

*TiVo, Inc. v. EchoStar Corp.*,
646 F.3d 869 (Fed. Cir. 2011) .................................32-36, 50, 51, 55, 56, 68, 69

*Vitronics Corp. v. Conceptronic*,
90 F.3d 1576 (Fed. Cir. 1996) .....................................................61

*Warner Chilcott Labs. Ir. Ltd. v. Impax Labs., Inc.*,
2013 U.S. Dist. LEXIS 167429 (D.N.J. Apr. 18, 2013) ..................76

*Zimmerman v. Portfolio Recovery Assocs., LLC*,
2013 U.S. Dist. LEXIS 174182  (S.D.N.Y. Dec. 11, 2013) .............75

**Statutes**

28 U.S.C. § 1295(a)(1)...............................................................1

28 U.S.C. §1332(a)(1)................................................................1

## <u>STATEMENT OF RELATED CASES</u>

On July 17, 2014, this Court dismissed Bridgeport's initial appeal in this matter for lack of jurisdiction.  *Arlington Indus. v. Bridgeport Fittings*, Inc., 759 F.3d 1333 (Fed. Cir. 2014).

# JURISDICTIONAL STATEMENT

This is an appeal from two final orders. The first found that Bridgeport's new frustroconical-shaped connectors were colorable imitations of its old cylindrical-shaped connectors, infringed claim 1 of U.S. Patent No. 6,335,488, and awarded Arlington lost profits, attorneys' fees, and expenses in an undetermined amount. The second awarded Arlington $495,648.79 in lost profits, $1,527,632.35 in attorneys' fees, and $282,839.55 in expenses. The District Court had jurisdiction pursuant to 28 U.S.C. §1332(a)(1).

Bridgeport timely filed notices of appeal from the final orders on June 27 and July 8, 2014. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## <u>STATEMENT OF THE ISSUES</u>

1.     Did the District Court err when it found that Bridgeport's new frustroconical-shaped connectors were colorable imitations of its old cylindrical connectors, even though  the new connectors were designed to avoid the "an external cylindrical surface" limitation and to operate in a substantially different and better way?

2.     Did the District Court err when it construed the claim term "cylindrical" as having "the *approximate* form of a cylinder," made other claim construction errors, refused to construe other limitations in the asserted method claim because they did not constitute "features" of the connector, and thereby found Bridgeport's new connectors infringed the method claim in issue?

3.     If this Court does not reverse the finding of contempt, did the District Court err when it permanently enjoined all sales and uses of the new connectors, including those that do not infringe the asserted method claim, and awarded Arlington lost profits for all uses of the new connectors and all of its alleged costs despite its failure to submit any supporting documentation?

## INTRODUCTION AND STATEMENT OF THE CASE

Plaintiff-Appellee Arlington Industries, Inc. ("Arlington") and Defendant-Appellant Bridgeport Fittings, Inc. ("Bridgeport") are fierce competitors in the electrical products and fittings market.  On November 30, 1993, Arlington received U.S. Patent No. 5,266,050 ("the '050 patent"), which disclosed a quick-connect fitting for electrical junction box.  On January 1, 2002, Arlington received U.S. Patent No. 6,335,488 ("the '488 Patent"), which claims a method for using a quick-connect fitting to attach armored or metal clad electrical cable to an electrical junction box.  After the '050 Patent expired in December 2011, Arlington initiated this contempt action alleging that Bridgeport's innovative frustroconical electrical connectors violated a consent injunction agreed by Bridgeport in settlement of multiple actions with Arlington in 2004.

This case is a thinly veiled attempt by Arlington to improperly broaden the scope of its patent rights to remove Bridgeport's superior frustroconical connectors from the market.  The District Court found Bridgeport was in contempt and that its frustroconical connectors infringed method claim 1 of the '488 Patent based on numerous legal and factual errors.

As part of a global settlement in 2004, Bridgeport admitted its old cylindrical-shaped connector models 590DCS and 590DCSI ("Old Connectors") infringed the '488 Patent.  Thereafter, Bridgeport invested many months

3

researching and developing a new innovative electrical connector that avoided, *inter alia*, the limitation in claim 1 requiring "a member having a leading end with an external cylindrical surface…."  Bridgeport marketed its new frustroconical-shaped connectors as Whipper-Snap® models 38ASP and 380SP ("New Connectors").  Unlike the Old Connectors, which had a cylindrical leading end with straight parallel sides, the New Connectors have a sloping frustroconical leading end, which allows them to operate in substantially different and better ways than the Old Connectors.

Nearly eight years later, Arlington brought a motion for contempt claiming that the New Connectors violated the 2004 settlement.  Because there was no claim construction or finding of infringement in the original action, the District Court essentially held a summary infringement proceeding, which limited the arguments and defenses that Bridgeport could raise.  After four days of hearings, the District Court found in favor of Arlington

Although the claim construction and infringement arguments advocated by Arlington were significantly broader than what it alleged in 2004, the District Court nonetheless decided these matters in a contempt proceeding for the first time rather than a new patent infringement action. The District Court ultimately accepted Arlington's argument that the proper construction of the term "cylindrical" is having the "*approximate* form of a cylinder."  This overly broad

construction is inconsistent with the unambiguous claim language and is not supported by the specification or any dictionary definition or industry standard.

Based upon this erroneous claim construction, the District Court improperly held that the New Connectors were no more than colorably different than the Old Connectors. The District Court wrongly disregarded Bridgeport's undisputed evidence that the New Connectors functioned in substantially different ways and achieved substantially different results. Instead, it relied on Arlington's expert's flawed analysis, based on a non-standard, litigation-concocted formula, to conclude that the redesign from a cylindrical leading end to a frustroconical one was insignificant. The District Court even accepted Arlington's dubious argument that the new frustroconical shaped connectors are *more* cylindrical than the old cylindrical connectors. Arlington's expert essentially concluded that cones are more cylindrical than cylinders.

Although the '488 Patent only claims a method for a specific use of a connector, the District Court enjoined all sales and uses of the New Connectors. This overbroad injunction prohibits Bridgeport from lawfully selling the New Connectors for non-infringing uses and converts the method patent into a product patent. The District Court compounded its error by awarding Arlington 100% of its alleged lost profits based on its overbroad injunction, despite undisputed evidence that many of the New Connectors were used in non-infringing ways and

Arlington could not have captured all of Bridgeport's sales "but for" Bridgeport's alleged infringement.

Based upon its erroneous findings of colorable imitation and infringement, the District Court awarded Arlington attorneys' fees and all of its costs. Arlington, however, failed to present any invoices or supporting documentation to evidence its alleged costs. Thus, Arlington failed to meet its burden of proof and the District Court should have denied all of its costs.

## STATEMENT OF FACTS

On March 19, 2013, the District Court entered an Order finding that
Bridgeport's new patented frustroconical connectors (left) were merely colorable
imitations of its old enjoined cylindrical connectors (right):

 

A408.  It is self-evident that the changes to the leading end of the New Connectors
are not mere "window-dressing," but rather a significant and intentional redesign.
Bridgeport designed around the limitation requiring a connector "having a leading
end with *an external cylindrical surface*."

The '488 Patent is a method patent.  A31-42.  Claim 1 states:

1.  A method for attaching an armored or metal clad electrical cable to
a junction box comprising:

providing a *junction box* having an aperture;

providing a member having a leading end with *an external cylindrical
    surface* and a trailing end with an inner diameter;

providing a *spring steel adapter surrounding said leading end
    external cylindrical surface* for snap fitting into said aperture;

7

providing a spring steel loading ring inserted into said trailing end inner diameter;

restricting rearward withdrawal motion of said spring steel locking ring from said member;

receiving an armored or metal clad cable in said spring steel locking ring; and

preventing removal of said armored or metal cable in a rearward direction from said spring steel locking ring.

A41.

The Old Connectors met the "an external cylindrical surface" limitation by having at least three such surfaces with straight parallel sides:



A470. To design around this limitation and also improve the function and ease of use, Bridgeport eliminated the lip on the front edge of the connector and tapered the entire external surface so that it had no straight, parallel sides.

8



A409.  The reduced diameter of the frustroconical leading end provides several

improvements in the function and how the connector is used.  A4594-95, A4611.

### A. The Original Litigation.

In 2002, Arlington alleged that Bridgeport's Old Connectors infringed claim

1 of the '488 Patent.  Only steps five, six, and seven were in issue.  A305-306,

A312-316.  The limitations "an external cylindrical surface" and "spring steel

adapter surrounding said leading end external cylindrical surface" limitations

(italicized above) were not contested.

Before a *Markman* hearing was held, the parties reached a global settlement

of multiple actions involving both method and non-method patents.  A3920-35.  As

part of the settlement, Bridgeport executed a Confession of Judgment and

Injunction ("Old Injunction"), which enjoined it from selling the Old Connectors

or any colorable imitations.  A63-69.  Nothing in the Old Injunction prevented

9

Bridgeport from competing with Arlington or designing around the '488 Patent. *Id.* This Court recently held that the Old Injunction applied to "products which infringe the method of claim 1 of the '488 [P]atent." *Arlington Indus. v. Bridgeport Fittings, Inc.*, 759 F.3d 1333, 1338 (Fed. Cir. 2014).

### B. Bridgeport Designs Around the '488 Patent.

Following the settlement, Bridgeport designed a new electrical connector that would not infringe the method claimed in the '488 Patent. A378. This involved months of trial and error, which resulted in a new connector featuring an unique frustroconical leading end. A378-79.

 

A393, A408. Because of the frustroconical shape of the New Connectors' leading end and adaptor, they are quicker and easier to insert into a knockout hole than the Old Connectors, as shown below. A393-97.

10



A394.  The reduced diameter of the New Connector's leading end allows it to have

a tolerance for misalignment that is twenty five times (25x) greater than the Old

Connectors.  A395-97.  This greater tolerance allows the New Connectors to enter

a junction box at an angle, which was not possible with the Old Connectors.  A397.

For end users, the practical advantage is quicker and easier installation, because the

locking tangs of the New Connectors can be hooked over the edge of an aperture,

and then snapped into place with an audible "click."  A4594-95, A4611.



This ease of use makes the New Connectors particularly suited for use in flat panel lighting fixtures, which are made of thinner metal. A4589-92, A4601, A4616, A4811-12. Ease of entry is one of the goals of the product patents that underlie the '488 Patent. A31. This leveraged instillation method is unique to Bridgeport's New Connectors.

To remove the Old Connectors, the end-user had to remove the entire spring steel adaptor with a tool. A397. In the process of removal, the adaptor would become distorted, rendering the entire connector useless. In contrast, the frustroconical design of the New Connectors allows the end-user to easily remove the connector by depressing one of the two locking tangs. *Id.* Not only does the adaptor stay on the connector during removal, but the entire connector is reusable. A379-81.

The Old Connectors maintained contact with the wall of the aperture using only two tensioning tangs. A400. The New Connectors have four tensioning tangs and the locking tangs also contact the wall of the aperture, for a total of six independent contact zones with the aperture. *Id.* Six independent contact zones increases the reliability of electrical connection of the New Connectors, which is critical in dusty construction zones and buildings intended to stand for decades. *Id.*, A2775-76.

The USPTO considered Bridgeport's new frustroconical connector non-obvious compared to the prior art and granted Bridgeport U.S. Patent No. 6,916,988 on July 12, 2005.  A542-50.  Bridgeport did not market the New Connectors until after the USPTO issued the patent.  A383-84.  Bridgeport has obtained twelve patents relating to its frustroconical electrical connectors.  A380, A407.

### C. Arlington Distinguishes Between Cylindrical and Frustroconical Electrical Connectors.

For purposes of this litigation, Arlington has argued that cylindrical and frustroconical shapes are equivalent.  Arlington, however, distinguished between the two shapes in sworn submissions made to the USPTO.  For example, in U.S. Patent No. 7,161,095, Arlington described a cylindrical adaptor (called a "snap ring" in the specification) as having an advantage over frustroconical adapters.  A397-98.  Arlington also obtained a patent covering an electrical connector featuring a frustroconical "snap ring" adaptor.  *Id*.

### D. The Parties' Prior Unrelated Patent Actions.

After Bridgeport introduced its New Connectors, and prior to the filing of this contempt proceeding, the parties litigated various Whipper-Snap® connectors and the '050 Patent – a now-expired product patent for an electrical connector.  To establish infringement in that litigation, Arlington relied on alleged functional

13

"ramps" located on the frustroconical leading end of the New Connectors.  A2317-18.



These purported "ramps," which Arlington describes as a "significant structure," do not exist on the Old Connectors.  A1093, A2322.

### E. Arlington Files this Contempt Action.

On December 12, 2009, three days prior to the expiration of the '050 Patent, Arlington alleged for the first time that the New Connectors infringed the method in claim 1 of the '488 Patent.  A1001-04.  Bridgeport denied Arlington's accusations because it was confident it had successfully designed the New Connectors to avoid infringement.  *Id.*

### F. Arlington's Faulty Analysis.

The District Court and Arlington acknowledged that Bridgeport made legitimate modifications to the leading end on the New Connectors.  A98. Arlington's expert, Christopher Rahn, admitted that the leading end of the New Connectors is not a cylinder.  A2353.  He further agreed that the Old Connectors

14

had three separate external cylindrical surfaces and that claim 1 required only at least one external cylindrical surface.  A2333.  Rahn also admitted that the New Connectors function in a different way with respect to their ability to enter an aperture at an angle.  A3155-56.

To reach his opinions regarding colorable imitation and infringement, Rahn relied on tricks and deception.  He concocted a formula allegedly for determining shapes.  Because no engineer or product designer has ever used this formula, Rahn called it a "standard deviation analysis" and produced several academic papers (mostly written by him) that included the phrase "standard deviation analysis." The papers, however, discussed using standard deviation as part of a statistical analysis; not to determine the shape or cylindricity of an object.  *See* A2716-19. Properly used, standard deviation is a tool to measure the dispersion in a distribution of data, not a method to determine shape.  A413.

Rahn's formula is not a "standard deviation analysis."  He added an additional step and divided his "standard deviation" calculation by the mean of the data with which he started.  A2715.  This distorts the data by resulting in a non-representative calculation of the shape.  A1961, A2756.

Rahn's opinion was based entirely upon distorted data.  On the Old Connectors he did not use diameter measurements from the front cylinder, center cylinder, or rear cylinder alone.  Rather, he treated the three as a single surface.

15

Therefore, even though all three cylinders have straight parallel sides, Rahn's formula and calculation suggest that the Old Connectors have external cylindrical surfaces with variable diameters. Rahn's analysis does not comport to generally accepted engineering standards and defies common sense, as no reasonable person could find that the front, center, or rear cylinders have sloping or variable diameters. *See* A129-30, A198, A2334-35.



A129. This was therefore not an "apples to apples" comparison, but a comparison of an artificial shape on the Old Connectors to the sloped shape on the New Connectors.

Using this concocted methodology, Rahn obtained a deviation of 5% from a perfect cylinder for each of the Old Connectors. A198. He obtained a "deviation" of 3-4% for the New Connectors. *Id.*, A1194-95. Thus, Rahn's analysis indicated

that the frustroconical leading ends of the New Connectors were more cylindrical

than the cylindrical leading ends of the Old Connectors:

| Old Connectors | Rahn's Opinion – *Less* Cylindrical |
|---|---|

New Connectors                    Rahn's Opinion – *More* Cylindrical



Rahn never established a baseline for establishing whether a shape is cylindrical or not. A2361-62. He opined that 5% deviation is close enough to be cylindrical, while any other number may or may not be sufficient. *Id.*

Rahn did not use the American Society of Mechanical Engineers (ASME) test of cylindricity. A2356; *see* A3272-74. After receiving Bridgeport's analysis, he allegedly applied the ASME Standard to compare the cylindricity of the Old and New Connectors. A1069-72. However, rather than apply the ASME standard to either the front cylinder or center cylinder or rear cylinder on the Old Connectors, Rahn again combined them together and analyzed them as a single surface. A1071-82, A1196-97. As a result of this flawed analysis, Rahn concluded that the

18

Old Connectors differed from a cylinder by 5.46%, while the New Connectors differed by 5.54%. A1196.

Rahn also opined that the New Connectors were colorable imitations because the sloped leading end does not impact electrical resistance. A1099-1103, A1949-53. Bridgeport, however, never alleged that the frustroconical shape impacted electrical resistance. Rahn's argument was a straw man intended to divert attention from the actual improvements in the function and way resulting from Bridgeport's change in shape. A1956-59, A2341. Moreover, Rahn's test and opinion were irrelevant and misleading because he never actually tested the electrical resistance of a New Connector. A2340-41. Instead, he tested a connector created by Arlington for the specific purpose of providing an infringement opinion in this litigation. A2339.

### G. Bridgeport's Analysis.

Rather than creating a litigation driven formula, Bridgeport's expert's (Dr. J. Brian P. Williamson) opinions were based upon the ASME Standard using a Coordinate Measuring Machine (CMM). A440-41. A CMM machine uses a probe to measure the surface of an object and then determines the shape of that object. *Id.* When the CMM analyzed the frustroconical leading end of the New Connectors, it could not calculate the cylindricity because it deviated too far outside the standards for a cylinder. A441.

19

Bridgeport's second expert, Professor Walter Herbst, the director of Northwestern University's Master of Product Design and Development program, opined that due to the re-design from a cylindrical leading end to a frustroconical one, the New Connectors were significantly different from the Old Connectors. A460, A467-71.  He explained that cylinders and cones (including frustroconical shapes) are recognized at a very young age as dramatically different shapes. A2455-59.  According to Professor Herbst, a cone does not require any particular slope – a conclusion with which Rahn agreed.  A2460-61, A2325.  Bridgeport's Old Connectors had cylindrical surfaces with parallel sides:



A470.  Bridgeport's New Connectors have a frustroconical shape where the sides are not parallel, but sloped:



A470.  Indeed, Rahn agreed the leading end of the New Connectors was not a cylinder.  A2353.  Dr. Williamson made the same observation using cutaways through the axial length of the New Connectors.  A437-38.  Professor Herbst also testified that the frustroconical shape of the New Connectors provides mechanical advantages, including that they can be inserted into an opening at an angle, while the Old Connectors have to be inserted straight on.  A2470-71.

### H. Claim Construction.

Because the frustroconical leading ends on the New Connectors do not have the form of a cylinder, Arlington's infringement analysis was based upon a new and overly broad construction of the "an external cylindrical surface" limitation. Arlington argued that the plain and ordinary meaning is a "surface on the outside of the leading end having the *approximate* form of a cylinder."  A140.  However,

Arlington could not identify any definition for "cylindrical" that included the word "approximate."  A2349.

Rahn admitted that the patentee never used the word "approximate" to describe "an external cylindrical surface."  A2346-48.  *See* A31-42.  He admitted that the claim language "an external cylindrical surface" is singular.  To support his proposed construction he argued that the specification figures show cylindrical surfaces with "varying cross sections."  A1080.  But the specification merely shows that the leading end can have more than one cylindrical surface, which is entirely consistent with the claim language that requires "*an* external cylindrical surface."[1]  A4 (emphasis added).

---

[1] He also agreed there are three separate cylindrical surfaces on the Old Connectors.  A2333.



FIG. 6

Nothing in the patent claims or specification supports Rahn's position that the front (red) and rear (yellow) cylinders must be construed as a single surface.

Dr. Williamson construed "cylindrical surface" to mean "the surface of a straight elongated body that has a circular cross-section which remains constant along the body's axial length." A427, A2802-03. Professor Herbst similarly construed "cylindrical" to mean "an elongated body that has a circular cross-section that remains constant along its axial length." A463, A2490. Because the leading ends of the New Connectors do not have circular cross sections that remain constant anywhere along their axial length, Dr. Williamson opined that use of the New Connectors did not infringe claim 1 of the '488 Patent. A436-41.

23

## I.  The District Court's Contempt Order.

After four days of evidentiary hearings, the District Court found Bridgeport in contempt of the Old Injunction.  Although the parties presented over 1,000 pages of testimony, the District Court did not cite to a single page.  *See* A1-30.  Without mentioning that Bridgeport had received patents on its frustroconical design, it concluded that the New Connectors were colorable imitations of the Old Connectors.  A17.  Although the specification makes no mention of electrical resistance and Bridgeport never argued that the frustroconical shape caused a change in electrical resistance, the District Court relied on Rahn's dubious testing of an imitation connector.  *Id*.  It failed to address any of Bridgeport's evidence regarding substantial differences in way and result caused by the change from a cylindrical leading end to a frustroconical leading end.  *See* A16-17.

In its claim construction, the District Court broke the "an external cylindrical surface" in two.  It first construed "an external … surface" to mean "everything forward of the back flange of the connector's leading ends, except for the lip."  A10.  Then it construed "cylindrical" to mean "having the *approximate* form of a cylinder."  A22 (emphasis added).  It did not consider or address the indefinite article rule or rely on a dictionary for the ordinary meaning of "cylindrical."  It also failed to reconcile its construction with the patentee's use of other terms of approximation in the specification and other patent claims with regard to other

24

limitations.  *See* A22-23.  Based upon its flawed constructions, the District Court held that the New Connectors infringed the '488 Patent.  A25.

The District Court then enjoined *all* sales of the New Connectors ("New Injunction").  A29-30.  Bridgeport therefore has been precluded from selling the New Connectors, even for non-infringing uses that do not involve a junction box.

### J.  Arlington's Lost Profits.

Arlington moved to recover its lost profits from Bridgeport.  It did not rely on any analysis for the time period at issue or the competing products available on the market, but instead relied almost exclusively on a jury verdict from 2009 that awarded it lost profits based upon a two supplier theory involving a different patent.  A4830-31.

Bridgeport presented undisputed evidence that the New Connectors were used primarily in non-infringing lighting fixture applications, which do not include a junction box as required by claim 1.  A419- 25.  Approximately 73% of the New Connectors were used in applications other than with junction boxes.  A4589-92.  Bridgeport's damages expert further opined that Arlington's damages claim was overstated for a number of reasons.  A4654-85.

Bridgeport identified a number of non-infringing substitutes that compete with Arlington's commercial embodiment.  These competing products market the same features as the New Connectors and Arlington's commercial embodiment:

25

| Product | Image | Selling Features |
|---------|-------|------------------|
| Arlington Snap2It Connectors |  | "For AC · MCI-A · HCF steel and aluminum cable · Flexible metal conduit steel and aluminum (regular and reduced wall) · MCI cable continuous corrugated aluminum · AC90.<br><br>Zinc die-cast. Concrete tight when taped.<br><br>**NO TOOLS!**<br>· Safe and fast installations<br>· Saves about 17 seconds per fitting!<br>· Competitively priced" |
| Bridgeport New Connectors |  | "LOCK & LOAD.<br><br>One simple action – push and click – and The WHIPPER-SNAP® is in and secure. And it comes out as easy as it goes in – ready to reuse.  Available in single and duplex models, with a unique push-through design that eliminates snags and wire damage." |
| Raco Redi-Loc |  | "REDI-LOC Connector is a patented snap-in design. MCI, AC and HCF Cable can be securely installed in outlet boxes or enclosures in seconds without tools or locknuts. The REDI-LOC Connectors cut installation by 33% over competing termination methods. Compact single unit design, no need to worry about loose components or fumbling with protruding hardware. Snaps tightly into the knockout, no need to worry about loose connections. Zinc electroplated for corrosion protection." |

| Product | Image | Selling Features |
|---------|-------|------------------|
| Thomas and Betts Steel City XC-130 |  | "**Description:**<br>Steel Snap-In Fittings for MC cable. Accommodates the widest range of MC cable size in the industry - 14-2 to 10-3.<br><br>**Features**<br>No set screws, locknuts or tools required to attach MC cable to a box or enclosure. Patented one-piece spring steel construction.<br>Removable and re-usable as well as accommodating the widest range of MC cable sizes in the industry - 14-2 to 10-3<br>Ideal for commercial construction or pre-fabricated electrical wiring assemblies." |
| Sigma Double Snap Lock |  | "**Install this AC/MC cable fitting without tools.**<br><br>The new Double Snap Lock® Connector from Sigma is a real time saver.  Simply push onto BX cable and snap into junction box on the other end of the conduit.<br><br>**Features**<br>• Robust bushing<br>• Fits 14/2-10/3 cable<br>• Removable and reusable" |

A5247-49; A5302-16.

One such product, the Sigma 38ADS, has been continuously available since mid-2011, but was not available during the earlier, unrelated jury trial in 2009. A4596, A4813-14, A5317-18.  Bridgeport began selling the Sigma 38ADS (shown as "Sigma Double Snap Lock" above) as a replacement for the New Connectors

27

after the New Injunction.  At least 20% of Bridgeport's customers for New Connectors chose to purchase the Sigma 38ADS rather than switch to an Arlington connector.  A5249-50, A5287-301.  Therefore, conclusive evidence existed that Arlington would not have made 100% of Bridgeport's sales if the New Connectors were not on the market.

Despite this evidence, the District Court awarded Arlington $495,648.79 in lost profits, which constitutes lost profits on 100% of Bridgeport's sales.  A7a.  Although Bridgeport had irrefutable evidence it had successfully converted at least 20% of its New Connector customers to the Sigma 38ADS, the District Court dismissed this evidence simply because Arlington's vice-president baldly stated in a declaration that the Sigma 38ADS was not an acceptable non-infringing substitute.  *See* A4a.  While the District Court did not disagree that approximately 73% of the New Connectors were used in non-junction box applications, it relied on its overbroad injunction to ignore this fact, because the injunction enjoined all sales of the New Connectors, regardless of whether they were used in a manner which infringed claim 1 of the '488 Patent.  *See* A6a.

### K. Arlington's Attorneys' Fees and Costs.

The District Court also awarded Arlington attorneys' fees and costs.  A29-A30.  Arlington's fee petition sought almost $3 million – over five times its alleged damages.  A9a.  Arlington submitted bills from 34 separate timekeepers from

28

London, New York, San Francisco, Washington, D.C., and Pennsylvania, replete with unexplained, excessive rate increases (in one case over 103%) and duplicative billings, despite arguing that the case was "leanly staffed." A4888, A5322-23.

Arlington also claimed costs and expenses in the amount of $282,839.55. A4893-95. Arlington did not submit any invoices to support this claim. Instead, Arlington only provided summary tables and line items on its counsel's billing statements. These line items contained such unhelpful descriptions as "Meals," "Express Delivery," "Outside Duplicating," "Consulting Fees," and "Air fare." A4937, A4944, A4974, A4984, A5027. Arlington did not submit a single invoice from any vendor or third party for any of its claimed costs and expenses. A27a. No evidence exists to correlate Arlington's claimed costs to any person or task. By withholding the relevant invoices, Arlington prevented Bridgeport from making specific objections to Arlington's claimed costs. Although it acknowledged that Arlington had failed to produce any supporting invoices detailing its costs, the District Court found that Arlington's attorney bills were adequate to evidence all its costs. *Id.*

## SUMMARY OF ARGUMENT

The District Court erroneously held Arlington proved, by clear and convincing evidence, that the New Connectors were not more than colorably different from the Old Connectors. But this summary proceeding involved different limitations than were in issue in the prior litigation. The redesign was a substantial improvement over the Old Connectors (and Arlington's competing product) that resulted in significant changes in the way the New Connectors work and their results. The District Court also erred by adopting the scientifically unsound and unsupported opinions of Rahn, and ignoring Bridgeport's substantial evidence of novelty.

The District Court erroneously construed "cylindrical" to mean "having the *approximate* form of a cylinder." This construction is <u>not</u> the ordinary meaning of "cylindrical," is inconsistent with the intrinsic record of the '488 Patent, and impermissibly rewrote and broadened the claim. The District Court also misconstrued the "surrounding" limitation. Based on a proper claim construction, the New Connectors do not infringe the '488 Patent.

If this Court does not reverse the District Court's finding of colorable imitation or infringement, it must modify the scope of the New Injunction. The District Court erred as a matter of law when it enjoined Bridgeport from selling

any New Connectors regardless of whether they are used in a method that infringes the '488 Patent.

The District Court erroneously awarded Arlington 100% of its lost profits. It wrongly ignored undisputed evidence that Bridgeport had retained at least 20% of its New Connector customers by offering a noninfringing substitute product, and despite evidence of changed market conditions, price elasticity, and the existence of other noninfringing substitutes. The District Court also ignored undisputed evidence that 73% of Bridgeport's New Connectors were used in a manner that did not infringe claim 1.

Finally, while the District Court admitted that Arlington failed to substantiate its costs, it improperly awarded Arlington 100% of its claimed expenses. Arlington's expenses were not supported by any third party invoices. As a result, Bridgeport was prevented from being able to credibly review and contest them.

## <u>STANDARD OF REVIEW</u>

This Court reviews findings of colorable imitation and infringement in contempt proceedings for clear error. *TiVo, Inc. v. EchoStar Corp.*, 646 F.3d 869, 883 (Fed. Cir. 2011). Any award of sanctions is reviewed for abuse of discretion. *Id*. The Court reviews claim construction *de novo*. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (*en banc*). With regard to the grant and scope of an injunction, this Court reviews for abuse of discretion. *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 772 (Fed. Cir. 1993). Whether lost profits are legally compensable is reviewed *de novo*. *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1287 (Fed. Cir. 2011).

This Court applies regional circuit law when evaluating an award of costs. *Shum v. Intel Corp.*, 629 F.3d 1360, 1370 (Fed. Cir. 2010). In the Third Circuit, an award of costs is reviewed for abuse of discretion. *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 674 F.3d 158, 167 (3rd Cir. 2012).

## ARGUMENT

**I.   THE DISTRICT COURT ERRONEOUSLY HELD THAT BRIDGEPORT'S NEW CONNECTORS WERE COLORABLE IMITATIONS OF ITS OLD CONNECTORS.**

Bridgeport's New Connectors are not only a significant redesign of the Old Connectors, but an entirely new concept.  A378-81.  When Bridgeport began designing the New Connectors in 2004, the idea of having a connector with a frustroconical leading end was "out of the box" thinking, illustrated by the numerous patents Bridgeport has received on its new design.  Although it serves the same general function of joining metal clad cable to a knockout hole, the New Connectors perform this function in a substantially different way with substantially different results.  These substantial differences arise from the changes to a frustroconical leading end and adapter, which directly relate to clauses two and three of claim 1 of the '488 Patent.  Despite these improvements, the District Court wrongly relied on Rahn's litigation-driven analysis.

Under *TiVo*, "the party seeking to enforce the injunction must prove both that the newly accused product is not more than colorably different from the product found to infringe and that the newly accused product actually infringes." "[C]ontempt is a severe remedy, and should not be resorted to where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct."  *TiVo*, 646 F.3d at 881-882.  A contempt proceeding "is not a sword for wounding a former

33

infringer who has made a good-faith effort to modify a previously adjudged or admitted infringing device to remain in the marketplace," but a "shield protecting the patentee against an infringer's *flagrant disregard* for court orders." *Arbek Mfg. v. Moazzam*, 55 F.3d 1567, 1570 (Fed. Cir. 1995) (emphasis added). "[T]he modifying party generally deserves the opportunity to litigate the infringement question at a new trial, 'particularly if expert and other testimony subject to cross-examination would be helpful or necessary.'" *Id*. Indeed, the contempt analysis should "take account of the policy that legitimate design-around efforts should always be encouraged as a path to spur further innovation." *TiVo*, 646 F.3d at 882.

"The primary question on contempt should be whether the newly accused product is so different from the product previously found to infringe that it raises 'a fair ground of doubt as to the wrongfulness of the defendant's conduct.'" *Id*. This analysis "must focus not on differences between randomly chosen features of the product found to infringe in the earlier infringement trial and the newly accused product, but on those aspects of the accused product that were previously alleged to be, and were a basis for, the prior finding of infringement." *Id*. "When one or more of those elements previously found to infringe has been modified, or removed, the court must make an inquiry into whether that modification is significant." *Id*. "If those differences between the old and new elements are significant, the newly accused product as a whole shall be deemed more than

colorably different from the adjudged infringing one, and the inquiry into whether the newly accused product actually infringes is irrelevant." *Id.* A product is not more than colorably different only if it "do[es] the same work in substantially the same way, and accomplish[es] substantially the same result." *KSM Fastening Sys. v. H.A. Jones Co.*, 776 F.2d 1522, 1527 (Fed. Cir. 1985).

"The significance of the differences between the two products is much dependent on the nature of the products at issue." *Id.* Courts may look to relevant prior art to determine whether the modification would have been obvious to a person having ordinary skill in the art at the time the modification was made. *TiVo*, 646 F.3d at 882. "A nonobvious modification may well result in a finding of more than a colorable difference." *Id.* at 882-883. If the "court concludes that there are no more than colorable differences between the adjudged infringing product and modified product, a finding that the newly accused product continues to infringe the relevant claims is additionally essential for a violation of an injunction against infringement." *Id.* at 883.

*TiVo* mandates that "the patentee bears the burden of proving violation of the injunction by clear and convincing evidence, a burden that applies to both infringement and colorable differences. *Id.* at 883. Proving contempt remains a "heavy burden." *KSM*, 776 F.2d at 1524.

35

## A. Different Limitations Are Now at Issue.

This contempt proceeding raises significant questions of equity and fairness. Unlike *Tivo*, here the contempt arguments were based upon limitations, proposed claim constructions, and infringement arguments that were never alleged let alone successful in the original case. A2308-09. Arlington readily admitted that its previous expert did not offer a proposed construction of "cylindrical."[2] A2308, A2310. The District Court received three expert reports from Rahn, two from Dr. Williamson, and one from Professor Herbst. The evidentiary hearing spanned four days and produced in excess of 1,000 pages of transcript. The complexity of the issues and volume of evidence went well beyond that which is appropriate for summary disposition via contempt. *See Abbott Labs. v. Torpharm, Inc.*, 503 F.3d 1372, 1379 (Fed. Cir. 2007).

This Court "counsels caution in contempt proceedings," and has advised that when a party has made a good faith effort to modify a previously admitted infringing device to stay in the marketplace, "the modifying party generally

---

[2] Arlington's expert in the original action proposed a construction for step two of claim 1, but did not include the qualifier "approximate" when defining the form of a cylinder. A278. Regardless of whether Arlington has now changed its claim construction, its new broader construction raises significant questions of fairness. *See TiVo*, 646 F.3d at 883. "The patent owner may not, in contempt proceedings, seek to broaden the scope of the claims which were adjudicated and, thereby, catch the modified device." *KSM,* 776 F.2d at 1529.

deserves the opportunity to litigate the infringement question at a new trial."

*Arbek*, 55 F.3d at 1569-1570.  Bridgeport should not have been forced to litigate an

entirely new infringement action in a limited summary contempt proceeding.

### B. The New Connectors Are More than Colorably Different.

Bridgeport presented substantial unchallenged evidence that the New

Connectors are more than colorably different from the Old Connectors.  Thus,

Arlington could not have met its heavy burden of proving that no colorable

differences exist between the New and Old Connectors by clear and convincing

evidence.

1.    <u>The New Connectors are a Drastically Different Shape.</u>

While the Old Connectors featured a leading end with straight, parallel sides,

the leading end of the New Connectors slopes, such that the sides are not parallel.

The external surface of the New Connectors is not uniform.  There are recessed

sections and elevated areas ("ramps" for allegedly pushing the adaptor outward).

A2317-18.



Rahn admitted that the surface of the New Connectors is not a cylinder. A2353.

Professor Herbst testified that the change from a cylindrical design to a

frustroconical one was significant. A469-71, A2462-63. Cylinders and cones are

basic primitive shapes, and even a child can distinguish between the two. A2456-

58, A3275. A visual inspection (see above) easily reveals that the leading ends of

the Old and New Connectors are two drastically different shapes.

    In addition to not being cylindrical, the New Connectors' leading ends are

comprised of various conical surfaces that have no equivalent on the Old

Connectors:



A3280.



A409.  As shown above, the lugs are yellow, the "ramps" are green, and the

recessed area is teal.  There are sixteen separate surface facets on the New

Connectors, all of which have sloping exterior surfaces.  A2757-2758.

Rahn admitted, "The ramp is a significant structure on the leading end of the

[New] Connector."  A1093.  This significant structure did not exist on the Old

Connectors.  In a prior unrelated case between the parties, Rahn relied heavily on

the presence of the "ramps" to establish infringement of the '050 Patent.  A2317-

24.  It is not credible to find, as the District Court did, that the New Connectors are

no more than colorably different when Rahn admitted in two separate actions that

the New Connectors possessed a "significant" new feature.

2.    The New Connectors are Significantly Easier to Use.

Ease of use and of insertion are intended benefits of the invention disclosed

in the '488 Patent.  A3153-54.  Unlike the Old Connectors, the frustroconical-

shaped New Connectors have a greater tolerance for misalignment and can be

inserted at an angle.  A4594-95, A4611.  Because the New Connectors are easier to

insert and use, they improve upon the problem contemplated by the '488 Patent.

39

A2119.  Such real-world improvements can hardly be dismissed as mere window dressing.

The frustroconical leading end allows a user to use leverage to attach the connector to an aperture by "hooking" a locking tang over the edge in the opening. A2471, A394-97, A2702.  This "hooking" also allows an end-user to come into the aperture blindly, an advantage not present with the Old Connectors.  A2471, A394-97, A2783-85, A2702.  Rahn admitted that the New Connectors function in a different way:

> Q. Well, you can't – do you think you can do this with one of the enjoined connectors, go in at an angle like this and hook it over one of the locking tangs and snap it in?
>
> A.  You can go in at an angle.  I would say *the locking tangs probably function in a different way.*

A3155-56 (emphasis added).



The New Connectors also can be easily removed and reused.  To remove the Old Connectors, a screwdriver or a similar implement was required to pry off the

adaptor.  The New Connectors can be removed simply be pressing down with a screwdriver and then reused.  A397, A2330-31.  Rahn admitted this was a benefit not available on the Old Connectors.  *Id*.  The greater ease with which the New Connectors can be removed is not a trivial benefit.  One of the top three selling features of the New Connectors was that they can "be removed easily, so you wouldn't have to discard the whole product if you stuck it in the wrong hole in the box."  A2642-43.

These innovative features led the New Connectors to be primarily used on flat plate lighting fixtures, which could be damaged by cylindrical shaped connectors such as Arlington's product and the Old Connectors due to the brute force required to jam them into the aperture.  A4588-92, A4616, A4811-12.  As a result, approximately 73% of the New Connectors sold were used in flat plate lighting fixtures, as opposed to junction boxes.  A4589-90.

     3.   <u>The Adaptor on the New Connectors is Attached in a Different Way and Creates a More Reliable Electrical Connection.</u>

A critical function of the external cylindrical surface on the Old Connectors and in the '488 Patent is to provide a "seat" for the adaptor, which allows the connector to be affixed into a knockout hole.  A40, col. 7, l. 29; A3150.  Although the frustroconical external surface on the New Connectors shares the same function, it does so in a substantially different way with substantially different results.

41

The adaptor on the Old Connector was held in place by two metal flanges on either side of the adaptor:



A402.  Because the adaptor rested between the flanges and could freely spin, it did not create a good electrical contact due to the lack of a firm connection.  A2773-74, A2329; *see also* A702.

Bridgeport developed a new way in which to attach the adaptor to the connector body, utilizing a frustroconical adaptor that would clip over lugs on the leading end.  A378-79.



A405.  On the New Connector, the adaptor "slips over the lugs and then bites upwards into them…."  A2774.  Unlike the Old Connectors, the adaptor on the New Connectors cannot spin.  A2329.  While the Old Connectors had "a contact between two pieces of metal which loosely are pressed together," the New Connectors have "a contact between pieces of metal which actually dig into each other."  A2774.  Therefore, the tighter connection between the adaptor and connector body on the New Connectors "assures you of long-term reliability."  A2702-03, A2774

On the Old Connectors, the primary method of electrical contact between the adaptor and the aperture was through four small teeth that dug into the wall of the box:





A2774-75.  Because of their frustroconical design, the New Connector's adaptor

contacts the aperture via the two large anchor tabs and the four tensioning tangs.

*Id*.  This results in 65% of the circumference of the aperture being contacted by the

adaptor on the New Connectors, instead of the mere 12% contact achieved by the

Old Connectors.  A2775.  By employing six separate, large contacts, the New

Connectors have a substantially different method of connecting to the aperture, are

more resistant to vibration, and have greater long-term reliability.  *Id*.

The New Connectors also grip the aperture in a new way.  On the Old

Connectors, the tensioning tangs were simple springs – meaning they are attached

at one end to the adaptor and bend at the other end when the adaptor was pushed

into the aperture.  A2777-78.  In contrast, the four tensioning tangs on the New

Connectors extend over the ramps on the external surface of the leading end.

A2778, A2375-76.  When pressed into an aperture, the tangs are pushed downward onto the edges of the "ramps," which makes the tensioning tangs stiffer.  *Id*.  As a result, the tensioning tangs press against the aperture with greater force, which creates a more secure and long-term electrical contact.  *Id*.  These are critical features for electrical connectors.  The more reliable electrical contact is a dramatic improvement, a feature that was not present either literally or in any equivalent form on the Old Connectors.  A2778.

> 4.    The Grommet on the New Connectors is Carried by the Frustroconical Adaptor.

The change to a frustroconical shape also led to manufacturing improvements and cost savings.  The leading end of one model of the Old Connectors carried an insulating grommet, requiring the manufacture and stocking of two separate connector bodies.  A2765.  On the New Connectors, the grommet is carried on the frustroconical adaptor, so only a single connector body needs to be manufactured and stocked, resulting in significant cost savings.  A2765.  A change that requires a different manufacturing process and results in cost savings can hardly be considered mere window dressing or insignificant.

**C. The District Court Improperly Relied on Rahn's Calculations.**

The District Court wrongly relied on Rahn's litigation-driven analysis and calculations.  The entirety of Rahn's opinions were devised with one goal in mind: to capture the New Connectors and their dramatically different design within claim

45

1 of the '488 Patent.  By admitting and relying on unsound opinions, the District

Court abused its discretion.

1.    Rahn's Concocted Methodology.

The trial court must act as "gatekeeper" to ensure "that an expert's testimony

both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v.*

*Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).  This inquiry requires "a

preliminary assessment of whether the reasoning or methodology underlying the

testimony is scientifically valid and of whether that reasoning or methodology

properly can be applied to the facts in issue."  *Id*. at 592-93.[3]

Reliable expert testimony must be grounded "in the methods and procedures

of science," and signify knowledge beyond "subjective belief or unsupported

speculation."  *Id*. at 590.  At the same time, "conclusions and methodology are not

entirely distinct from one another," and "[a] court may conclude that there is

simply too great an analytical gap between the data and the opinion proffered."

*General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Under *Daubert*, a court should consider whether the expert's approach:  (1)

can be or has been tested; (2) has been subjected to peer review and publication;

(3) has a known or potential error rate when applied; and (4) has been generally

---

[3] Bridgeport brought a *Daubert* motion to exclude Rahn's "standard deviation
analysis," which the court denied.  *See* A1333-64, A1793.

accepted in the relevant scientific, technical, or professional community. *Daubert*, 509 U.S. at 593-94. Ultimately, the court must ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999), such that the expert's work product amounts to "good science." *Daubert*, 509 U.S. at 593.

The proponent of the expert testimony bears the burden of establishing the admissibility of such testimony. *See id.* at 593 n.10. In challenging proposed expert testimony, a defendant need not "come forward with 'scientific evidence'" negating the expert's claims, but may "point out deficiencies in plaintiff's proof." *Id.*

Rahn's concocted methodology was an outcome determinative analysis derived solely for this litigation. The proper use of standard deviation is to measure the dispersion in a frequency distribution using a statistical method, not to determine the shape of an object. A413. But Rahn's methodology was not a normal standard deviation analysis. He added an extra step and divided his answer from the standard deviation calculation by the mean of the data with which he started. A2715. This Court must not be confused by Rahn's misleading use of the phrase "standard deviation analysis." Dr. Williamson had never seen another engineer use Rahn's concocted methodology. *Id.*

47

The reason is evident from an experiment Dr. Williamson conducted, where he measured two areas of a single conical surface using Rahn's concocted methodology. Despite taking two measurements from a single conical surface, Dr. Williamson found a deviation of 1.5% for one portion, and 12.6% for the second. In contrast, the ASME Standard gave a uniform cylindricity deviation of 0.2 inches on both parts. A1961, A2756. Rahn's concocted methodology compares changes in surface diameter at specific points while ignoring the overall shape across the surface. The '488 Patent merely speaks to the shape (cylindrical) of the surface and not to diameters or elevation changes between surfaces. Rahn's methodology has no basis in engineering or connection to the '488 Patent, and is nothing more than smoke and mirrors.

Rahn's concocted methodology has not been subjected to peer review or publication. A2350-51. In response to Bridgeport's *Daubert* motion, Rahn produced three articles, two of which he co-authored, as alleged support for his concocted methodology. *See* A1502-19. But none of these papers actually used Rahn's concocted methodology to determine shape or even mentioned it. A2716-19. One paper used a true standard deviation to estimate the typical random error component of measurements. A2718. Rahn simply passed off irrelevant articles which the District Court blindly accepted.

48

Rahn never identified any baseline for his concocted methodology and therefore, it is impossible to determine a potential error rate. Rahn's concocted methodology varies wildly even on the same surface. *See* A1961, A2756. Moreover, he never established a baseline that would determine whether a given shape was cylindrical or not. A2361-62. Apparently, whether an object is cylindrical under Rahn's concocted methodology depends on whether he says so. Such *ipse dixit* is insufficient as a matter of law. *See General Electric Co.*, 522 U.S. at 146. This Court has rejected attempts to define claims in a way that is not quantifiable by a person of ordinary skill in the art, and must do so here. *See, e.g., Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244, 1254-55 (Fed. Cir. 2008).

Rahn also did not consult anyone prior to creating his concocted methodology to determine shape. A2350, A1502-19. He did not produce any evidence that his "standard deviation analysis" has been used in any industry, recognized by any engineering body, or related to any recognized way of determining cylindricity. A2719. Given the inherent unreliability of Rahn's "standard deviation analysis," the District Court erred in admitting and relying upon it.

 2. The District Court Wrongly Conflated Three Surfaces to Form One.

For purposes of the colorable differences analysis, the District Court ignored the actual claim language "an external cylindrical surface," and instead defined "an

49

external … surface." *See* A9-10.  It did not explain its piecemeal construction or omission of the critical adjective "cylindrical."  *Id.*  The District Court allegedly relied on the '488 Patent specification that refers to the "reduced diameter seat" to hold that the "an external … surface" means "everything forward of the back flange of the connector's leading ends, except for the lip."  A10; *see also* A39, col. 6, ll. 2-4; A40, col. 7, ll. 34-38.

The District Court's claim construction analysis wrongly ignored the indefinite article rule, which says that an indefinite article "a" or "an" means "one or more."  *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008).  The District Court was required to interpret "*an* external … surface" as providing for one or more surfaces.[4]  By construing everything between the rear flange and the lip as one surface, the District Court conflated three surfaces to form one and violated the rule.  It relied on this erroneous construction to find that the New Connectors were not more than colorably different than the Old Connectors.

The District Court was required to compare the infringing elements of the Old Connectors to the New Connectors to determine whether any of the elements have been modified or removed.  *See TiVo,* 646 F.3d at 882.  Relying on its

---

[4] The lower court's construction is also inconsistent with the specification, which states that the flange and lip "define the boundaries."  A40, col. 7, l. 36.  Multiple surfaces can lie in the reduced diameter area and still be bounded by the flange and lip.

erroneous construction, the District Court improperly compared the entire surface between the rear flange and lip on the Old Connector to the entire leading end surface of the New Connectors.  A10.

When the phrase "an external … surface" is properly construed, the Old Connectors clearly had three separate external cylindrical surfaces:



This is consistent with Rahn's testimony that "at least one" external cylindrical surface is required for infringement.   A3152.

A proper colorable imitation analysis involves individually comparing each of the three cylindrical surfaces from the Old Connector to the leading end of the New Connectors to determine if any of them have been modified or removed.  *See TiVo*, 646 F.3d at 882.  Regardless of which of the three external cylindrical surfaces is compared to the leading end of the New Connectors, they have all been significantly modified.  There are no comparable cylinders on the leading end of the New Connectors, as compared to the Old Connectors, as shown below:



By conflating measurements on the three surfaces together, the court – and Rahn – skewed the cylindricity of the Old Connectors. This allowed Rahn to make the incredible assertion that the frustroconical New Connectors were more cylindrical than the Old Connectors, which the District Court implicitly accepted. A130-31, A1194-97, A2304.

When Rahn measured the Old Connectors using his concocted methodology, he took measurements on the central recessed area and the two ridges. A129-30, A198. By combining these measurements, Rahn created an artificial shape and concluded that the Old Connectors deviated from a perfect cylinder by 5%. A198. Turning his concocted methodology to the New Connectors, Rahn obtained a deviation of 4% for the 38ASP and 3% for the 380SP. *Id*.; A1194-95. Rahn concluded that this shape:



was more cylindrical this shape:



This assertion defies common sense, but follows as a result of Rahn's perverse logic.

Rahn performed his concocted methodology only on the recessed area and found the deviation from a cylinder on the Old Connectors was "on the order of .3, .4 percent." A2335. Dr. Williamson made those measurements using Rahn's concocted methodology to compare the Old and New Connectors. A2722-25. Using Rahn's formula, Dr. Williamson found that the "standard deviation" of the Old Connectors was indeed 0.3 and 0.4 percent. A2723-24. When compared with the "standard deviation" of 3.9% Rahn obtained for the New Connectors under his

litigation-created formula, the New Connectors are ten times farther from being cylindrical than the Old Connectors.  A2724; *see also* A1956-65.

The District Court incorrectly rejected Dr. Williamson's measurements on the Old and New Connectors.  Dr. Williamson used the universally accepted ASME Standard.  A414-16, A457-59.  Using this method, and measuring the recessed central area of the Old Connectors, Dr. Williamson established that the Old Connectors deviated from a cylinder by .003 of an inch.  A2731.  He then established that the New Connectors deviated from a cylinder by .065 of an inch – more than twelve times greater than the Old Connectors.  A2731-33.  Using the ASME Standard, the CMM could not calculate any similarity between the New Connectors and a cylinder.  A441, A2753.

In a footnote, the District Court "reject[ed] Dr. Williamson's relative cylindricity calculation, which included the lugs on the Accused Connectors but not the lips on the Enjoined Connectors and thus resulted in an inconsistent comparison."  A17, n.8.  The District Court's criticism is without basis.  Dr. Williamson performed a cylindricity analysis both with and without the lip on the Old Connectors, and in both cases, the New Connectors were further from a cylinder than the Old Connectors.  A1959-60.  Such an analysis was necessary and prudent given that Bridgeport had to prepare its defense in short order and there was no claim construction of the '488 Patent.

54

3.   <u>Rahn's Irrelevant Millivolt Drop Tests.</u>

The District Court's colorable imitation finding was also erroneously based upon on a series of irrelevant millivolt drop tests performed by Rahn. A13-14, A16-17.  Bridgeport never alleged that the New Connectors had substantially improved electrical *resistance*.  Bridgeport established that the frustroconical leading end and adapter allowed the New Connectors to achieve greater long term *reliability*.  Rahn's "test" was a straw man that had nothing to do with long term reliability.  A1956, A2779-80.

Moreover, Rahn's tests were not based on any limitation of claim 1 of the '488 Patent.  *See* A1099-1103, A1948-53.  When asked to identify where "voltage resistance" was required by the '488 Patent, he admitted that "[t]here's no reference to it."  A3150-51.  Instead, he opined that it is relevant to the "function" of the New Connector.  A3151.  But a test showing no significant change in voltage resistance is not clear and convincing evidence of colorable imitation when there is no allegation of significant change in that function.  To meet its burden of proof, Arlington had to show *no* significant changes, not merely identify one similar function.  *See TiVo,* 646 F.3d at 882-883.

The District Court's reliance on Rahn's testing was also erroneous because he did not even compare Old and New Connectors.  A2340-41. Instead, he tested New Connectors against a mockup connector that was

created by Arlington for purposes of litigation.  A2338-41.  This is not the

product-to-product comparison that *TiVo* mandates.

### D. Bridgeport's New Connectors are Protected by Patents.

The District Court failed to consider that the New Connectors are covered by

patents.  *See TiVo*, 646 F.3d at 882 & n.1.  Bridgeport has obtained twelve patents

on its frustroconical designed electrical connectors.  A380, A2796.  Dr.

Williamson opined that these patents cover the New Connectors.  A407.  By

granting Bridgeport patents on a frustroconical design, the USPTO explicitly

acknowledged that they represented a novel and useful invention compared to the

prior art, which included Arlington's patents relating to cylindrical connectors.

Under this Court's admonition in *TiVo*, this fact weighs heavily against a finding

of colorable imitation.

### II.   THE DISTRICT COURT'S CLAIM CONSTRUCTIONS AND FINDING OF INFRINGEMENT WERE ERRONEOUS.

### A. "An External Cylindrical Surface"

The District Court failed to apply basic patent law when it construed the

limitation "an external cylindrical surface."  Based upon the intrinsic evidence and

consistent dictionary definitions, Bridgeport construed this limitation to mean "an

outer surface of an elongated body that has a circular cross-section which remains

constant along the body's axial length."  A427.  Arlington argued that the phrase

should be construed to mean "a surface on the outside of the leading end having the *approximate* form of a cylinder." A140 (emphasis added).

The District Court construed the term to mean "having the *approximate* form of a cylinder." *See* A10; A20-23 (emphasis added). This construction was predicated on a series of errors. First, the District Court construed "an external … surface" based on the parties' colorable imitation arguments and the Old Connectors. It therefore ignored the indefinite article rule, which tainted its subsequent claim construction analysis. Second, it adopted a construction for "cylindrical" that is inconsistent with the intrinsic and extrinsic evidence and impermissibly broadened the scope of claim 1. By inserting a term of approximation, the District Court improperly rewrote the limitation to broadly cover features that were never disclosed by the patentee. Finally, the District Court relied, at least in part, on a construction of the term "cylindrical" from a different infringement case involving an unrelated product patent where the term is used to describe a different feature. This ad hoc analysis caused the District Court to commit numerous errors.

1.   The District Court failed to apply the indefinite article rule.

This Court has repeatedly held that "an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *Baldwin Graphic Sys.,* 512 F.3d at 1342. The

57

"one or more" construction is a "bedrock rule of patent law," with very limited

exceptions. *Creative Internet Advertising Corp. v. Yahoo!, Inc.*, 476 Fed. Appx.

724, 735 (Fed. Cir. 2011).

Rahn acknowledged the indefinite article rule and that the limitation "*an*

external cylindrical surface" means "you need at least one surface."  A3152.

Nevertheless, the District Court failed to apply this bedrock rule of patent law.[5]

Under the District Court's construction, the entire blue area below is "an external

… surface":



FIG. 6

---

[5] The District Court's confusion about this claim construction rule and its colorable imitation analysis is evidenced by its belief that Bridgeport had "offered different theories as to what constitutes 'an external … surface.'"  A9-10.  Merely identifying different areas of the Old Connectors as *an* external cylindrical surface is not a "different theory," but rather recognition that the indefinite article rule requires the limitation to be construed to include one or more external cylindrical surfaces.

A34.  The specification, however, only states that the flange and lip "define the boundaries."  A40, col. 7, l. 36.  The patentee did not say that the surface must adjoin the flange and lip.

The indefinite article rule dictates that the limitation be construed to include one or more external surfaces.  Such a construction is consistent with the specification.  The larger diameter red cylinder and the smaller diameter yellow cylinder below are two external surfaces that are both bounded by the rear flange and lip:



*Id*.  This is also consistent with Rahn's admission that the connector needs one or more external surfaces, as required by claim 1.  *See* A3152.

Because the District Court's construction violates the rule that the indefinite article "an" means "one or more," this Court should reject it. Moreover, this erroneous construction also infected the District Court's construction of the term "cylindrical."

>    2.    The District Court impermissibly broadened "cylindrical,"
>           inconsistent with the intrinsic and extrinsic evidence.

Construing a claim term begins with the words of the claim, and if it has a plain and ordinary meaning, the court's inquiry ends. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1361 (Fed. Cir. 2013). Only when a claim term does not have an ordinary meaning and its meaning is not clear from the claim, should a court turn to the remaining intrinsic evidence, including the specification, to aid in its construction. *Id.* Courts may "rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1322-23 (Fed. Cir. 2005).

Both parties agree that "cylindrical" is unambiguous and carries its ordinary meaning. *See* A110; A141; A361. However, Rahn asserted that the plain and ordinary meaning of "cylindrical" is "having the *approximate* form of a cylinder." A141-42 (emphasis added). His only authority was Webster's Third New International Dictionary, which defines "cylindrical" as "relating to or having the form or properties of a cylinder." *Id.* Nothing in Webster's definition supports the

60

inclusion of the adverb "approximate," which impermissibly broadens the definition to include other geometric shapes.[6]  *See* A428; A466.  Although the only authority cited by Arlington refutes its overly broad definition of "cylindrical," the District Court adopted it.  This was improper.  *See Phillips*, 415 F.3d at 1318; *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1584 (Fed. Cir. 1996).

The ordinary meaning of "cylindrical" is exactly what Webster's says it is – "having the form of a cylinder."  *See Advanced Fiber Tech. (AFT) Trust v. J & L Fiber Servs., Inc.*, 674 F.3d 1365, 1374-75 (Fed. Cir. 2012).  Webster's defines a "cylinder" as "the surface traced by a *straight line* moving parallel to a fixed *straight line* and intersecting a fixed planar closed curve."  A447 (emphasis added).  This Court, therefore, should hold that the proper construction of "cylindrical" is "having a form consisting of a straight elongated body that has a circular cross-section which remains constant along the body's axial length."  *See* A427-28, A473-74; *see also* A427.

After a court determines the ordinary meaning of a term, it must confirm that it is consistent with the intrinsic record.  *Ferguson Beauregard v. Mega Sys., LLC*,

---

[6] There is a "heavy presumption" in favor of the ordinary meaning of claim language.  *Bell Atl. Network Servs., Inc. v. Covad Comm'ns Grp., Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001).  To overcome this presumption, the patentee must "clearly set forth" and "clearly redefine" a claim term away from its ordinary meaning.  *Id.*  By arguing for an overly broad meaning, Arlington redefined "cylindrical" without having to overcome the heavy presumption.

350 F.3d 1327, 1338-39 (Fed. Cir. 2003). Here the intrinsic record is inconsistent with the District Court's construction.

The patentee knew how to use terms of approximation when he wanted to avoid a strict mathematical or geometric boundary. He described the inside diameter of the locking ring as being "*approximately* the same as the inside diameter of the shoulder." A38, col. 4, ll. 34-35 (emphasis added). He also disclosed that "tang 40 is displaced from tang 40a *approximately* one hundred twenty degrees along the inner circumference of steel locking ring 20." A39, col. 5, ll. 65-67 (emphasis added). When discussing the preferred embodiment, the patentee stated that the "*generally* tubular-shaped die-cast member 128 has a central flange 130 located *approximately* mid-way along its length." A40, col. 7, ll. 26-28 (emphasis added). Most importantly, in both the specification and claim 2, the patentee placed the adverb "generally" before the adjective "cylindrical" when describing the "spring steel locking ring."[7] A39, col. 5, ll. 2-3, 13-14; A41, col. 10, ll. 18-19.

A person of ordinary skill would understand the patentee's intent when including terms like "approximately" and "generally" to describe features of the connector. A person of ordinary skill would understand the difference and

---

[7] The patentee also used numerous terms of approximation when discussing the prior art. *See, e.g.*, A37, col. 1, ll. 58-59; col. 2, ll. 3-4; col. 2, ll. 6-7.

significance of the patentee's decision to use both "cylindrical" and "generally cylindrical" in the claims – the former referring to a true cylinder whereas the latter encompassing shapes that deviate from a true cylinder. *See* A428-29, A464-65. The patentee's explicit use of terms of approximation in other instances weighs heavily against the District Court's insertion of the term "approximate" into its construction of "cylindrical." Moreover, its construction renders the term "generally" in claim 2 superfluous. *See Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1311-12 (Fed. Cir. 2003). A claim construction that renders claim language superfluous is almost always incorrect. *See Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1362 (Fed. Cir. 2007).

The District Court concluded that its construction was supported by the specification and accompanying embodiments because they "portray an external cylindrical surface on the leading end of a connector that has varying cross-sections along its axial length." A22. Its conclusion, however, is completely wrong. The specification does not disclose "varying cross-sections," but rather multiple straight-sided cylinders of different diameters. The cross-section of each cylinder does *not* vary along its axial length. The larger diameter cylinder has straight sides and if those sides are extended, they will never intersect. The same is true with respect to the smaller diameter cylinder:



FIG. 6

A34. Nothing in the specification or embodiments supports the District Court's inclusion of the adverb "approximately" to sweep other undisclosed geometric shapes (such as cones) into the limitation.

This Court reversed a similar claim construction in *International Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363 (Fed. Cir. 2004). There, the district court construed "polygonal" to be "generally but not perfectly polygonal—i.e., the surface expression of the base will be a closed figure with generally (not necessarily perfectly) straight sides." *Id.* at 1370. This Court began its claim construction analysis with the definition of "polygonal" from Webster's Dictionary, which is "a closed figure consisting of straight lines joined end to end." *Id.* at 1371. It reviewed the patent and determined that the depictions and descriptions were "consistent with the dictionary definition." *Id.* Although this

Court acknowledged that the formation process of the polygonal base regions "blurs the outline of the regions" and that one figure in the patent depicted the base with "slightly rounded corners," that did not support the district court's construction. *Id*. This Court ruled that patentees must be held accountable for their draftsmanship. *Id*. at 1372.

Here, the District Court erroneously broadened the construction of "cylindrical" to allow frustroconical shapes. The patentee could have used a term of approximation to describe the "an … external surface." He did not. Just as in *International Rectifier*, this Court must hold the patentee accountable for his draftsmanship.

3. <u>The District Court erroneously considered its construction of the phrase "cylindrical outbound end" in an unrelated patent.</u>

The District Court noted that in a different litigation involving the same parties it construed the phrase "cylindrical outbound end" in U.S. Patent No. 6,521,831 ("the '831 Patent").[8] A21. The '831 Patent is not in the same family as the '488 Patent.[9] More importantly, the District Court's construction of "cylindrical outbound end" was based on its determination that the limitation

---

[8] This Court recently affirmed, *inter alia*, the USPTO's invalidation of claims 1, 5 and 6 of the '831 Patent. *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 2014 U.S. App. LEXIS 16697 (Fed Cir., Aug. 29, 2014).

[9] The '831 Patent discloses a duplex connector. None of the connectors at issue here are duplex connectors.

included both the rear flange and front flange, *i.e.*, the lip. *Arlington Industries, Inc. v. Bridgeport Fittings, Inc.*, 2007 U.S. Dist. LEXIS 88968 at *36-39 (M.D. Pa. Dec. 4, 2007). The parties agree that "an external cylindrical surface" does *not* include the rear flange or lip in the '488 Patent. If anything, the District Court's construction of "cylindrical outbound end" supports Bridgeport's construction of "an external cylindrical surface," because if the rear flange, cylinders, and lip mean "having the approximate form of a cylinder," then the cylinders alone must be more narrowly construed. The District Court's reliance on the '831 Patent was erroneous and does not support its construction of "cylindrical." *See Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1318 (Fed. Cir. 2005).

## B. "Spring Steel Adaptor Surrounding Said Leading End External Cylindrical Surface"

Limitation three of claim 1 requires "a spring steel adaptor surrounding said leading end external cylindrical surface…." A41, col. 10, ll. 1-2. The District Court adopted Arlington's proposed construction and construed the term "surrounding" to mean "significantly borders." A24. The District Court, however, failed to engage in any meaningful claim construction analysis. Instead, it improperly relied upon another court's claim construction from a different action involving an unrelated patent and mischaracterized Bridgeport's proposed construction.

The specification discloses that the die cast member has a reduced diameter area for receiving an adapter. A38, col. 4, ll. 15-17. It also describes the reduced diameter area as the "seat" to accommodate an adapter. A40, col. 7, ll. 36-37. "Seat" refers to something that serves as the base or bottom support for something. This is consistent with the figures, which illustrate that the adapter sits on top of the external cylindrical surface. *See* A32, Fig. 1. Bridgeport therefore proposed that "spring steel adaptor surrounding said leading end external cylindrical surface" be construed as "the die cast connector body has a spring steel adaptor that is on the outside of the smooth cylindrical section and which encircles the external cylindrical surface." A430. The District Court rejected Bridgeport's construction, claiming there was no support for requiring an adapter that "'[completely] encircles' the external cylindrical surface." A24 (insertion in original). Bridgeport, however, never used the adjective "completely" in its proposed claim construction and acknowledged that the adapter can have slits and openings in it. *See, e.g.*, A38, col. 4, l. 1.

The District Court construed "surrounding" to mean "significantly borders." A24. This construction is overbroad because it does not require that the adapter be entirely on the outside of the cylindrical surface. Nowhere in the intrinsic record does the cylindrical surface extend outside the adapter. Such a broad construction is also inconsistent with the specification's description of the cylindrical surface as

67

the "seat" to accommodate the adapter.  Therefore, this Court should reverse the

District Court's construction of "spring steel adaptor surrounding said leading end

external cylindrical surface" and adopt Bridgeport's proposed construction.

### C. The District Court's Finding of Infringement Must Be Reversed.

Once it is determined that the New Connectors are no more than colorably

different (which the District Court improperly found), the court "is required to

evaluate the modified elements of the newly accused product against the asserted

claim, on a limitation by limitation basis, to ensure that each limitation continues to

be met." *TiVo*, 646 F.3d at 883.  Here, under a proper claim construction,

Bridgeport's New Connectors do not infringe the method described in claim 1 of

the '488 Patent.  A435-47, A2812-19.

In its Order, the District Court impermissibly conflated infringement into

colorable imitation and merely compared the nonsensical "surface deviations"

between the Old and New Connectors.  A25.  Under such an analysis, every

colorable imitation is an infringing product and the second step of a contempt

proceeding is little more than a rubber stamp.

The '488 Patent is a method patent.  This means that the electrical connector

described in the patent can be legally manufactured and sold, provided it is not

*used* in the claimed method.  *See Limelight Networks, Inc. v. Akamai Techs., Inc.*,

134 S.Ct. 2111, 2117 (2014); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301,

1317 (Fed. Cir. 2009). Here, the District Court inexplicably precluded Bridgeport from presenting any noninfringement arguments relating to steps 1, 4, 5, 6, and 7 of claim 1. A1774. Therefore, it refused to construe the limitation "junction box" or allow Bridgeport to present evidence demonstrating non-infringement of step one. *See* A1793. *TiVo* does not instruct or permit courts to convert a method patent into a product patent. Yet the District Court did just that.

Moreover, Arlington failed to offer any evidence that even a single Bridgeport customer actually practiced any of the steps of claim 1. A party cannot be liable for induced infringement unless there is evidence that inducement led to actual infringement. *Limelight Networks, Inc.*, 134 S.Ct. at 2118. Here, no evidence exists that Bridgeport's marketing materials actually induced any customer to practice the steps of the patented method. The District Court's finding of infringement must be reversed.

## III.   THE DISTRICT COURT ENTERED AN OVERBROAD INJUNCTION.

If this Court does not reverse the District Court's finding of contempt, it must modify the overbroad scope of the New Injunction. "A method claim is not directly infringed by the sale of an apparatus even though it is capable of performing only the patented method." *Joy Techs.*, 6 F.3d at 774-75. *See also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009); *Eli Lilly & Co. v. Medtronic, Inc.*, 915 F.2d 670, 674 (Fed. Cir. 1990). In contempt

69

proceedings, "the only acts the [new] injunction may prohibit are infringement of the patent by the adjudicated devices and infringement by devices not more than colorably different from the adjudicated devices." *Int'l Rectifier*, 383 F.3d at 1316.

Here, Arlington presented evidence of only one act of direct infringement by Bridgeport. A2289-90; *see also* A2299-2300. The same evidence also showed the New Connectors being used in a non-infringing application by snapping into a flat metal plate used for light fixtures, which is *not* a junction box. A3640-43. In the electrical connector industry, terms such as "junction box" are standardized and precise. A421-24. "Junction box" would not refer to a flat metal plate used for light fixtures. A419-25. Therefore, if the New Connectors are used in an application not involving junction boxes, they do not infringe the method claimed in the '488 Patent, which requires "providing a junction box having an aperture." A41.

As this Court has recently held, the Old Injunction only enjoins those products that "infringe the *method* of claim 1 of the '488 patent." *Arlington Indus.*, 759 F.3d at 1338. The District Court, however, did not limit its injunction to sales of the New Connectors that infringe the method claimed in the '488 Patent, *i.e.*, connectors used with a "junction box." A29-30. Instead, it enjoined all sales of the New Connectors during the term of the '488 Patent. Effectively, the District Court enjoined the New Connectors as if the '488 Patent was a product patent, not

70

a method patent.  This was erroneous.  This Court must limit the scope of the New

Injunction to methods which infringe claim 1 of the '488 Patent.

## IV.  THE DISTRICT COURT ERRED WHEN IT AWARDED ARLINGTON 100% OF ITS LOST PROFITS.

Despite objective evidence that Arlington failed to capture all of

Bridgeport's sales for the New Connectors following the New Injunction and

evidence of other quick connect fittings on the market, the District Court awarded

Arlington 100% of its lost profits.  A7a.  The District Court based its decision

primarily on the overbroad scope of the New Injunction, which enjoined all sales

of the New Connectors, regardless of the method of use.  The District Court's

damages determination was wrong and must be reversed.

In order to show entitlement to lost profits under a two-supplier market

theory, the patentee must show:  "1) the relevant market contains

only two suppliers, 2) its own manufacturing and marketing capability to make the

sales that were diverted to the infringer, and 3) the amount of profit it would have

made from these diverted sales."  *Micro Chem. Inc. v Lextron, Inc.*, 318 F.3d 1119,

1124 (Fed. Cir. 2003).  The first step in this analysis is to establish the market,

which, as a starting point, is defined by the patented invention.  *Id.*

"The relevant market also includes other devices or substitutes similar in

physical and functional characteristics to the patented invention."  *Id.*  A non-

infringing substitute product, by definition, does not "represent an embodiment of

the [patented] invention," and court may therefore consider "the realities of the marketplace in connection with an assertion that 'but for' the infringing activities, the patent owner would have made the sales." *Smithkline Diagnostics, Inc. v. Helena Laboratories Corp.*, 926 F.2d 1161, 1166 (Fed. Cir. 1991). "[I]f the realities of the market are that others would likely have captured sales made by the infringer, despite a difference in the products, it follows that the 'but for' test is not met." *Id*.

"Acceptable substitutes that the infringer proves were available during the accounting period can preclude or limit lost profits." *Grain Processing Corp*. v. Am. Maize-Prods. Co., 185 F.3d 1341, 1353 (Fed. Cir. 1999). The critical period for evaluating acceptable substitutes is during the period for which the patent owner claims damages. *Id*. "Important factors shaping demand may include customers' intended use for the patentee's product, similarity of physical and functional attributes of the patentee's product to alleged competing products, and price." *Id*. at 1355.

Arlington is not entitled to 100% lost profits under either the two-supplier or *Panduit* tests. The District Court ignored the requirements for establishing entitlement to lost profits and wrongly held that "customer behavior during the injunction period dictates Arlington's entitlement to lost profits." A6a.

This decision flies in the face of basic damages principles.  First, the District Court held that because the New Injunction prohibited all uses of the New Connectors – including uses that do not violate the method in claim 1 of the '488 Patent – Bridgeport was not entitled to a reduction in damages.  A5a-A6a.  The District Court did not contest Bridgeport's evidence that 73% of the New Connectors were used in applications other than with junction boxes, which use is required to infringe claim 1.  A5a-A6a, A41.  Yet in a confusing tautology, the District Court relied on its overbroad New Injunction to hold that Arlington was entitled to 100% lost profits, despite undisputed evidence that 73% of the uses of the New Connectors did not infringe claim 1.  *See supra* Section III.  This Court cannot affirm a lost profits award that unjustly enriches Arlington for uses of the New Connectors that do not infringe the '488 Patent.

Second, the District Court ignored empirical evidence that Arlington would not have captured all of Bridgeport's sales.  After the New Injunction was issued and the New Connectors were removed from the market, Bridgeport began selling the Sigma 38ADS as a substitute.  A4596, A4813-26.  If a two-supplier market existed, every sale of the New Connectors would translate into a sale for Arlington.  Instead, Bridgeport retained at least 20% of its customers by selling the Sigma 38ADS connectors.  A5249-50, A5287-301.  This demonstrates that a two-supplier market does not exist.

73

Third, the District Court erroneously relied on the self-serving declaration of Arlington's vice-president to hold that a number of competing products, including the Sigma 38ADS product, were not acceptable non-infringing substitutes during the damages period.  A4a.  But as the marketing materials establish, the Sigma 38ADS is marketed with the same features as the New Connectors, Arlington's commercial embodiment, a host of other similar products on the market.  *See* A4602-04, A4617-22, A4663-71, A5246-51.

Finally, the District Court ignored substantial evidence presented by Bridgeport of brand loyalty, changed market conditions, and price elasticity.  A5a-A6a, A4663-79, A4617-22, A4811-12.  Bridgeport's expert performed a detailed analysis of Arlington's higher prices in the market, and opined that Bridgeport's customers in a price sensitive market would not have purchased as many of Arlington's higher priced product.  A4675-79.  The District Court's failure to take into account Bridgeport's expert testimony was error, especially in light of its unquestioned acceptance of Arlington's arguments.

## V.   THE DISTRICT COURT ERRONEOUSLY AWARDED ARLINGTON ALL OF ITS CLAIMED COSTS.

The District Court awarded Arlington $282,839.55 in claimed costs despite acknowledging that Arlington had not produced any of the underlying invoices.  A27a-A28a.  The District Court's acceptance of summary sheets at face value without any underlying documentation sets a dangerous precedent.  It is

74

fundamentally unfair to require Bridgeport to pay expenses that it never had the opportunity to review or contest.

Courts will not award costs without proper documentation. *See Stover v. Riley*, 30 F. Supp. 2d 501, 507 (E.D. Pa. 1998); *Sullivan v. Chrysler Motors Corp.*, 1997 U.S. Dist. LEXIS 2503 at *18-19 (D.N.J. Feb. 28, 1997). "A party seeking reimbursement of costs 'must provide sufficient information' to establish the compensable nature of the requested costs." *Perri v. Resorts Int'l Hotel, Inc.*, 2014 U.S. Dist. LEXIS 6223 at *9 (D.N.J. Jan. 16, 2014); *see also Cover v. Potter,* 2008 U.S. Dist. LEXIS 66753 (S.D.N.Y. Aug. 29, 2008). At the very least, courts will reduce a costs award if submitted costs are not documented. *See Zimmerman v. Portfolio Recovery Assocs., LLC,* 2013 U.S. Dist. LEXIS 174182 at *40-41 (S.D.N.Y. Dec. 11, 2013).

Here, the District Court acknowledged that Arlington failed to substantiate its expenses. A27a. The only evidence Arlington submitted were line item expenses from its counsel's bills, and those "records" provide no detail as to how, why, and when Arlington incurred its costs. Most of these costs were incomprehensible. One bill featured $24,237.50 for "Consulting Fees," $1,565.49 for "Hotel," and $3,148.42 for "Comp. Library Research." *See, e.g.,* A5004, A5010, A5022, A5027, A5035, A5042. As a result, Bridgeport was not able to specifically challenge Arlington's expenses, nor was the Court able to properly

75

evaluate them. *See Warner Chilcott Labs. Ir. Ltd. v. Impax Labs., Inc.*, 2013 U.S. Dist. LEXIS 167429 at *11 (D.N.J. Apr. 18, 2013). The District Court's decision to award 100% of Arlington's costs without requiring <u>any</u> documentation was wrong and must be reversed.

## <u>CONCLUSION</u>

For the foregoing reasons, the District Court's finding of contempt and issuance of a new injunction must be reversed and the case remanded with instructions to enter judgment in favor of Bridgeport. If this Court does not reverse the finding of contempt, it must modify the injunction to the extent it applies to non-infringing uses of the New Connectors and reverse and remand the District Court's lost profits determination and costs award.

Dated: October 20, 2014.

s/ Alan M. Anderson
Alan M. Anderson
(Counsel of Record)
Matthew R. Palen
    *Of counsel*
Aaron C. Nyquist
    *Of counsel*
Alan Anderson Law Firm LLC
Crescent Ridge Corporate Center
11100 Wayzata Blvd., Suite 545
Minneapolis, MN 55305
Telephone: 612.756.7000

aanderson@anderson-lawfirm.com
mattpalen@comcast.net
anyquist@anderson-lawfirm.com

*Attorneys for Appellant*
*Bridgeport Fittings, Inc.*

76

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

*Page*

March 19, 2013 Memorandum Opinion (Docket Entry 192) ................................. A1

June 23, 2014 Memorandum Opinion (Docket Entry 283) ................................. A1a

June 23, 2014 Order (Docket Entry 284) .......................................................... A29a

July 2, 2014 Memorandum Order (Docket No. 286) ......................................... A30a

U.S. Patent No. 6,335,488 B1 ............................................................................. A31

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

ARLINGTON INDUSTRIES, INC.,

      Plaintiff,

           v.

BRIDGEPORT FITTINGS, INC.,

      Defendant.

CIVIL ACTION NO. 3:02-CV-0134

(JUDGE CAPUTO)

## MEMORANDUM

Before the Court is a motion (Doc. 51) by Plaintiff Arlington Industries, Inc. to hold Defendant Bridgeport Fittings, Inc. in contempt for violating the Confession of Judgment and Injunction (Doc. 47) signed by the parties as part of a settlement agreement in 2004 and entered by this Court on January 18, 2012 (Doc. 46). The Court held a contempt hearing on October 25–26, 2012, December 17, 2012, and February 20, 2013. For the reasons explained below, the Court concludes that Arlington has demonstrated by clear and convincing evidence that Bridgeport is in contempt of the Confession of Judgment and Injunction. Accordingly, the Court will grant Arlington's motion.

## BACKGROUND

Plaintiff Arlington Industries, Inc. ("Arlington") and Defendant Bridgeport Fittings, Inc. ("Bridgeport") both manufacture electrical conduit fittings which are used to connect electrical wiring and cable. Previously, connecting a cable into an electrical junction box required the use of a threaded lock nut. In 1992, Arlington developed the "Snap-Tite" connector, which could simply be snapped into the junction box. Although tools were still required to secure the incoming cable to the connector, Arlington eliminated this problem in 1998 with a patented "Snap$^2$It" connector that allowed a cable to be snapped into the connector, which together could then be snapped into the junction box. In 1999, Bridgeport

released a similar product line of quick-connect fittings called the "Snap-In" and "Speed-Snap" fittings.

On March 19, 2001, Arlington brought an action in this district, No. 3:01-CV-0485 ("the '0485 Action"), for infringement of U.S. Patents Nos. 5,266,050 ("'050 Patent") and 5,171,164 ("'164 Patent") against Bridgeport's entire line of Snap-In connectors. That action was assigned to the Honorable Christopher C. Conner. Shortly thereafter, on January 28, 2002, Arlington filed the instant action for infringement of U.S. Patent No. 6,335,488 (the "'488 Patent") against a subset of Bridgeport's products accused in the '0485 Action, namely the 590-DCS and 590-DCSI Speed-Snap connectors (the "Enjoined Connecters"), which was assigned to me. Although the '0485 action proceeded further than the instant action, both were settled as part of an April 17, 2004 settlement agreement.

Following settlement, Bridgeport released a new line of connectors which Arlington found similarly infringing, including the connectors currently at issue in this case: the "Whipper-Snap" 380SP and 38ASP connectors (the "Accused Connectors"). Judge Conner then reopened the '0485 Action and entered a confession of judgment on June 30, 2006. A jury subsequently found that 29 of those new products literally infringed the '050 Patent, that one infringed under the doctrine of equivalents, and that 26 of the new products were colorable imitations. *See Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 692 F. Supp. 2d 487, 497 (M.D. Pa. 2010). Judge Conner entered a permanent injunction, which expired on December 4, 2011 along with the '050 Patent. *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 3:01-CV-0485, 2010 WL 817519, at *8 (M.D. Pa. Mar. 9, 2010).

With the expiration of the '050 Patent, Arlington returned its attention to the instant matter which had been dormant for almost eight years.[1] It informed Bridgeport that while

---

[1]       The Court entered an order on April 23, 2004 stating that the action would be dismissed without prejudice and that the Court would maintain continuing jurisdiction to enforce the terms of the parties' Settlement Agreement. (Doc. 42.)

2

it was free to sell some of the products previously enjoined by the '050 Patent, the Accused Connectors were infringing the '488 Patent, which remains valid until 2018. Bridgeport nevertheless began selling the Accused Connectors, and, on January 18, 2012, Arlington filed an Unopposed Motion to Enter Defendant's Confession of Judgment and Injunction. (Doc. 44.) That motion was granted, the matter was reopened, and the Clerk of Court was directed to enter the Confession of Judgment and Injunction. (Doc. 46.) In the Confession of Judgment and Injunction, Bridgeport submitted to entry of judgment that claim 1 of the '488 Patent "is infringed by the manufacture, sale and offer of sale" of Bridgeport's 590-DCS and 590-DCSI Speed-Snap connectors. (Doc. 47 at ¶1.) The Confession of Judgment and Injunction also provided that Bridgeport was permanently enjoined from "directly or indirectly making, using, selling, offering for sale or importing" or causing or inducing others to make, use, sell, offer to sell, or import the 590-DCS and 590-DCSI Speed-Snap connectors or any colorable imitations thereof during the term of the '488 patent. (*Id.* at ¶ 2.)

To prohibit the sale of the Accused Connectors, on February 13, 2012, Arlington filed a motion for contempt for violating the above Confession of Judgment and Injunction. (Doc. 51.) In particular, Arlington moves for the Court to hold Bridgeport in contempt for violating the Confession of Judgment and Injunction by selling the Accused Connectors, permanently enjoin Bridgeport from making or selling the Accused Connectors, and award Arlington two times its lost profits for any Bridgeport sales made in violation of the Confession of Judgment and Injunction as well as attorneys' fees incurred as a result of the contempt motion. A hearing was held on October 25–26, 2012, December 17, 2012, and February 20, 2013. The Court heard argument on the contempt motion at the hearing, but the parties did not address the issue of damages. The motion for contempt has been briefed and is now ripe for the Court's review.

3

**A3**

## LEGAL STANDARDS

### I. Motion for Contempt

To prevail on a motion for contempt in a patent case, "the party seeking to enforce the injunction must prove both that the newly accused product is not more than colorably different from the product found to infringe and that the newly accused product actually infringes." *TiVo, Inc. v. EchoStar Corp.*, 646 F.3d 869, 882 (Fed. Cir. 2011) (en banc). The patentee bears the burden of proving violation of the injunction by clear and convincing evidence, a burden that applies to both the colorable differences and infringement inquiries. *Id.* "[C]ontempt 'is a severe remedy, and should not be resorted to where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct.'" *Id.* at 881–82 (quoting *Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885)). Although contempt "is not a sword for wounding a former infringer who has made a good-faith effort to modify a previously adjudged or admitted infringing device to remain in the marketplace," *Arbek Mfg., Inc. v. Moazzam*, 55 F.3d 1567, 1570 (Fed Cir. 1995), "an assertion that one has . . . designed around a patent should not be used to mask continued infringement." *TiVo*, 646 F.3d at 883.

"[T]he contempt analysis must focus initially on the differences between the features relied upon to establish infringement and the modified features of the newly accused products." *Id.* at 882. "The primary question on contempt should be whether the newly accused product is so different from the product previously found to infringe that it raises a fair ground of doubt as to the wrongfulness of the defendant's conduct." *Id.* (internal quotation marks omitted). If the differences between the modified features and those previously found to infringe "are significant, the newly accused product as a whole shall be deemed more than colorably different from the . . . infringing one, and the inquiry into whether the newly accused product actually infringes is irrelevant. Contempt is then inappropriate." *Id.* However, "when a court concludes that there are no more than colorable differences between the . . . infringing product and modified product, a finding that the newly accused product continues to infringe the relevant claims is

4

additionally essential for a violation of an injunction against infringement." *Id.* at 883.

## II. Colorable Differences Analysis

In *TiVo*, the United States Court of Appeals for the Federal Circuit explained that the "colorable differences" analysis "must focus initially on the differences between the features relied upon to establish infringement and the modified features of the newly accused products." 646 F.3d at 882. Specifically, the Federal Circuit emphasized:

> The analysis must focus . . . on those aspects of the accused product that were previously alleged to be, and were a basis for, the prior finding of infringement, and the modified features of the newly accused product. Specifically, one should focus on those elements of the adjudged infringing products that the patentee previously contended, and proved, satisfy specific limitations of the asserted claims. Where one or more of those elements previously found to infringe has been modified, or removed, the court must make an inquiry into whether that modification is significant.

*Id.* The significance of the difference is a question of fact and is dependent on the nature of the products at issue. *Id.* at 882–83. "[T]he innovative significance of the modification is best viewed in light of the existing art and from the perspective of one of ordinary skill in the art." *Id.* at 883 n.1. Thus, this Court must directly compare the elements of an accused product that previously were specifically identified or accused by the patentee as meeting a disputed claim limitation, and any subsequent modifications made by the accused infringer to those specifically accused elements.

An accused product is a colorable imitation of an enjoined product if it is the substantial equivalent of the enjoined product. An accused device is the substantial equivalent of an enjoined device if it performs substantially the same function in substantially the same way with substantially the same result. *See Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950); *KSM Fastening Sys., Inc. v. H.A. Jones Co., Inc.*, 776 F.2d 1522, 1527–28 (Fed. Cir. 1985). The Court may compare the accused product to the patentee's commercial embodiment. *See Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1301 (Fed. Cir. 2012).

## III. Claim Construction

An inventor may assert ownership only over those designs encompassed within

5

the claims section of the patent. *See* 35 U.S.C. §112; *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 63 (1998); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc), *cert. denied*, 546 U.S. 1170 (2006). Claim construction requires the court to determine the "ordinary and customary meaning" of the claim terms as they would be understood by "a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13. Intrinsic evidence—*i.e.*, the language of the patent (namely the language of the claim and specification) and the prosecution history—are the "primary resources" reviewing courts use to construe claims. *Kara Tech v. Stamps.com, Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009). The court may use extrinsic evidence, such as dictionaries, treatises, and expert testimony, to aid in claim construction, but such evidence is "less significant than the intrinsic record" and is "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1317–19, 1324; *see also Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1355–56 (Fed. Cir. 2004).

In using the language of the patent itself, "claims 'must be read in view of the specification,' . . . [which] is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cit. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996) and *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Likewise, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314 (citing *Vitronics*, 90 F.3d at 1582). To this end, the context in which a claim term is used, the language of other claims in the patent, and the differences among claims can assist the court in construing disputed claim terms. *See id.* at 1314–15.

## IV. Infringement

### A. Direct Infringement

"[F]or a party to be liable for direct patent infringement under 35 U.S.C. § 271(a), [it] must commit all the acts necessary to infringe the patent, either personally or vicariously." *Akami Tech., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1307 (Fed.

6

Cir. 2012). "In the context of a method claim, that means the accused infringer must perform all the steps of the claimed method, either personally or through another acting under his direction or control." *Id.* Because direct infringement is a strict liability tort, the Federal Circuit has "rejected claims of liability for direct infringement of method claims in which several parties have collectively committed the acts necessary to constitute direct infringement, but no single party has committed all of the required acts." *Id.*

### B. Indirect Infringement

There are two types of indirect infringement: induced infringement and contributory infringement. Induced infringement occurs where a party "knowingly induced infringement and possessed specific intent to encourage another's infringement." 35 U.S.C. § 271(b); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 851 (Fed. Cir. 2010); *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1321–22 (Fed. Cir. 2009) ("[T]he plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would influence actual infringement.") For purposes of inducement, "[i]t is enough that the inducer 'cause[s], encourage[s], or aid[s]' the infringing conduct and that the induced conduct is carried out." *Akami*, 692 F.3d at 1308 (quoting *Arris Grp., Inc. v. British Telecomms. PLC*, 639 F.3d 1368, 1379 n. 13 (Fed. Cir. 2011)). A defendant may be held liable for induced infringement of a method patent pursuant to § 271(b) if it has performed some of the steps of a claimed method and has induced other parties to commit the remaining steps, or if it has induced other parties to collectively perform all the steps of the claimed method, but no single party has performed all of the steps itself. *Id.* at 1308–09.

Contributory infringement occurs pursuant to 35 U.S.C. § 271(c) where a party "sells, or offers to sell, a material or apparatus for use in practicing a patented process." *i4i*, 598 F.3d at 850. "That 'material or apparatus' must be a material part of the invention, have no substantial noninfringing uses, and be known (by the party) 'to especially made or especially adapted for use in an infringement of such patent.'" *Id.* at

7

850–51 (quoting *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.,* 424 F.3d 1293, 1312 (Fed. Cir. 2005).)

Evidence of sales of the infringing product along with instructions teaching the infringing use is enough to demonstrate direct infringement by customers. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009).

## DISCUSSION

The parties' dispute concerns limitations 2 and 3 of claim 1 of the '488 Patent, which recites the following:

A method for attaching an armored or metal clad electrical cable to a junction box comprising:

providing a junction box having an aperture;

**providing a member having a leading end with an external cylindrical surface and a trailing end with an inner diameter;**

**providing a spring steel adapter surrounding said leading end external cylindrical surface for snap fitting into said aperture;**

providing a spring steel loading rind inserted into said trailing end inner diameter;

restricting rearward withdraw motion of said spring steel locking ring from said member;

receiving and armored or metal clad cable in said steel locking ring; and

preventing removal of said armored or metal cable in a rearward direction from said spring steel locking ring.

U.S. Patent No. 6,335,488 col.9 l.27 – col.10 l.12 (issued Jan. 1, 2002) (emphasis added). Arlington contends that the Accused Connectors are not more than colorably different than the Enjoined Connectors because they still have "a leading end with an external cylindrical surface" and "a spring steel adapter that surrounds the leading end cylindrical surface." It further argues that the Accused Connectors both directly and indirectly infringe limitations 2 and 3 of claim 1 of the '488 Patent. Bridgeport responds that the Accused Connectors are more than colorably different because they have redesigned leading ends with "conical" external surfaces and lugs that jut through the

8

**A8**

spring steel adapters. It also maintains that the Accused Connectors neither directly nor indirectly infringe limitations 2 and 3 of claim 1 of the '488 Patent.

## I. Colorable Imitation Analysis

### A. Limitation 2 – "[A] Leading End with an External Cylindrical Surface"

Limitation 2 of claim 1 of the '488 Patent refers to "a member having a leading end with an external cylindrical surface . . . ." ('488 Patent col.9 l.30–32.) Although Arlington acknowledges that Bridgeport has modified the external surfaces on the Accused Connectors' leading ends from the stepped shape of the Enjoined Connectors to a sloped shape, which Bridgeport describes as "conical," it maintains that this change is insignificant in both form and function. (Doc. 52 at 17–19.) It also contends that the Accused Connectors' leading end external surfaces perform substantially the same function in substantially the same way with substantially the same result as the Enjoined Connectors' leading end external cylindrical surfaces and are thus no more than colorably different with respect to the "cylindrical" limitation of claim 1 of the '488 Patent.

### 1. Defining "an External . . . Surface"

Arlington contends that "an external . . .surface" of the connector's leading end, mentioned in limitation 2 of claim 1 of the '488 Patent, refers to everything forward of the back flange of the connector's leading end except for the lip. To support this assertion, it cites the '488 Patent specification, which indicates that "the lip and central flange define the boundaries of [the] reduced diameter seat," which "will later accommodate a spring steel adapter." ('488 Patent col.7 l.34–38, fig.15.) The specification notes that the "[r]educed diameter area for receiving [the] adapter . . . is defined by [the] lip, which prevents [the] adapter from slipping out once inserted." ('488 Patent col.6 l.2–4, fig.6.) It also references a "smooth outer cylindrical section," which "accommodates a spring steel adapter" and "has flanges at each end defining to hold the . . . adapter in place." ('488 Patent col.9 l.4–8.)

Bridgeport has offered different theories as to what constitutes "an external . . . surface" at different times in this proceeding. In its Brief in Opposition, Bridgeport noted

9

**A9**

that the "[external] cylindrical surface" of the Enjoined Connectors' leading ends is composed of a central cylinder that is flanked by two raised cylinders. (Doc. 74 at 13–14; Doc. 77 at ¶ 32.) At the hearing, however, Bridgeport argued that those three cylinders are in fact separate external cylindrical surfaces.

The Court agrees with Arlington that "an external . . . surface" of the connector's leading end refers to everything forward of the back flange of the connector's leading ends, except for the lip. This conclusion is based on the '488 Patent specification and accompanying embodiments. ('488 Patent col.7 l.34–38, fig.15; '488 Patent col.6 l.2–4, fig.6.) Therefore, "an external . . . surface" of the Enjoined Connectors' leading ends is composed of everything forward of the back flange of the leading ends, except for the lip—what Bridgeport has described as "the three cylinders." Because Bridgeport has admitted that the Enjoined Connectors violate claim 1 of the '488 Patent, the Enjoined Connectors' leading end external surfaces are thus "cylindrical," as limitation 2 states that the leading end has "an external cylindrical surface." Accordingly, the "external . . . surface" of the Accused Connectors' leading ends[2] will be compared to the external cylindrical surfaces of the Enjoined Connectors to determine if they are more than colorably different from one another.

### 2. Colorable Differences Analysis

Arlington contends that the Accused Connectors are not more than colorably different than the Enjoined Connectors with respect to limitation 2 of claim 1 of the '488 Patent because they still have "a leading end with an external cylindrical surface." Bridgeport counters that it has made significant changes to the Enjoined Connectors' cylindrical surface, which is now conical on the Accused Connectors. (Doc. 74 at

---

[2]     The Court agrees with Arlington that the lugs on the Accused Connectors are not a part of "an . . .external surface" because, like the lips of the Enjoined Connectors' leading ends, they hold the adapter in place. (Doc. 74 at 12; Doc. 95, Ex. 4, at ¶ 11.) The lugs are not part of the Accused Connectors' leading end external surfaces because no part of the connector body extends beyond them. (Doc. 95 at 35; Doc. 95, Ex. 4, at ¶ 11.)

10

**A10**

14–15.)  Arlington maintains that even though Bridgeport has modified the external surfaces on the Accused Connectors' leading ends from the stepped shape of the Enjoined Connectors to a sloped shape, this change is insignificant with respect to the "cylindrical" limitation.  (Doc. 52 at 22–23.)

### a. Arlington's Expert Witness

In support of its position, Arlington offers the expert testimony and declaration of Dr. Christopher Rahn, Professor of Mechanical Engineering and Director of the Mechatronics Research Laboratory at the Pennsylvania State University.  In his declaration, Dr. Rahn notes that the external surfaces on the Accused Connectors' leading ends have been modified from the stepped shape of the Enjoined Connectors' leading end external cylindrical surfaces to a sloped shape via a slight taper.  (Doc. 53 at ¶¶ 14–15.)  However, he contends that this change is insignificant in form, application, and function and that the external surfaces of the Accused Connectors' leading ends are more cylindrical than conical.  (*Id.* at ¶¶ 18–19; Doc. 95, Ex. 4, at ¶ 17.)

### i. Form

Dr. Rahn opines that the changes to the Accused Connectors' leading end external surfaces is insignificant in form because "the measure in which the [external] surfaces of the [leading ends of the] Accused Connectors and Enjoined Connectors approximate a cylinder is almost identical."  (Doc. 53 at ¶ 18.)  To reach this conclusion, Dr. Rahn used a standard deviation analysis, which he believes is "[t]he best way to quantify whether a surface has the approximate form of a cylinder."  (*Id.* at ¶ 16.)  This analysis entails measuring diameters "evenly distributed across the surface" with calipers and calculating the standard deviation "of the surface shape from a perfect (right circular) cylinder with a fixed diameter along its length."  (*Id.* at ¶ 18.)  After performing those steps, Dr. Rahn found that the standard deviation of the external surfaces of both the 590-DCS and 590-DCSI connectors, which infringed the '488 Patent and thus had "an external cylindrical surface," was 5%, meaning that their external cylindrical surfaces deviated from a perfect cylinder by that amount.  (*Id.* at ¶ 17, Ex. 4.)  He also found that

11

the standard deviations of the external surfaces of the 38ASP and 380SP connectors were 4% and 3%, respectively.  (*Id.* at ¶ 18, Ex. 4.)  Based on this analysis, Dr. Rahn concluded that the change from the stepped leading end external cylindrical surfaces of the Enjoined Connectors to the sloped leading end external surfaces of the Accused Connectors is insignificant in form.[3]  (*Id.* at ¶ 18.)

Although Dr. Rahn believes that standard deviation is a better metric for determining the deviation of an external surface from a perfect cylinder than cylindricity,[4] which Bridgeport's expert asserts is the internationally accepted standard method of measuring a zinc die cast connector's external surface, he also performed a cylindricity test on the Accused and Enjoined Connectors.  (Doc. 95, Ex. 4, at ¶¶ 19, 22.)  Using product dimensions taken from high quality drawings of the Accused and Enjoined Connectors, Dr. Rahn found that the leading end external surfaces of the Accused Connectors deviate from a perfect cylinder by 5.54%, whereas the leading end external cylindrical surfaces of the Enjoined Connectors deviate from a perfect cylinder by 5.46%.[5]  (*Id.* at ¶ 23.)  He categorizes this 0.08% difference in cylindricity deviation

---

[3]      Dr. Rahn later performed the standard deviation analysis using dimensions taken from high quality drawings of the Accused and Enjoined Connectors.  (Doc. 95, Ex. 4, at ¶ 23.)  He found that the leading end external surfaces of the Enjoined Connectors and Accused Connectors deviated from a perfect cylinder by 5.05% and 3.93%, respectively.  (*Id.* at ¶ 23, Ex. G.)  The same figures result if the lips and lugs are included in the connectors' leading end external surfaces.

[4]      Dr. Rahn states that an object's cylindricity "is based on only two measurements or dimensions corresponding to the maximum and minimum diameter."  (Doc. 95, Ex. 4, at ¶ 19.)  He notes that although he initially considered reporting the cylindricity of the connectors' external surfaces, he opted to use standard deviation analysis because it "includes many diameters and gives a more representative deviation from a perfect cylinder for the entire surface."  (*Id.*)  He also believes that the cylindricity analysis used by Dr. Williamson is inapplicable here because such a test "is only applicable to the surfaces of perfect cylinders" and the "external cylindrical surface" described in limitation 2 of claim 1 of the '488 Patent is not required to be a perfect cylinder.  (*Id.* at ¶ 20.)

[5]      If the lips or lugs of the leading end external surfaces of the Enjoined Connectors and Accused Connectors are included in the cylindricity calculation, the leading end external surfaces of the Accused Connectors deviate from a perfect cylinder

12

between the Accused Connectors and Enjoined Connectors as insignificant. (*Id.*)

Dr. Rahn performed these quantitative analyses in addition to a visual inspection of the Accused Connectors. For this inspection, Dr. Rahn created a figure which compares the leading ends of the Accused Connectors with perfect cylinders and cones that had the same length as the leading ends and the same average diameter. (Doc. 95, Ex. 4, at ¶ 17.) In his opinion, the shape of the Accused Connectors' leading ends are nearly identical to the perfect cylinder and "clearly different" from the cone, leading him to conclude that the external surfaces of the Accused Connectors' leading ends are more cylindrical than conical based on looks alone. (*Id.*)

### ii. Function

Dr. Rahn further opined that the changes made to the Enjoined Connectors' external cylindrical surfaces were insignificant in application and function. (Doc. 53 at ¶ 19.) He notes that both the Accused and Enjoined Connectors "are . . . designed to fit in the same ½ inch round knockout holes with nominal diameters of 0.875 inch," [have] [t]he maximum diameter . . . at the same location . . . , immediately in front of the flange," "provide an external surface for a spring steel adapter to surround," "have similar interior diameters to allow the same size cables to pass through," (*Id.*), and "snap into the junction box hole without the use of a lock nut or tools" (*Id.* at ¶ 21).

Dr. Rahn tested the Accused Connectors to see if the 0.040" taper on their leading end external surfaces had any mechanical or electrical function. For these tests, he developed prototypes of the Accused Connectors with and without tapers on the external surfaces of their leading ends and mounted Bridgeport adapters to them. (Doc. 95, Ex. 4, at ¶¶ 57, 59.) With regard to mechanical function, Dr. Rahn found that the modified and unmodified Accused Connector prototypes function in the same way, as the adapters "were secured to and surrounded the leading end in the same manner" and

---

by 9.50%, whereas the leading end external cylindrical surfaces of the Enjoined Connectors deviate from a perfect cylinder by 9.43%. (Doc. 95, Ex. 4, at ¶ 24.) Dr. Rahn categorizes this 0.07% difference in cylindricity as insignificant. (*Id.*)

13

the connectors "snapped into a ½ inch hole in a pan box the same way" for both the tapered and non-tapered prototype connectors. (*Id.* at ¶ 57.) He also conduced resistance tests to measure the millivolt drop between the connectors and the boxes to see if the taper changed the way the Accused Connectors maintained good electrical conductivity.[6] (*Id.* at ¶ 58.) After testing three unmodified prototypes and three modified prototypes, Dr. Rahn found that the average voltage drop of the modified prototypes was smaller than that of the unmodified prototypes, which led him to conclude that the taper on the Accused Connectors' leading end external surfaces does not significantly change the grounding. (*Id.* at ¶ 59.) Dr. Rahn thus determined that the taper has no function, as it "does not change the way that the adapter is secured to and surrounds the leading end" or "the way that the adapter is grounded to the connector." (*Id.* at ¶ 60.) He concluded that the Accused Connectors' leading end external surfaces perform the same function in substantially the same way to produce substantially the same result as the Enjoined Connectors' leading end external cylindrical surfaces, and are therefore not more than colorably different with respect to the "cylindrical" limitation. (*Id.*)

### b. Bridgeport's Expert Witnesses

Bridgeport offered the expert testimony and declarations of Mr. Walter Herbst, Clinical Professor of Mechanical Engineering and Director of the Master of Product Development Program at Northwestern University, and Dr. J. Brian P. Williamson, who has a Ph.D. in Surface Science and has worked in the electrical connective devices industry for several decades.

### i. Form

Based on a visual analysis of the connectors, Prof. Herbst opines that there are more than colorable differences between the Accused Connectors' leading end external

---

[6]     The resistance test was conducted as follows: "30 [amperes] of electrical current was passed through the housing to the box. The voltage drop was measured across the adapter between the housing and the box." (Doc. 95, Ex. 4, at ¶ 58.) "A low voltage drop indicated low resistance and good grounding. A high voltage drop indicated high resistance and poor grounding." (*Id.*)

14

surfaces and the Enjoined Connectors' leading end external cylindrical surfaces. (Doc. 78 at ¶ 26.) He asserts that the shape of the Accused Connectors' leading end external surfaces is a cone, which is "drastically different" than that of the Enjoined Connectors' leading end external cylindrical surfaces. (*Id.* at ¶¶ 24–25.) He also opines that the 0.040" taper of the Accused Connectors' leading end external surfaces provides this difference in shape from cylinder to cone and concludes that since such a difference could be appreciated by "[a]nyone with a basic education of shapes," Dr. Rahn "does not fully appreciate the distinct differences between basic shapes." (*Id.* at ¶¶ 27–30.)

Dr. Williamson similarly opines that the Accused Connectors are not colorable imitations of the Enjoined Connectors due to "significant re-design efforts." (Doc. 77 at ¶ 12.) He asserts that the Enjoined Connectors' leading external cylindrical surfaces had straight, parallel sides, but the Accused Connectors have a sloping, conical leading end external surfaces that accept the conical adapter. (*Id.* at ¶ 34.) Dr. Williamson believes that this substantial change is supported by the fact that a Mitutoyo Coordinate Measuring Machine ("CMM"), which "is accepted worldwide as the standard instrument for measuring shapes," was unable to identify the Accused Connectors' leading end external surfaces as a cylinder or find any similarity between their leading ends and a cylinder. (*Id.* at ¶¶ 91–92.)

Dr. Williamson also challenges Dr. Rahn's use of standard deviation analysis, which "is wholly unrelated to determining the form tolerances of a structure," "is not a recognized method nor a standard procedure approved by any . . . mechanical engineering institute" for such a purpose, and whose "inappropriate nature . . . is clearly shown by the fact that Professor Rahn finds the leading ends of the [Accused Connectors] to be more closely cylindrical . . . than those of the [Enjoined Connectors]." (*Id.* at ¶¶ 38, 40.) Instead of using standard deviation methodology to assess the cylindricity of a manufactured component, Dr. Williamson uses the "internationally accepted standard for how cylindricity should be assessed" published by the American

15

Society of Mechanical Engineers ("ASME").[7]  (*Id.* at ¶ 40.)  Employing such methodology, Dr. Williamson found that the shapes of the Accused Connectors' leading end external surfaces deviated significantly further from a cylinder than those of the Enjoined Connectors by a ratio of 7 to 4.  (*Id.* at ¶ 41.)

### ii. Function

In addition, Dr. Williamson opines that the Accused Connectors function differently than the Enjoined Connectors due to their reduced leading end diameter. (Doc. 77 at ¶ 24).  He asserts that the Accused Connectors' leading ends have space to enter the hole of a junction box at an angle, which produces a greater tolerance for misalignment than the Enjoined Connectors and therefore makes it easier and quicker to insert the connectors, especially when the hole of the junction box is difficult to see or reach.  (*Id.*)  He cites the ease with which the Accused Connectors can be removed from a junction box and later be re-used due to the conical shape of their leading ends.  (*Id.* at ¶ 15.)  Dr. Williamson also opines that the taper on the Accused Connectors' leading end external surfaces change the way that they maintain good electrical contact to the wall of the junction box.  (*Id.* at ¶ 22.)

### c. Conclusion

The Court agrees with Arlington that the leading end external surfaces of the Accused Connectors are not more than colorably different than the leading end external cylindrical surfaces of the Enjoined Connectors.  As demonstrated by the standard deviation and cylindricity analyses performed by Dr. Rahn, the change from the stepped shape of the Enjoined Connectors' leading end external cylindrical surfaces to the

---

[7]     According to Dr. Williamson, ASME Standard Y14.5-2009 "measures the difference between the radius of the smallest true cylinder that fits over the outside of the shape being assessed and that of the largest true cylinder that fits inside it." (Doc. 77 at ¶ 41.)  "The relative cylindricity of two shapes can then be assessed by determining this radial difference for both of them, and quoting the ratio of the two results."  (*Id.*)  He emphasizes that, unlike Dr. Rahn's standard deviation method, the ASME "measure of relative cylindricity is valid even when comparing cylinders of different diameters."  (*Id.*)

16

sloped shape of the Accused Connectors' leading end external surfaces is insignificant.[8]
The mechanical and electrical function tests performed by Dr. Rahn also show that the
Accused Connectors' leading end external surfaces are not substantially different in
application or function than those of the Enjoined Connectors. Therefore, the Court finds
that Arlington has demonstrated by clear and convincing evidence that the Accused
Connectors' leading end external surfaces perform substantially the same function in
substantially the same way with substantially the same result as the Enjoined
Connectors' leading end external cylindrical surfaces—*i.e.*, that they are not more than
colorably different. Both leading end external surfaces connect the spring steel adapter
to the connector's leading end (function) by providing a surface area for the adapter to
surround (way) so that the adapter is mechanically and electrically connected to the
leading end (result).

### B. Limitation 3 – "[A] Spring Steel Adapter Surrounding Said Leading End External Cylindrical Surface"

Limitation 3 of claim 1 of the '488 patent refers to "a spring steel adapter
surrounding said leading end external cylindrical surface for snap fitting . . . ." ('488
Patent col.10 l.1–3.) Arlington contends that the Accused Connectors, like the Enjoined
Connectors, have a spring steel adapter surrounding the leading end external cylindrical
surface. (Doc. 52 at 27.) Bridgeport counters that because the Accused Connectors'
leading ends have lugs that jut through the sides of the adapter, the leading ends are not
encircled by the adapter and therefore are not "surrounded" by it. (Doc. 74 at 20.)

---

[8] The Court rejects Dr. Williamson's relative cylindricity calculation, which included
the lugs on the Accused Connectors but not the lips on the Enjoined Connectors
and thus resulted in an inconsistent comparison. Dr. Rahn correctly notes that
an accurate comparison between the Accused and Enjoined Connectors must
either include or exclude both the lips and the lugs. (Doc. 95, Ex. 4, at ¶ 26.) He
is also correct that no matter which "apples to apples" comparison is used, the
relative cylindricity is nearly 1, which demonstrates that the Accused Connectors'
leading end external surfaces are not more than colorably different from the
Enjoined Connectors' leading end external cylindrical surfaces. (*Id.*)

17

### 1. Colorable Differences Analysis

### a. Arlington's Expert Witness

Dr. Rahn opines that the Accused Connectors are not more than colorably different than the Enjoined Connectors with respect to the "surrounding" limitation of claim 1 of the '488 Patent because the adapters on the Accused Connectors "significantly border the leading end the same way as the Enjoined Connectors." (Doc. 95, Ex. 4 at ¶ 29.) He also opines that "[t]o surround the leading end of the connector, the adapters need to significantly border the circumference of the leading end [external] cylindrical surfaces, which these adapters clearly do. Both connectors snap into the juncion box hole without the use of a lock nut or tools." (Doc. 53 at ¶ 21.)

Arlington also contends that colorable imitation with respect to "surrounding" was conclusively decided in the '0485 Action, in which the Enjoined and Accused Connectors were also at issue. In that action, a jury found that the Accused Connectors literally infringed Claim 8 of the '050 Patent and were also colorable imitations of the Enjoined Connectors. *See Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 692 F. Supp. 2d 487, 497 (M.D. Pa. 2010). Claim 8 of the '050 Patent required the adapter to "surround"[9] the entire leading end of the connector.[10] ('050 Patent, col.10 l.35–36.) Claim 1 of the '488 Patent, which incorporates a sibling of the '050 Patent in its entirety, only requires the adapter to "surround" the external cylindrical surface of the connector's leading end. ('488 Patent, col.10 l.1–2.) Arlington reasons that because the Accused Connectors, which infringe Claim 8 of the '050 Patent and thus have spring steel adapters that "surround" their entire leading ends, were found to be colorable imitations of the

---

[9]    In the '0485 Action, Judge Conner construed the term "surrounding" in the context of the '050 Patent to mean "significantly borders" rather than "completely envelopes." *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 290 F. Supp. 2d 508, 521–22 (M.D. Pa. 2003).

[10]    In its Pretrial Memorandum in the '0485 Action, Bridgeport did not dispute that, with respect to Claim 8 of the '050 Patent, the Accused Connectors had "a circular spring metal adapter surrounding said leading end." (Doc. 129 at 15–16.)

18

Enjoined Connectors, which infringe Claim 1 of the '488 Patent and thus have spring steel adapters that "surround" their leading end external cylindrical surfaces, the Accused Connectors must also have spring steel adapters that "surround" their external cylindrical surfaces.

### b. Bridgeport's Expert Witness

Dr. Williamson opines that the Accused Connectors are more than colorably different than the Enjoined Connectors with respect to the "surrounding" limitation, as the adapters on the Enjoined Connectors surrounded the leading end external cylindrical surfaces but the lugs on the Accused Connectors poke through the adapters and are thus not encircled by them. (Doc. 77 at ¶¶ 27, 93.)

### c. Conclusion

The Court agrees with Arlington that the Accused Connectors are not more than colorably different than the Enjoined Connectors with respect to the "surrounding" limitation of claim 1 of the '488 Patent. The Court finds that Arlington has shown by clear and convincing evidence that the spring steel adapters "surrounding" the Accused Connectors' leading end external cylindrical surfaces perform substantially the same function in substantially the same way with substantially the same result as the spring steel adapters "surrounding" the Enjoined Connectors' leading end external cylindrical surfaces. Both connect the adapter to the connectors' leading end external cylindrical surfaces (function) by the adapter significantly bordering and contacting the external cylindrical surfaces (way) so as to electrically and mechanically connect the adapter to the connectors' leading end external cylindrical surfaces (result). This conclusion is also supported by the fact that the Accused Connectors, which infringe Claim 8 of the '050 Patent and thus have spring steel adapters that "surround" their entire leading ends, were found to be colorable imitations of the Enjoined Connectors, which infringe Claim 1 of the '488 Patent and thus have spring steel adapters that "surround" their leading end external cylindrical surfaces.

In sum, the Court finds that the Accused Connectors are not more than colorably

19

**A19**

different than the Enjoined Connectors with respect to limitations 2 and 3 of Claim 1 of the '488 Patent. As this Court has not previously construed the '488 Patent, "cylindrical" and "surrounding" will now be construed in order to undertake the infringement analysis required by *TiVo*. As previously stated by this Court, any claim construction in this matter must be faithful to Bridgeport's admission that the Enjoined Connectors infringed the '488 Patent and thus met each limitation in the '488 Patent. (Doc. 129 at 9.)

## II. Claim Construction

### A. Limitation 2 – "[A] Leading End with an External Cylindrical Surface"

#### 1. Intrinsic Evidence

Limitation 2 of claim 1 of the '488 Patent requires "a member having a leading end with an external cylindrical surface . . . ." ('488 Patent col.9 l.30–32.) The '488 Patent specification describes "a die cast member having a smooth outer cylindrical section" that "has flanges at each end." ('488 Patent col. 9 l.4–7.)

#### 2. Extrinsic Evidence

#### a. Arlington's Proposed Construction

Dr. Rahn opines that a person of ordinary skill in the relevant art would construe "an external cylindrical surface," as used in claim 1 of the '488 Patent, as "a surface on the outside of the leading end [of the connector] having the approximate form of a cylinder" (Doc. 53 at ¶ 36) and know that the exact shape of a perfect cylinder cannot be realized in practice (Doc. 95, Ex. 4 at ¶ 32).[11] Dr. Rahn points to the '488 Patent specification, which references "a die cast member having a smooth outer cylindrical section" and the flanges at each end of "[t]he smooth cylindrical section . . . ." ('488 Patent col. 9 l.4–7.) In addition, he notes that all of the relevant embodiments provided as examples in the '488 Patent specification show the cylindrical surface, labeled as the

---

[11] Based on his "experience and understanding of the electrical connector industry and the technology described in the '488 Patent," Dr. Rahn defines one with "ordinary skill in the relevant art" as "someone with a high school education and one year's training or experience working for an electrical connector manufacturer." (Doc. 53 at ¶ 31.)

seat, "with varying cross sections, not one cross section that remains constant along the body's axial length." ('488 Patent figs. 6, 15; Doc. 53 at ¶ 38; Doc. 95, Ex. 4 at ¶ 33.) Because the '488 Patent specification does not disclose any embodiments with a cylindrical surface that is the exact shape of a perfect cylinder, Arlington contends that Bridgeport's proposed construction of "cylindrical" must be denied. (Doc. 95, Ex. 2 at 23–25.) He also posits that "having the approximate form of a cylinder" is the plain and ordinary meaning of "cylindrical" and cites Webster's definition of "cylindrical" as "relating to or having the form or properties of a cylinder." (Doc. 53 at ¶ 38.)

Arlington contends that its proposed construction of "cylindrical" is consistent with the construction that I issued in the "'1105 Action," which construed "cylindrical" with regard to a connector's "outbound end" described in claim 1 of U.S. Patent No. 6,521,831 ("the '831 Patent")[12] to mean "having the approximate form of a cylinder" and rejected Bridgeport's proposed construction of "shaped like a cylinder, with a cross-section that is constant along its length." *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 06-CV-1105, 2007 WL 4276565, at * 13 (M.D. Pa. Dec. 4, 2007). Arlington maintains that although the '488 and '831 Patents do not derive from the same application, their use of "cylindrical" is similar because they include the same disclosure, as the '488 Patent is a continuation of the '933 Patent.[13] (Doc. 52 at 36.)

---

[12] U.S. Patent No. 6,194,661 ("the '661 Patent") "described a duplex connector that combines the spring steel adapter and spring steel locking ring of [U.S. Patent No. 6,080,993 ("the '993 Patent")] with a novel connector to connect two helically wound armored or metal clad electrical conductors to a junction box or electrical panel through a single access hole or knockout. The '831 Patent is a duplex connector that is simpler than the duplex connector of the '661 Patent." *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 06-CV-1105, 2007 WL 4276565, at *2 n.2 (M.D. Pa. Dec. 4, 2007).

[13] "The '933 Patent describes a locking cable connector composed of three mating pieces that snap together and provide a connector for connecting helically wound armored or metal clad electrical conductors to junction boxes or electrical panels. One of these three mating pieces is a spring steel adapter. Another is a spring steel locking ring." *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 06-CV-1105, 2007 WL 4276565, at *2 n.2 (M.D. Pa. Dec. 4, 2007).

21

### b. Bridgeport's Proposed Construction

Dr. Williamson opines that a "cylindrical surface" should be construed as "the surface of a straight elongated body that has a circular cross-section which remains constant along the body's axial length" because a person having ordinary skill in the art would interpret it as such.[14] (Doc. 77 at ¶¶ 66, 71.) He contends that a cylindrical surface does not taper. (*Id.* at ¶ 66.) Dr. Williamson points to the patentee's descriptions of the connector's "spring steel locking ring" as "generally cylindrical" ('488 Patent col. 5 l.2–3, 13–14; '488 Patent col.10 l.18–19) as evidence that when the patentee wished to describe a shape that deviated from a one that is straight with a constant, circular cross-section, he did so. (*Id.* at ¶ 69.)

Prof. Herbst also opines that a person of ordinary skill in the art would understand "cylindrical" to mean "an elongated body that has a circular cross-section which remains constant along the body's axial length."[15] (Doc. 78 at ¶ 12.) He is of the opinion that "'cylindrical' clearly refers to a shape that has straight, parallel sides"—*i.e.*, "a true cylinder"—because the patentee used "generally cylindrical" elsewhere in the '488 Patent to refer to shapes that "could deviate slightly from a true cylinder." (*Id.* at ¶ 15.)

### c. Conclusion

"Cylindrical" should be interpreted to mean "having the approximate form of a cylinder." This construction is based on the '488 Patent specification and accompanying embodiments, which portray an external cylindrical surface on the leading end of a connector that has varying cross-sections along its axial length. These embodiments do

---

[14] According to Dr. Williamson, a person having ordinary skill in the art would either have a degree in a relevant branch of engineering (*e.g.*, electrical or mechanical) and two or three years' experience in the industry, or, alternatively, a trade school or high school degree and four or five years' experience in the industry. (Doc. 77 at ¶ 44.)

[15] Although Prof. Herbst does not offer his own definition of "a person of ordinary skill in the art," he notes that his opinion is the same whether Dr. Rahn's definition or Dr. Williamson's definition is used. (Doc. 78 at ¶ 13.)

22

not meet Bridgeport's proposed construction, and claim interpretation that excludes a patentee's preferred embodiment is rarely the correct interpretation. *See Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1371 (Fed. Cir. 2010) (citing *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1581 (Fed. Cir. 1996)). The '488 Patent supports the conclusion that "cylindrical" means "having the approximate form of a cylinder," and does not limit the claim to only external surfaces that have a circular cross-section which remains constant along their axial length. In short, "cylindrical" is not the equivalent of a perfect cylinder.

### B. Limitation 3 – "[A] Spring Steel Adapter Surrounding Said Leading End External Cylindrical Surface"

#### 1. Intrinsic Evidence

Limitation 3 of claim 1 of the '488 patent requires "a spring steel adapter surrounding said leading end external cylindrical surface for snap fitting . . . ." ('488 Patent col.10 l.1–3.)

#### 2. Extrinsic Evidence

#### a. Arlington's Proposed Construction

Arlington contends that the correct claim construction for "surrounding" is "significantly bordering" because in the '0485 Action, Judge Conner construed the phrase "spring metal adapter surrounding said leading end" in the '050 and '164 Patents to mean "an adapter that significantly borders the circumference of the 'leading end' of the connector."[16] *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 290 F. Supp. 2d 508, 521–22 (M.D. Pa. 2003). Dr. Rahn opines that this construction is appropriate in this

---

[16]  Judge Conner noted that the claims of the '050 and '164 Patents "do not describe an adapter that 'completely' or 'entirely' surrounds the connector. Such limiting language would connote an item that totally encircles, without breaks, the underlying connector. That the patentee chose not to use this language suggests that such a limited meaning was not intended." *Arlington*, 290 F. Supp. 2d 508, 521 n.7 (M.D. Pa. 2003). "Thus, 'surrounding' is not necessarily limited to circumstances in which a force or thing completely envelopes . . . an individual or item. Rather, the term may be used more loosely to describe any situation in which an outer boundary significantly borders an underlying entity." *Id.* at 521.

23

matter because the disclosure of the '488 Patent is almost identical to the context of the '050 Patent, as the '488 Patent incorporates by reference the '106 Patent, which is a sibling of the '050 Patent, in its entirety. (Doc. 95, Ex. 4, at ¶ 43.)

### b. Bridgeport's Proposed Construction

Dr. Williamson opines that a person having ordinary skill in the art would construe "spring steel adapter surrounding said leading end external cylindrical surface" to mean that "the die case connector body has a spring steel adapter that is on the outside of the smooth cylindrical section and which encircles the external cylindrical surface." (Doc. 77 at ¶ 74.)

### c. Conclusion

"Surrounding" should be construed to mean that the spring steel adapter "significantly borders" the connector's leading end external cylindrical surface, as Arlington argues, rather than "[completely] encircles" the external cylindrical surface. This is supported by the embodiments in the '488 and '106 Patents[17] ('488 Patent fig.1, '106 Patent fig.5, 20, 22) as well as the prior claim construction of the '050 and '164 Patents issued by Judge Conner in the '0485 Action. See *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning."); *see also Realtime Data, LLC v. Stanley*, 875 F. Supp. 2d 276 (S.D.N.Y. 2012) (treating the sibling of a patent incorporated by reference into an asserted patent as a related patent of the asserted patent).

Having construed "cylindrical" and "surrounding," as used in claim 1 of the '488 Patent, the Court will now conduct the infringement analysis required by *TiVo*. As the Court has concluded that there are no more than colorable differences between the

---

[17] "When a document is 'incorporated by reference' into a host document, such as a patent, the referenced document becomes effectively part of the host document as if it were explicitly contained therein." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 274 F.3d 1316, 1329 (Fed. Cir. 2001).

24

Enjoined Connectors and Accused Connectors, a finding that the Accused Connectors infringe claim 1 of the '488 Patent will result in Bridgeport being found in contempt for violating the Confession of Judgment and Injunction. *See TiVo*, 646 F.3d at 883.

## III. Infringement Analysis

### A. Direct Infringement

The Court finds that Arlington has carried its burden of demonstrating by clear and convincing evidence that the Accused Connectors have leading end external surfaces that are "cylindrical"—*i.e.*, having "the approximate form of a cylinder." Dr. Rahn's analyses, both visual and quantitative, convince the Court that this is so. His standard deviation analysis shows that the leading end external surfaces of the Accused Connectors deviate from a perfect cylinder by 3–4%, which is less than the 5% deviation present in the Enjoined Connectors' leading end external cylindrical surfaces. He also took consistent measurements and used cylindricity analysis, the method preferred by Dr. Williamson, which shows that the Accused Connectors' leading end external surfaces deviate from a perfect cylinder by 5.54%, which is insignificantly different from the 5.46% deviation of the Enjoined Connectors' leading end external cylindrical surfaces. Therefore, because Arlington has shown by clear and convincing evidence that the Accused Connectors have leading end external surfaces that have the approximate form of a cylinder, they meet limitation 2 of claim 1 of the '488 Patent.

The Court also finds that Arlington has demonstrated by clear and convincing evidence that the Accused Connectors have spring steel adapters "surrounding"—*i.e.*, "significantly bordering"—their leading end external cylindrical surfaces. In the '0485 Action, the Accused Connectors were found to infringe claim 8 of the related '050 Patent, which required the spring steel adapter to "surround"—construed by Judge Conner to mean "significantly border"—the connector's leading end. The Accused Connectors are not more than colorably different than the Enjoined Connectors, which infringe claim 1 of the '488 Patent and thus have spring steel adapters that "surround"—*i.e.*, "significantly border"—their leading end external cylindrical surfaces,

25

with respect to the "surrounding" limitation of claim 1 of the '488 Patent. It follows that the spring steel adapters must also significantly border the Accused Connectors' leading end external cylindrical surface. Accordingly, because Arlington has shown that the Accused Connectors have spring steel adapters that significantly border the leading end external cylindrical surfaces, they also meet limitation 3 of claim 1 of the '488 Patent.

In addition, the Court finds that Arlington has shown by clear and convincing evidence that Bridgeport directly infringes claim 1 of the '488 Patent by performing all of the steps of the process described in the claim. In its online promotional videos (Pl.'s Exs. 73, 89), Bridgeport uses its Whipper-Snap connectors to perform all the steps of claim 1's "method for attaching an armored or metal clad electrical cable to a junction box" while instructing end users on how to do the same.

Because the Court finds that Arlington has demonstrated by clear and convincing evidence that the Accused Connectors meet limitations 2 and 3 of claim 1 of the '488 Patent and that Bridgeport performs all of the steps of the process described in claim 1, Arlington has carried its burden and demonstrated that Bridgeport is a direct infringer of claim 1 of the '488 Patent pursuant to pursuant to 35 U.S.C. § 271(a).

### B. Indirect Infringement

Arlington further contends that Bridgeport indirectly infringes of the '488 Patent pursuant to 35 U.S.C. § 271(b) by knowingly inducing end users' infringement of claim 1 of the '488 Patent and possessing specific intent to encourage that infringement. (Doc. 95, Ex. 2 at 39.) As evidence of Bridgeport's knowing inducement and specific intent, Arlington points to Bridgeport's online promotional videos, which demonstrate how the Whipper-Snap connectors work and instruct end users on how to use them. (*Id.* at 40.) In one such video, Bridgeport's Technical Sales Manager verbally instructs the viewer on how to use Whipper-Snap connectors as he inserts an armor-clad ("AC") or metal-clad ("MC") cable into the trailing end of a 38ASP connector and then snaps the connector into a hole in the junction box. (Pl.'s Ex. 73.) In another, a narrator instructs the viewer to "snap the cable into the connector" and then "snap the assembly into the half inch

26

**A26**

knockout on the electrical box" as an individual performs those same steps. (Pl.'s Ex. 89.) Arlington also presents evidence of Bridgeport's sales of the Accused Connectors. (Doc. 184 at 198:1–10.)

The Court finds that Arlington has shown by clear and convincing evidence that Bridgeport induces infringement of claim 1 of the '488 Patent. By presenting evidence of sales of the Accused Connectors and Bridgeport's instructions that teach the infringing use of the connectors, Arlington has demonstrated direct infringement by Bridgeport's customers. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009). Arlington has also shown that Bridgeport actively, knowingly, and with the requisite intent induces end users' infringement by instructing them on how to use the Whipper-Snap connectors in a way that infringes all limitations of claim 1 of the '488 Patent through its online promotional videos. *See Akami Tech., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1308 (Fed. Cir. 2012). ("It is enough that the inducer 'cause[s], encourage[s], or aid[s]' the infringing conduct and that the induced conduct is carried out.") Accordingly, Bridgeport induces infringement of claim 1 of the '488 Patent.

In sum, the Court finds by clear and convincing evidence that the Accused Connectors meet limitations 2 and 3 of claim 1 of the '488 Patent and that Bridgeport both directly and indirectly infringes claim 1 of the '488 Patent. As this Court has already found that the Accused Connectors are not more than colorably different than the Enjoined Connectors with respect to limitations 2 and 3 of claim 1 of the '488 Patent, Bridgeport has violated the Confession of Judgment and Injunction (Doc. 47) and will be held in contempt of this Court's January 18, 2012 Order (Doc. 46).[18]

---

[18] In its Motion for Contempt, Arlington asks the Court to order Bridgeport to pay two times Arlington's lost profits for any sales made in violation of the Confession of Judgment and Injunction as well as Arlington's attorneys' fees incurred as a result of the contempt motion, both in an amount to be determined. (Doc. 51 at ¶ 8.) The parties should attempt to resolve the questions of lost profits and attorneys' fees amicably. Failing that, the parties should contact the Court, and the Court will schedule a hearing or hearings to resolve the issues of lost profits and counsel fees.

## CONCLUSION

For the foregoing reasons, the Court will grant Arlington's motion for contempt.  The Court will hold Bridgeport in contempt for violating the Confession of Judgment and Injunction through the sale of the Accused Connectors, and enjoin Bridgeport from selling the Accused Connectors for the duration of the '488 Patent.

An appropriate order follows.


March 19, 2013                                    /s/ A. Richard Caputo
Date                                             A. Richard Caputo
                                                 United States District Judge

28

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

ARLINGTON INDUSTRIES, INC.,

      Plaintiff,

            v.

BRIDGEPORT FITTINGS, INC.,

      Defendant.

CIVIL ACTION NO. 3:02-CV-0134

(JUDGE CAPUTO)

## ORDER

**NOW**, this 19th day of March, 2013, **IT IS HEREBY ORDERED** that:

(1)    The claim construction adopted by the Court regarding the disputed language in the '488 Patent is as follows:

        (A) **Disputed Language**: ". . . a member having a leading end **with an external cylindrical surface** . . . ."

        **Construction:**"The end of the member which is inserted into the hole or knockout of the enclosure has an outer surface that has the approximate form of a cylinder."

        (B) **Disputed Language**: ". . . a spring steel adapter **surrounding** said leading end external cylindrical surface for snap fitting . . . ."

        **Construction**: "An adapter made of spring steel significantly borders the leading end external cylindrical surface of the connector."

(2)    Plaintiff's Motion for Contempt (Doc. 51) is **GRANTED**.

(3)    Defendant is in **CONTEMPT** of this Court's January 18, 2012 Order (Doc. 46) entering Bridgeport's Confession of Judgment and Injunction (Doc. 47).

(4)    Defendant and its officers, agents, attorneys, servants, employees, successors, assigns, and all those in active concert or participation with them are **ORDERED** to comply with all provisions of the Confession of Judgment and Injunction (Doc. 47).

(5)    Defendant, its officers, agents, attorneys, servants, employees,

successors, assigns, and all those in active concert or participation with them are **PERMANENTLY ENJOINED** from directly or indirectly making, using, selling, offering for sale or import or causing or inducing others to make, use, sell, offer to sell, or import the Whipper-Snap 380SP and 38ASP model connectors during the remaining term of U.S. Patent No. 6,335,488.

(6)  The parties are to attempt to resolve the questions of lost profits and attorneys' fees amicably. Failing that, the parties shall contact the Court, and the Court will schedule a hearing or hearings to resolve the issues of lost profits and counsel fees.

(7)  Plaintiff's Motion to Strike Certain Testimony of Dr. Williamson (Doc. 153) is **DISMISSED AS MOOT**.

(8)  Defendant's Motion *in Limine* to Preclude Plaintiff's Improper Deposition Designations (Doc. 160) is **DISMISSED AS MOOT**.

(9)  Defendant's Motion in Limine to Preclude Plaintiff's Improper Deposition Designations (Doc. 163) is **DISMISSED AS MOOT**.

(10)  Plaintiff's Oral Motion to Strike Certain Testimony of Prof. Herbst is **DISMISSED AS MOOT**.


/s/ A. Richard Caputo
A. Richard Caputo
United States District Judge

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ARLINGTON INDUSTRIES, INC., | CIVIL ACTION NO. 3:02-CV-0134 |
| Plaintiff, | |
| v. | (JUDGE CAPUTO) |
| BRIDGEPORT FITTINGS, INC., | |
| Defendant. | |

## <u>MEMORANDUM</u>

Pursuant to this Court's determination that Defendant Bridgeport Fittings, Inc. ("Bridgeport") was in contempt of the Court's January 18, 2012 Order (Doc. 46) entering Bridgeport's Confession of Judgment and Injunction (Doc. 47), the Court must now resolve the issue of lost profits as well as attorney's fees and expenses. The parties were instructed to submit evidence of lost profits for sales made in violation of the Confession of Judgment and Injunction, and each side has done so. Arlington Industries, Inc. ("Arlington") has also submitted records regarding attorney's fees and expenses and both sides have submitted evidence of the reasonableness of these amounts. For the reasons that follow, the Court concludes that Arlington has demonstrated its entitlement to **$495,648.79** in lost profits and **$33,918.61** in prejudgement interest, calculated using the IRS overpayment rate. Arlington is also entitled to **$1,527,632.35** in attorney's fees and **$282,839.55** in costs and expenses.

## <u>BACKGROUND</u>

The background of this case is detailed in the Court's Memorandum and Order entered on March 19, 2013 (Docs. 192 and 193), *Arlington Industries, Inc. v. Bridgeport Fittings, Inc.*, No. 02-cv-134, 2013 WL 1149230 (M.D. Pa. Mar. 19, 2013). In that

Memorandum and Order, the Court granted Arlington's motion to hold Bridgeport in contempt for violating the Confession of Judgment and Injunction (Doc. 47).  The parties were instructed to "attempt to resolve the questions of lost profits and attorneys' fees amicably."  *Arlington Industries*, 2013 WL 1149230, at \*16, n.18.  As the issues of lost profits and attorney's fees have yet to be resolved, the Court is now faced with this task.

## <u>DISCUSSION</u>

**A.      Lost Profits**

In the contempt setting, "the innocent party is entitled to be made whole for the losses it incurs as the result of the contemnors' violations, including reasonable attorneys' fees and expenses."  *Halderman by Halderman v. Pennhurst State Sch. & Hosp.*, 49 F.3d 939, 941 (3d Cir. 1995) (citing *Robin Woods, Inc. v. Woods*, 28 F.3d 396, 400–01 (3d Cir.1994)).  With respect to lost profits, the parties agree that a patentee must establish a reasonable probability that "but for" the infringing sales, it would have made the infringer's sales.  *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1377 (Fed. Cir. 2003).  "To show 'but for' causation, the patentee must reconstruct the market to determine what profits the patentee would have made had the market developed absent the infringing product."  *Id.* (citing *Grain Processing Corp. v. Am. Maize–Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir.1999)).  However, "[a] patentee may resort to any method showing, with reasonable probability, entitlement to lost profits 'but for' the infringement."  *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1122 (Fed. Cir. 2003).

As an initial matter, Bridgeport asserts that "Arlington may only recover damages for those uses of the New Connectors that practice every step of the method claimed in the '488 Patent."  (Doc. 218, 9.)  However, as Arlington points out, the Injunction entered in this case enjoined Bridgeport from "making, using, selling, offering for sale or importing or causing or inducting others to make, use, sell, offer to sell, or import" Bridgeport's 590-DCS and 590-DCSI or any colorable imitations of such.  (Doc. 47, ¶ 2.) The injunction applied to all uses of these products, and did not create an exception for

2

certain permissible uses of these products. Therefore, the Court is not persuaded by Bridgeport's argument that Arlington is not entitled to recover lost profits on 100% of Bridgeport's sales simply because Arlington cannot show that every use of the New Connectors violates the '488 patent.

As to lost profits, Arlington asserts that it can demonstrate its entitlement to lost profits under either the "two supplier" market theory or under the *Panduit* test, set out in *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir.1978). *See, e.g. Micro Chem*, 318 F.3d at 1122 ("The *Panduit* and two-supplier market tests are recognized methods of showing 'but for' causation.") Both theories are addressed below.

### 1. Two-Supplier Market Theory

Under the two-supplier market theory a patentee must show "1) the relevant market contains only two suppliers, 2) its own manufacturing and marketing capability to make the sales that were diverted to the infringer, and 3) the amount of profit it would have made from these diverted sales." *Id.* at 1124 (citations omitted).

With respect to the first factor, that the relevant market contains two suppliers, Bridgeport argues that there were numerous competing products in the market, and thus it had more than two suppliers. (Doc. 218, 15-16; *Cerasale Decl.*, Doc. 227-2,¶ 22-30.) However, in support of its contention that the market contained only two suppliers, Arlington submits a declaration from Arlington Vice President Thomas Gretz ("Gretz"), asserting that every product identified by Bridgeport, except the Sigma Connectors, was on the market before Arlington was awarded supplemental damages in the '0485 Action.[1] *See Arlington Industries, Inc. v. Bridgeport Fittings, Inc.*, No. 01-cv-0485, 2013 WL 3773836 (M.D. Pa. July 17, 2013); (*Gretz Decl.*, Doc. 238-2, ¶¶ 12-15, 17-27). In

---

[1]     The "'0485 action," No. 3:01-CV-0485, commenced on March 19, 2001 in this district for infringement of U.S. Patent Nos. 5,266,050 and 5,171,164 against Bridgeport's entire line of Snap-in connectors. The action was assigned to Judge Conner. Shortly thereafter, Arlington filed the instant action for infringement of U.S. Patent No. 6,335,488 against a subset of Bridgeport's products accused in the '0485 Action.

3

the '0485 action, Judge Conner concluded that "Bridgeport and Arlington continued to compete in a two-supplier market during the contested period" despite Bridgeport's assertions that the market was not a two supplier market because of the existence of these purportedly competing products. *Id.* at *4. The Court sees no reason to depart from this conclusion.

As to the Sigma "private label" products not considered in the '0485 Action, Gretz asserts that 38ACDS (Sigma's Cut-In Connector) and 38ADS (Sigma's Double-Snap Connector), collectively, the "Sigma Connectors," do not constitute acceptable non-infringing substitutes to Arlington's Snap2It Connectors or Bridgeport's Colorable Imitations. (*Gretz Decl.*, Doc. 238-2, ¶ 30). Gretz bases this determination on differing design features and differences in use and states that neither Sigma connector is an acceptable non-infringing substitute since they do not share the advantages that motivated purchasers to buy either the Arlington or Bridgeport products. *Id.* at ¶¶ 31-32. Based on these representations, the Court is satisfied that the relevant market contained two suppliers, Arlington and Bridgeport, during the relevant period. Therefore, the first factor of the two supplier market theory is met.

Looking to the second factor, Arlington's own manufacturing and marketing capability, Arlington contends that it would have had the capability to make the sales that were made by Bridgeport during the relevant time period. *See Gretz Decl*; Doc. 238-2, ¶ 42, *Gallagher Decl.*, Doc. 238-4, ¶¶ 60-64. Bridgeport does not appear to dispute this assertion. Therefore, the Court is satisfied that Arlington would have had the manufacturing and marketing capability to make the sales that were diverted to the infringer.

With respect to the third factor of the two-supplier market theory, the amount of profits that would have been made on the sales made in contempt of the Injunction, Arlington provides Mr. Gallagher's methodology (Doc. 222-15, ¶ 5) indicating a sum of $495,648.79 in lost profits. Mr. Gallagher was also retained by Arlington in the '0485 action to make a similar calculation. *Id.* at ¶ 3, *see also Arlington*, 2013 WL 3773836 at

4

*6.  Bridgeport, through the declaration of Carol Ludington, argues that Arlington's damage calculations are unsupported and overstated. (*Ludington Decl.*, Doc. 253, ¶ 8.) For example, Ludington asserts that Arlington's damage claim is inflated because it is based on Arlington's historical average prices which were approximately 12% to 15% higher than those for Bridgeport's Colorable Imitations.  *Id.* at ¶ 72, 54.  While Arlington's prices have been higher than Bridgeport's prices, a similar price elasticity argument was rejected in the '0485 action, and there is no evidence to suggest that Arlington's higher prices would impact customers buying the product for the patented features.  (*Gallagher Decl.*, Doc. 238-4, ¶ 74.)

Ludington further argues that Bridgeport developed significant brand loyalty among its customers, which could have decreased demand for Arlington's products. (*Ludington Decl.*, Doc. 253,  ¶ 51-52.)  However, as Gallagher notes, in making this argument Bridgeport attempts to capitalize on customer goodwill from selling the Colorable Imitations in violation of the Injunction that was already in place.  (*Gallagher Decl.*, Doc. 238-4, ¶ 77.)  The Court is not persuaded by the argument that customer brand loyalty towards Bridgeport impacts the amount of profits Arlington would have made from the sales diverted to Bridgeport.  Therefore, Arlington has demonstrated its entitlement to lost profits under the two supplier market theory.

As to the amount of damages, Bridgeport argues that Arlington is only entitled to recover damages based upon its actual loss and that "undisputed evidence" shows that 73% of the Colorable Imitations were used for applications other than with junction boxes.  (Doc. 218, 14; Doc. 200 ¶ 10.)  Accordingly, Ludington asserts that Arlington's damage calculations are overstated because they include non-infringing sales by Bridgeport.  (*Ludington Decl.*, Doc. 253, ¶¶ 8-13.)  As an initial matter, the "undisputed evidence" provided by Bridgeport that 73% of Bridgeport's Colorable Imitations were used for applications other than with junction boxes was an estimate provided by Eric Cerasale, technical sales manager for Bridgeport, "based on [his] understanding of Bridgeport's end-users, the engineering community, and how they specify project and

5

design." (Doc. 200, ¶¶ 10, 1.)  Moreover, as noted above, the Contempt Order stated that Bridgeport was "permanently enjoined from directly or indirectly making, using, selling, offering for sale or import or causing or inducing others to make, sell, use, offer to sell, or import the Whipper-Snap 380SP and 38ASP model connectors during the remaining term of U.S. Patent No. 6, 335,488." (Doc. 193, ¶ 5.)  Therefore, the Court is unpersuaded that 73% of Bridgeport's sales of the Colorable Imitations should not be included in the lost profits calculation.

In addition, Bridgeport argues that Arlington "simply assumes that it is entitled to recover 100% of its lost profits without presenting an iota of evidence on market conditions." (Doc. 218, 12.)  In an attempt to challenge this "assumption" Ludington asserts that market conditions and other considerations demonstrate that it is not reasonable to assume that Arlington would have made Bridgeport's assumed sales. (*Ludington Decl.,* Doc. 253, ¶ 14.)  However, in the '0485 action, Gallagher's same calculation of lost profits was adopted through December 4, 2011.  Gallagher Decl. ¶¶ 30, 33.  The parties do not specifically indicate, and the Court remains unconvinced that market conditions have changed significantly from December 5, 2011 through March 19, 2013 in a way that would affect Arlington's entitlement to lost profits.  *Id.* at ¶ 33.

Bridgeport also argues that a prior injunction on its Colorable Imitations "empirically demonstrates that Bridgeport's customers will not automatically purchase" Arlington's connectors.  (Doc. 218, 17.)  It asserts that "[b]ecause Arlington cannot show that it would have captured all of Bridgeport's sales of the [Colorable Imitations] during the damages period, this Court cannot award Arlington's lost profits on 100% of Bridgeport's sales." *Id.*  However the Court is not persuaded that customer behavior during the injunction period dictates Arlington's entitlement to lost profits.

Under the two-supplier market theory, Arlington is entitled to lost profits using Mr. Gallagher's method.

6

### 2. Panduit Test

Alternatively, under the *Panduit* test, to obtain lost profits as damages a patentee must prove: "(1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made." *Panduit*, 575 F.2d at 1156. In terms of demand for the patented product, Arlington asserts, based on declarations from Gretz and Gallagher, that there is and was substantial demand for Arlington's patented product and that Bridgeport has failed to dispute this demand. Specifically, Gallagher notes that Arlington's 38AST Connector is Arlington's number one selling product. (*Gallagher Decl.*, Doc. 238-4, ¶ 38.) Moreover, during the relevant time period, Arlington had an increase in sales for the patented connectors. (*Gretz Decl.*, Doc. 238-2, ¶ 41.) Based on the representations from Gretz and Gallagher, the first element of the *Panduit* test is satisfied.

With respect to the second element, the availability of acceptable non-infringing substitutes, as noted above with respect to the first factor of the two-supplier market theory analysis, acceptable non-infringing substitutes were not on the market during the relevant time period. In addition, as explained above, Arlington has demonstrated both manufacturing and marketing capability as well as calculability of lost profits, meeting the final two elements of the *Panduit* test.

### 3. Lost Profits Conclusion

For the foregoing reasons, based on either the two-supplier market theory or the Panduit test, Arlington is entitled to lost profits in the amount of **$495,648.79**.

### B. Pre-judgment Interest

The decision of whether or not to award prejudgment interest is within the sound discretion of the trial court. *Booker v. Taylor Milk Co.*, 64 F.3d 860, 868 (3d Cir. 1995).

7

Prejudgment interest should be awarded "in response to considerations of fairness and denied when its exaction would be inequitable." *Id.* (internal citations omitted).

This Court has recently relied on the IRS overpayment rates in 26 U.S.C. § 6621(a)(1) for an award of prejudgment interest. *See Supinski v. United Parcel Serv., Inc.*, 3:06-CV-00793, 2012 WL 2905458, at *4 (M.D. Pa. July 16, 2012) (internal citations omitted) (providing a detailed explanation of calculating interest owed using IRS overpayment rates).

Prejudgment interest will be calculated based on the lost profit figures presented by Mr. Gallagher for the periods of December 5, 2011 to December 31, 2011; January 2012 to December 2012; and January 1, 2013 to March 19, 2013, respectively. The total amount of prejudgment interest to be awarded is **$33,894.87**.[2]

---

[2]     The Chart below contains the calculations for the amount of prejudgment interest owed based on the lost profits for the three time periods provided by Mr. Gallagher. (Doc. 222-18, Ex. C, Sch. 1A).

Lost Profit Amount
$24,133.88

| Time Period | Rate | Time | Amount Owed |
|---|---|---|---|
| Dec. 5, 2011-Dec. 31, 2011 | 3% | 26 days | 51.57168817 |
| Jan 1, 2012 - Dec. 31, 2013 | 3% | 24 mo. | 1448.0328 |
| Jan 1, 2014-May 31, 2014 | 3% | 5 mo. | 301.6735 |
| June 1, 2014-June 20, 2014 | 3% | 20 days | 39.67213151 |
| | | | **1840.95012** |

$375,241.5

| | | | |
|---|---|---|---|
| Jan. 1, 2012- Dec. 31, 2012 | 3% | 12 mo. | 11257.2456 |
| Jan. 1, 2013-May 31, 2014 | 3% | 17 mo. | 15947.7646 |
| June 1, 2014-June 20, 2014 | 3% | 20 days | 616.8353753 |
| | | | **27821.84558** |

$96,273.38

| | | | |
|---|---|---|---|
| Jan 1, 2013 - Mar 19, 2013 | 3% | 78 days | 617.2046827 |
| Mar 20, 2013-Mar 31, 2013 | 3% | 11 days | 87.04168603 |
| April 1, 2013 -May 31 , 2014 | 3% | 14 mo. | 3369.5683 |

8

### C.    Attorney's Fees

Arlington requests a total of $2,380,704.65 in attorney fees (not including pre-judgment interest) incurred in connection with its motion for contempt.  The starting point for a court's determination of reasonable attorney's fees is to calculate the "lodestar" by multiplying the number of hours reasonably expended by each attorney by a reasonable hourly rate.  *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983).  The party seeking fees has the initial burden of presenting evidence that the claimed rates and amounts of time are reasonable.  *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564, 106 S. Ct. 3088, 92 L. Ed. 2d 439 (1986).  Once the fee applicant has made this initial showing, "the resulting product is presumed to be the reasonable fee to which counsel is entitled."  *Id.*  (quoting *Blum v. Stenson*, 465 U.S. 886, 897, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984)).  The opposing party then has the burden of making specific objections to the proposed fee by affidavit or brief.  See *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir.1990).  In considering the objections, the district court has significant discretion to adjust the lodestar downwards.  *Id.*

The first step in the lodestar calculation is the determination of the number of hours reasonably expended. The court begins with the claimed hours for which the applicant has evidentiary support, and then makes deductions, if necessary, as follows:

> The district court should exclude hours that are not reasonably expended. Hours are not reasonably expended if they are excessive, redundant, or otherwise unnecessary.  Further, the court can reduce the hours claimed by the number of hours "spent litigating claims on which the party did not

---

| June 1, 2014-June 23, 2014 | 3%  23 days | 181.996526 |
| | | **4255.810921** |

**$33,918.61**

9

> succeed and that were 'distinct in all respects from' claims on which the party did succeed." *Institutionalized Juveniles* [*v. Sec'y of Pub. Wellfare*], 758 F.2d [897, 919 (3d Cir.1985) ] (quoting *Hensley*, 461 U.S. at 440). The court also can deduct hours when the fee petition inadequately documents the hours claimed. *Hensley*, 461 U.S. at 433.

*Id.* (citations omitted). In determining whether the number of hours claimed is reasonable, the court may divide the claimed hours according to the type of work performed. See, e.g., *Maldonado v. Houstoun*, 256 F.3d 181 (3d Cir. 2001). Hours that would not typically be billed to a client cannot be billed to an adversary. See *Pub. Interest Research Grp. of N.J., Inc. v. Windall*, 51 F.3d 1179, 1188 (3d Cir. 1995).

The second step in the lodestar determination is determining whether the claimed rates are reasonable. The court starts with the market rates prevailing at the time of the petition, which the party seeking fees has the burden of establishing by satisfactory evidence. See *Maldonado*, 256 F.3d 181; *Lanni v. State of N.J.*, 259 F.3d 146, 149 (3d. Cir. 2001). "[T]he court should assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Rode*, 892 F.2d at 1183. If there is evidence that the market has established different rates for different categories of legal work, the district court should assign the appropriate rate to each category. See *Loughner v. Univ. of Pittsburgh*, 260 F.3d 173, 180 (3d Cir. 2001).

The lodestar carries a strong presumption of reasonableness. *Id.* at 180. Once the lodestar has been determined, the court can adjust the lodestar downwards if the amount is not reasonable in light of the applicant's success—or more properly, his lack thereof—in the litigation. *Rode*, 892 F.2d at 1183. In certain rare instances, the lodestar may also be adjusted upwards to compensate counsel for exceptionally high quality work or for the risks associated with undertaking the litigation. *Id.* at 1184. The "party seeking attorney fees bears the ultimate burden of showing that its requested hourly rates and the hours it claims are reasonable." *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 703 n. 5 (3d Cir. 2005) (citing *Rode v. Dellarciprete*, 892 F.2d 1177,

10

1183 (3d Cir. 1990)).  To the extent the opposing party seeks to challenge the fees sought, "the opposing party must then object 'with sufficient specificity' to the request." *Id.* (quoting *Rode*, 892 F.2d at 1183)).

### 1. Reasonableness of Hours Spent

Bridgeport forcefully objects to the number of hours billed by Arlington's counsel as excessive, duplicative, and redundant.  As an initial matter, Bridgeport objects to Arlington's use of "block billing" in maintaining its time records, arguing that Arlington's documents "do not properly identify what task was being performed or an allocation of time to a particular task."  (Doc. 257, 12.)  Arlington points out that "block billing is a common practice which itself saves time" and "will be upheld as reasonable if the listed activities reasonably correspond to the number of hours billed."  *Schlier v. Rice*, No. 3:04-cv-1863, 2009 WL 5182164, at *6 (M.D. Pa. Dec. 22, 2009).  Therefore, Arlington's fees are not unreasonable simply because block billing was used to keep track of hours.  However, Bridgeport emphasizes the caveat that block billing is reasonable only "if the listed activities reasonably correspond to the number of hours billed."  *Id.*  Moreover, "[i]f a block entry is confusing or makes it difficult to allocate reasonable time to a specific task, 'the blame lies on the party seeking fees because they were in the best position to mitigate any confusion.'"  *Dixon-Rollins v. Experian Information Solutions, Inc.*, No. 09-646, 2010 WL 3734547, at *5 (E.D. Pa. Sept 23, 2010) (citing *U.S. v. NCH Corp.*, No. 05-881, 2010 WL 3703756, at *5 (D.N.J. Sept. 10, 2010)).  Therefore, if the Court could not differentiate how much time was spent on a given task due to block billing, in making reductions in hours for duplicative or redundant entries the entire duration of the time entry was deducted since the party using a block billing system bears that risk.

Bridgeport takes issue with Arlington's assertion that the matter was leanly staffed because eighteen attorneys billed for time in some form over the course of this case.  (Doc. 257, 9).  However, as Arlington points out, on behalf of Crowell & Moring LLP

("C&M"), one partner, Ms. Clune, and two associates, Mr. Zambrzycki and Mr. Katz, were responsible for 92% of the hours billed.  (Arlington Contempt Sanctions Ppt. 122.) Similarly, on behalf of Rhoads & Sinon LLP ("Rhoads"), one partner, Mr. Tribeck, and one associate, Ms. Lavis, were responsible for 87% of the hours billed.  *Id.*  As such, Bridgeport's objection that the case was not leanly staffed is inapposite.

Bridgeport next asserts that Arlington's claimed fees are excessive and duplicative.  (Doc. 257, 10.)  For example, Bridgeport points to the time spent by Clune, Zambrzycki, and Katz in preparing for the depositions of Dr. Rahn, Mr. Herbst, and Dr. Williamson.  In *Shaw v. Cumberland Truck Equipment Co.*, Judge Conner found redundant hours arose from the use of two attorneys to prepare for and participate in depositions.  *Shaw*, No. 09-359, 2012 WL 1130605, at *5 (M.D. Pa. Mar. 30, 2012).  In the present case, the Court agrees with Bridgeport that some of the time spent preparing for these depositions was duplicative.  For example, in June 2012, both Clune and Zambrzycki spent a substantial amount of time preparing for and attending the depositions of Dr. Rahn and Mr. Herbst.   Therefore, the Court will reduce the number of hours that Zambrzycki spent performing the same task as Clune by half (½), resulting in a reduction of **33.125** hours for Zambrzycki.  Similarly, also in June 2012, both Clune and Katz spent a substantial amount of time preparing for and attending the deposition of Dr. Williamson, and the Court will therefore reduce the number of hours Katz spent on these duplicative tasks by half, resulting in a reduction of **18.125** hours.[3]  In addition, on two separate days in December of 2011, Zambrzycki "began drafting" the motion for contempt.  Therefore, his initial entry of **0.75** hours will be excluded.

Also in the category of duplicative billing, in September of 2012 attorneys Clune, Zambrzycki, and Katz each spent a substantial amount of time on essentially the same

---

[3]     As noted above, although block billing is an appropriate practice in this district, where the Court could not glean the amount of time apportioned to a given task, the Court used the entire entry to calculate reductions.

12

task: formulating Arlington's opposition to Bridgeport's motion for reconsideration. Therefore, each attorney's hours will be reduced by two-thirds (2/3) of the time spent on this task resulting in a decrease of **6.67** hours for Clune, **12** hours for Zambrzycki, and **13** hours for Katz.  Similarly, in March of 2012, Clune, Zambrzycki, and Katz each billed time for beginning to draft Arlington's reply regarding the motion for contempt. Therefore, each attorney's hours will be hours will be reduced in a similar manner, resulting in a reduction of **4.33** hours for Clune, **3.5** hours for Zambrzycki, and **2.17** hours for Katz.  In addition, Clune and Zambrzycki both performed the same task of drafting the direct of Dr. Rahn in October of 2012.  Therefore, each attorney's hours will be reduced by half (½), such that Clune's hours will be reduced by **5.625** and Zambrzycki's hours will be reduced by **7.125**.  In August of 2012, Zambrzycki and Attorney Sonia Murphy both worked on editing power point slides for oral argument for the Daubert hearing.  Therefore, the duplicative time entries for each will be reduced by half (½), resulting in a **6.125** hour reduction for Zambrzycki and a **4** hour reduction for Murphy.  In December of 2012, both Zambrzycki and Katz spent a substantial amount of time drafting questions for Rahn's rebuttal.  Since it appears to be duplicative to have two attorneys working on the same project and Katz appears to have done the lion's share of work on this task, billing 107 hours compared to Zambrzycki's 32.75 hours, Zambrzycki's hours will be reduced by **32.75**.  Finally, Murphy, who Clune said worked primarily on the Daubert motion, spent **4.5** hours reviewing the contempt motions and declarations, which the Court finds duplicative given that other attorneys were performing those tasks.  Therefore, her hours will be reduced by that amount.

Bridgeport also objects to the amount of time spent at the Contempt hearing in October of 2012.  The Court finds that having three C&M attorneys, Clune, Zambrzycki, and Katz,  present for the contempt hearing and each billing full time was redundant. Therefore, the Court will reduce the amount of time billed by Zambrzycki and Katz on the

13

day of the hearing by half, resulting in a **10.125** hour reduction for Zambrzycki and a **10** hour reduction for Katz.

Bridgeport vehemently objects to the amount of time billed by Arlington's attorneys in preparing for its closing arguments, eventually delivered in February of 2013. (Doc. 257,13.) As Bridgeport notes, by February of 2013, Arlington had already had a chance to prepare for closing arguments three times: at the initial hearing, when it gave its rebuttal on December 17, 2012, and finally on February 20, 2013. *Id.* The Court agrees with Bridgeport that some of the time billed for preparation of the closing in January and February was redundant. Therefore, the Court will reduce the amount of time spent by Clune, Zambrzycki, and Katz on preparing for the closing during these months by half, resulting in a reduction of **89** hours for Clune, **26** hours for Zambrzycki, and **65** hours for Katz.

In addition, Bridgeport objects to entries where Arlington attorneys billed for non-legal tasks. The Court agrees. Hours spent performing non-lawyer tasks that could have been delegated are not recoverable. *Halderman v. Pennhurst St. Sch. & Hosp.*, 49 F.3d 939, 942 (3d Cir. 1994). Therefore, Clune's hours will be reduced by a total of **1.5** hours for performing tasks such as sending letters via FedEx and email in December of 2011 and for updating a schedule in July 2012. Similarly, Katz's hours will be reduced by **1** hour for adding color images to a document on February 15, 2012.

Bridgeport specifically objects to Tribeck's time entries that bill for "reviewing unidentified documents for hours, if not days." (Doc. 257, 15.) This Court has previously disregarded time entries that "include broad statements such as 'Review litigation documents,' 'Review documents for Exhibit list,' 'Review pleadings,' 'Review trial exhibits,' and 'Review trial exhibits & documents.'" *Jama Corp. v. Gupta*, Nos. 3:99-cv-01624, 3:99-cv-1574, 2008 WL 108671, at *7 (M.D. Pa. Jan. 4, 2008). As in *Jama*, the Court here will strike Tribeck's entries for vague and unspecified tasks such as

14

"confer with counsel; review docs; review docket; memo re: same," and thus will reduce his hours by a total of **50.33**.[4]  *See* Doc. 222-221.  Along similar lines, Clune billed 10 hours for tasks such as "work on" Arlington's brief, declaration, or motion.  Because these entries are vague and unspecified, the Court will reduce Clune's hours by **10**.  In addition, Associate John Martin billed 10 hours for "research" and "continue research."  Because these time entries are vague and overbroad, these **10** hours will be disregarded.

Tribeck's time sheets contained a total of 126.5 hours of entries that mentioned travel in addition to preparation for, or attending hearings. Given the number of other attorneys preparing for, traveling to, and present at the hearing, rebuttal, and closing, Tribeck's hours for these tasks will be reduced by half, resulting in a **63.25** hour decrease.   Also, paralegal Jodie Koons billed a total of 46 hours for travel to hearings, preparation for hearings, and attending hearings.  As noted above, given the number of attorneys performing the same activity, these entries are duplicative and her hours will be reduced by half, resulting in a **23** hour decrease.[5]

Overall, Clune's hours will be reduced by **107.125**, Zambrzycki's hours will be reduced by **131.5**, Katz's hours will be reduced by **108.295**, and Murphy's hours will be

---

[4]     Bridgeport also asserts that Tribeck billed numerous entries that referenced a "conference with counsel" that were not substantiated by counsel with whom he would have been conferring.  (Doc. 257, 15.)  This 50.33 hour reduction, for entries which frequently contained "conference with counsel," addresses this concern as well.

[5]     C&M attorneys also billed a substantial amount of time for travel.  However, since Clune has represented that the total amount of fees claimed has been reduced by $29,660.00 for travel time related to the contempt proceeding (*Clune Decl.*, Doc. 222-3, ¶ 12), the Court does not find it necessary to make a further reduction in C&M's hours for travel time.

15

reduced by **8.5**. Tribeck's hours will be reduced by **113.58**, Martin's hours will be reduced by **10**, and Koons's hours will be reduced by **23**.

### 2. Reasonable Rates

Generally, attorney's fees should be calculated based on the rates prevailing in the judicial district that is the forum of litigation. *Interfaith Cmty. Org. v. Honeywell Int'l Inc.*, 426 F.3d 694, 705 (3d Cir. 2005). However, there are two (2) exceptions to this "forum rate" rule: (1) "where a case requires the 'special expertise of counsel from a distant district'" or (2) "[w]here local counsel are unwilling to handle a case." *Id.* In either of these situations, "the 'relevant community' for determining a prevailing market rate is the forum in which the attorneys regularly practice, not the forum of the litigation." *Id.*

Arlington asserts that Washington, D.C. is the relevant community for determining fees for C&M attorneys because the first exception to the forum rate rule applies: that this case required "special expertise from counsel from a distant district." *Id.* In considering whether the need for the special expertise of counsel from a distant district has been demonstrated, the Third Circuit Court of Appeals has stated that the precise issue is "the extent to which other counsel practicing in [the forum of litigation] did or did not possess 'special expertise' in order to represent [the party]." *Id.* The Third Circuit found that without evidence that the party seeking fees conducted a significant search for counsel with the ability to handle the case in the forum of litigation, where " there are hundreds of firms in [the forum] that identify themselves as practicing [the relevant kind of law]," the party failed to make the necessary showing that no local counsel had the expertise necessary to represent the party. *Id.* at 706.

Here, in its briefs and at argument, Arlington asserts that it qualifies for the first exception to the forum rate rule because patent litigation is a highly specialized field and the Middle District of Pennsylvania "has a relatively small number of attorneys with the requisite expertise to prosecute patent infringement actions" (Doc. 222-2, 10;

16

*Freedenberg Decl.*, Doc. 222-23, ¶ 12).  The Court agrees that patent litigation is a highly complex and specialized field.  However, this fact, along with Arlington's contention that the Middle District of Pennsylvania has a relatively small number of attorneys with requisite experience does not justify compensating C&M at rate higher than that of the forum of litigation.  The first exception requires a showing that local counsel lack special expertise to represent Arlington, not merely that only a small number of attorneys in the forum may have the requisite experience.  More specifically, to show that a case requires special expertise from a distant district, a party must show that it unsuccessfully attempted to retain counsel in the forum of litigation.  Here Arlington did retain one of the lawyers who, along with his firm, held themselves out as patent lawyers in the Middle District of Pennsylvania.

Arlington also argues that it qualifies for the first exception to the forum rate rule because it should be afforded the opportunity to retain the most competent counsel available to try a case without having to incur a detriment at the fee petition stage.   The Court agrees with Arlington; it is entitled to retain whomever it wishes as counsel.  However, in determining the reasonable rate at which Arlington's fees can be recovered from Bridgeport, the Third Circuit Court of Appeals was clear in *Interfaith* that the forum rate rule applies unless a party can demonstrate that one of the two narrow exceptions to the rule is satisfied.

Arlington further argues that it qualifies for the first exception to the forum rate rule because Ms. Clune has successfully represented Arlington for twelve years in patent infringement actions against Bridgeport and thus possesses institutional knowledge of the case that is invaluable and cannot be replaced.  While Ms. Clune's experience representing Arlington is impressive, and she has indeed achieved great success in doing so, the Third Circuit has yet to recognize an "intimate familiarity" or "institutional knowledge" exception to the forum rate rule for attorney's fees.  If experience and familiarity with a particular client or matter qualified as "special expertise"

17

under the first exception, every loyal lawyer who has performed significant services for the same client would satisfy it, and the first exception would swallow the forum rate rule.

In a further attempt to demonstrate that C&M attorneys qualify for an exception to the forum rate rule, Attorney Tribeck stated that "at the time this matter commenced, and indeed through the present, Rhoads & Sinon could not have served as primary lead counsel in this matter due to staffing requirements and experience." (*Tribeck Sec. Decl.*, Doc. 246-6, ¶ 16). He further noted that "this proceeding required the knowledge of complex patent law related to contempt proceedings, as well as intimate familiarity with the underlying past litigation of the parties, the underlying settlement agreement, patent prosecution, history, and the parties' respective Enjoined and Accused Connectors." *Id*. at ¶ 20. Tribeck testified similarly at the hearing. Mr. Freedenberg also stated in a declaration that "had [he] been approached to represent Arlington at that time, after explaining to Arlington all the reasons why, absent extraordinary circumstances, a decision to discharge Crowell & Moring and engage new counsel for the contempt proceeding would have been imprudent, I would have declined, for all the same reasons cited by Mr. Tribeck." (*Freedenberg Sec. Decl.,* Doc. 246-25, ¶ 18.) However, Arlington has not provided any evidence to suggests that prior to retaining Ms. Clune as lead counsel, Arlington performed any kind of inquiry or search into retaining an attorney from the Middle District of Pennsylvania, and more importantly, and in any event, Arlington did retain Mr. Tribeck, a patent attorney, as counsel in this case.[6] Moreover, any historical knowledge required to present the case could have been secured by consultation, not lead representation. Post-hoc declarations or testimony from Mr. Tribeck and Mr. Freedenberg that they would not have accepted this case as lead counsel are

---

[6]     Whether Mr. Tribeck was local counsel to satisfy Local Rule 83.9 is of no moment. He is a patent attorney; he did perform as counsel in the case, by actively participating in the presentation of Arlington's case at the Contempt Hearing.

insufficient to demonstrate that this case requires special expertise from a distant district.[7]

Therefore, there relevant community for determining C&M and Rhoads's attorney's fees is the Middle District of Pennsylvania. Looking to prevailing rates in the Middle District of Pennsylvania, Arlington and Bridgeport submitted conflicting declarations as to what constitutes a reasonable rate. *See* Declaration of Bruce J. Phillips (Doc. 258), Declaration of Harvey Freedenberg (Doc. 222-23), Declaration of Walter T. Grabowski (Doc. 255), Declaration of Erin A. Brennan (Doc. 235). Because, as noted above, there is conflicting evidence as to the prevailing rates in the Middle District of Pennsylvania, the Court will affix an adjusted rate. See *Loughner v. Univ. of Pittsburgh*, 260 F.3d 173, 180 (3d Cir. 2001). I hasten to add this is not about who Arlington can retain as counsel, but rather what the apposing party is required to pay that retained counsel.

### a. Attorney Clune's Rate

Kathryn Clune serves as the vice-chair of C&M's Intellectual Property Group and is a member of the firm's Litigation and Trial Department. (*Clune Decl.*, Doc. 222-2 , ¶ 21 (a).) She has represented Arlington in patent litigation matters since 2001 and has

---

[7]     Arlington did not argue that it qualifies for the second exception to the forum rate rule, that local counsel were unwilling to handle the case. However, even if Arlington did attempt to use this testimony to satisfy this exception, it still falls short of the kind of testimony that persuaded the Third Circuit in *Interfaith* that the second exception was met: an affidavit from local counsel stating that "[a]t the time the suit was initiated, I was not aware of any attorneys or law firms who would have been willing to assume the risks of litigating cases of this type, particularly without contemporaneous payment for their services and expenses." *Interfaith*, 426 F.3d at 707. Statements made more than two years after the fact that they "would have declined" to serve as lead counsel for Arlington, based on staffing requirements and lack of experience, are not sufficiently persuasive.

19

been practicing as an attorney for over 20 years.  *Id.* at ¶¶ 3, 21(a).  Clune asserts that she charged Arlington a discounted hourly rate of $600 in 2011 and 2012 and $700 in 2013.  *Id* at ¶ 27.

Bridgeport asserts that the prevailing rate for plaintiff's counsel in the Middle District of Pennsylvania ranges between $220 and $300 an hour, relying on a declaration from Wilkes-Barre attorney Bruce J. Phillips.  (Doc. 257, 19.)  Bridgeport also objects to the significant increase in Clune's rates over the course of the fourteen months of litigation.

In response, Arlington states that Philips and other experts relied on by Bridgeport lack experience with patent litigation and therefore lack the ability to properly opine on the reasonableness of hourly rates in this case.  (Doc. 246-2, 11.)  As to the prevailing hourly rate in the Middle District of Pennsylvania, Arlington cites *Broadcast Music, Inc. v. It's Amore Corp.*, 3:08-cv-570, 2009 WL 1886038 (M.D. Pa. June 30, 2009) for the proposition that an hourly rate of $575 is in line with those prevailing in the community for a copyright infringement case.  The Court is not persuaded that this is the case because in *Broadcast Music* the opposing party did not challenge the fee calculation, and the party seeking the fees represented that "an hourly rate of $575.00 is a customary one for attorneys of his experience and expertise in Philadelphia, where he practices."  *Id*. at *9.  Therefore, $575 per hour is not the appropriate rate to apply for Ms. Clune in this case.

Instead, the Court finds that an hourly rate of **$450** is appropriate for an attorney practicing patent law with Ms. Clune's level of experience and expertise in the Middle District of Pennsylvania.  Even though we are applying the forum rate in this case and Mr. Tribeck's rate represents the going rate for a patent lawyer in the Middle District, the fact is that Ms. Clune has extensive experience which is greater than Mr. Tribeck's.  Thus, a rate in the Middle District higher than Mr. Tribeck's is justified.  As Arlington

20

notes, this rate appears to be reasonable when compared to the American Intellectual Property Law Association (AIPLA) Report of the Economic Survey (2013) (Doc. 222-26).

### b. Attorney Zambrzycki's Rate

Jacob Zambrzycki is an associate at C&M's San Francisco office with four years of legal experience practicing patent law. (*Clune Decl.*, Doc. 222-2 ¶ 21(b).) Clune asserts that Zambrzycki's hourly rate was $380 in 2011, $400-430 in 2012, and $490 in 2013. *Id.* at ¶ 28. As noted above, Bridgeport asserts that the prevailing rate for plaintiff's counsel in the Middle District of Pennsylvania ranges between $220 and $300 an hour. The Court finds that **$250** an hour, a rate that is within the range of rates charged by associates at Rhoads, is reasonable for Mr. Zambrzycki given his level of experience and area of expertise.

### c. Attorney Katz's Rate

Amir Katz is an associate at C&M's Washington, D.C. office with three years of legal experience practicing patent and e-discovery law. (*Clune Decl.*, Doc. 222-2 ¶ 21(c).) Clune asserts that Katz's rate was $320 in 2011, $400 in 2012, and $455 in 2013. *Id*. at ¶ 28. The Court finds that a rate of **$220** an hour is reasonable for Mr. Katz given his area of expertise and slightly lower level of experience than Mr. Zambrzycki.

### d. Rates of Other C&M Attorneys

Sonia Murphy was a member of C&M's Intellectual Property Group with ten years of legal experience focusing on patent litigation. (*Clune Decl.*, Doc. 222-2 ¶ 22(a).) She drafted Arlington's opposition to Bridgeport's Daubert Motion. *Id.* Clune asserts that

21

Murphy's rate was $595. *Id*. at ¶ 28. As counsel with less experience than Ms. Clune, the Court finds that an hourly rate of **$300** for Ms. Murphy is reasonable.

Jane Wessel is an attorney at C&M's London, England office, who assisted in finding a location for and entering into necessary contracts to take the deposition of Dr. Williamson, who resides in England. (*Clune Decl.*, Doc. 222-2 ¶ 21(b).) Clune asserts that Wessel's hourly rate was $400. *Id*. at ¶ 28. Because she was compensated at a similar rate to C&M associates, the Court finds that an hourly rate of **$230** is reasonable for her services.

Phillip Mancini was an associate at C&M from 2009-2013. (*Clune Decl.*, Doc. 222-2 ¶ 21(c).) While he was working on the case, he had close to seven years of patent litigation experience. *Id*. Clune asserts that his hourly rate was $560. *Id*. at ¶ 28. Given his experience level, the Court finds that an hourly rate of **$280** is reasonable for Mr. Mancini.

Ali Hossein Khan Tehrani is currently a first year associate at C&M's Washington, D.C. office. (*Clune Decl.*, Doc. 222-2 ¶ 21(d).) Prior to Joining C&M, he worked in-house at Amazon.com's patent department. *Id*. Prior to September 2013, he worked on the matter as a student associate. *Id*. Clune asserts that Tehrani's hourly rate was $175 while he was a student associate and $360 after September 2013. *Id*. at ¶ 28. As a first year associate, the Court finds that an hourly rate of **$200** is reasonable for Mr. Tehrani, and an hourly rate of **$120**, in line with that of paralegal Ms. January, is reasonable prior to September 2013 given his level of experience with patents.

Vince Galluzo is an associate at C&M's Washington, D.C. office with three years of legal experience. (*Clune Decl.*, Doc. 222-2 ¶ 21(e).) Clune asserts that his rate was $320 in 2011 and $400 in 2012. Like Mr. Katz, the Court finds that an hourly rate of **$220** is reasonable for Mr. Galluzo.

22

Preetha Chakrabarti is a first year associate at C&M's New York office. She worked on discrete legal research issues related to the determination of sanctions. (*Clune Decl.*, Doc. 222-2 ¶ 21(f).) Clune asserts that her rate was $365. *Id*. at ¶ 28. Like Mr. Tehrani, the Court finds that an hourly rate of **$200** is reasonable for Ms. Chakrabarti.

Elliot Golding is an associate at C&M's Washington, D.C. office with four years of legal experience, practicing antitrust and health care law. (*Clune Decl.*, Doc. 222-2 ¶ 21(g).) Clune asserts that his hourly rate is $490. *Id*. at ¶ 28. The Court finds that an hourly rate of **$230** is reasonable given his experience and expertise.

### e.    C&M Paralegal Rates

Desiree January supported Ms. Clune, Mr. Katz, and Mr. Zambrzycki as a paralegal from December 2011 to October 2012. (*Clune Decl.*, Doc. 222-2 ¶ 24.) When she worked on this matter, she was a senior paralegal with 6 years of experience. *Id.* Her hourly rate was $195 in 2011 and $215 in 2012. *Id*. at ¶ 28. In addition to Ms. January, April Stillwell served as a paralegal on this case from December 2012 to the present. *Id.* At the time, she was a senior paralegal with thirteen years of experience. *Id.* Her hourly rate was $235. *Id*. at ¶ 28.

Apart from Ms. January and Ms. Stillwell, Juan Geraldo, a project assistant with one year of experience, Virginia Li, a paralegal with six years of experience, and George Smith, a senior paralegal with 4.5 years of experience worked a small number of hours on the case. (*Clune Decl.*, Doc. 222-2 ¶ 25.) Geraldo's hourly rate was $145, Li's hourly rate was $195, and Smith's hourly rate was $165. *Id*. at ¶ 28.

Bridgeport asserts that typical paralegal rates in the Middle District of Pennsylvania are between $70 and $120 an hour. *See Overly v. Global Credit & Collection Corp., Inc.*, 1:10-cv-2392, 2011 WL 2651807, at *5 (M.D. Pa. July 6, 2011).

23

Since *Overly*, a rate of $150 an hour was approved for a paralegal in a FLSA case. *See Dino v. Pennsylvania*, No. 1:08-cv-1493, 2013 WL 6504749, at * 3 (M.D. Pa. Dec. 11, 2013). Similarly, Arlington's expert, Mr. Freedenberg, suggests that an hourly rate of $125-$225 is reasonable for paralegals in this district.

Given her six years of experience, and area of work, the Court finds that an hourly rate of **$120** is reasonable for Ms. January. An hourly rate of **$130** an hour is reasonable for Ms. Stillwell, with seven more years of experience than Ms. January. An hourly rate of **$75** is reasonable for the work of Mr. Geraldo, Ms. Li, and Mr. Smith.

### f. Attorney Tribeck's Rate

Robert Tribeck is a partner in the Harrisburg office of Rhoads & Sinon, LLP and has been practicing for over nineteen years. (*Tribeck Decl.*, Doc. 222-20 ¶ 6(a).) Mr. Tribeck states that he charged Arlington a reduced hourly rate of $375 to $395 per hour.

Bridgeport asserts that Tribeck's rates are not reasonable compared with this forum's rates for similarly qualified individuals. (Doc. 257, 20). It relies on the declaration of Bruce J. Phillips (Doc. 258) for the proposition that $275 an hour would be a more reasonable and customary market rate for Mr. Tribeck. Because none of the attorneys considered by Mr. Phillips in his analysis of the customary market rate in the Middle District of Pennsylvania have experience with patent litigation, the Court finds that an hourly rate of $275 an hour is too low in this case. Given Mr. Tribeck's substantial experience and the complexities of litigating this contempt proceeding,[8] the Court finds that an hourly rate of **$375** is reasonable for Mr. Tribeck. This rate reflects

---

[8]   At argument and in its brief, Bridgeport repeatedly attempts to deflate the complexity of this matter, labeling it as a "mere motion for contempt." However, as the Court recalls, the proceeding was complex and did involve both an infringement and colorable imitation analysis. *See* Doc. 192.

24

his lower level of experience and expertise in patent litigation compared to Ms. Clune.

### g.    Rates of Rhoads & Sinon Associates

Amanda Lavis, an associate at Rhoads and a member of the firm's Intellectual Property and Business Litigation groups, graduated from law school in 2010.  (*Tribeck Decl.*, Doc. 222-20 ¶ 6(b).)  Peri Fluger, also a member of the firm's Intellectual Property group, also graduated from law school in 2010.  *Id.* at ¶ 6(e)

Nicole Radziewicz, a member of the firm's Business Litigation practice group, graduated from law school in 2012.  *Id.* at ¶ 6(c).  John Martin, also an associate at Rhoads in an unspecified practice group, graduated from law school in 2006.  *Id.* at ¶ 6(d).  Casey Coyle, another associate at the firm in an unspecified practice group, graduated from law school in 2008.  *Id.* at ¶ 6(f).  Holly Cline, an associate in the firm's Business Litigation practice group graduated from law school in 2008.  *Id.* at ¶ 6(g).  Evan Jones joined the firm's Business Litigation practice group in 2013, and prior to that worked as a law clerk for the firm.

Tribeck asserts that the blended hourly rate for the associate attorneys at Rhoads is $275 to $295.

Bridgeport asserts that the increases in the associates rates upwards from $275 an hour are unreasonable (Doc. 58,¶ 11), and the Court agrees.  Bridgeport also asserts that the customary hourly rate for an associate in the Middle District of Pennsylvania is $170.  As noted above, because patent litigation is a specialized and complex field, the Court finds than an hourly rate of **$220** is reasonable in this case for Ms. Lavis and Mr.

25

Fluger, members of the firm's Intellectual Property group. An hourly rate of **$175** is reasonable for all other Rhoads associates.[9]

### h. Rates of Rhoads & Sinon Paralegals

Jodie Koons has sixteen years of experience "as a paralegal or the equivalent" and Kimberly Houser has thirty-two years as a paralegal or the equivalent. (*Tribeck Decl.*, Doc. 222-20 ¶ 7(a-b).)

Mr. Tribeck asserts that the hourly rate of Ms. Koons was $165-$170 per hour and the hourly rate of Ms. Houser was $150 per hour. The Court finds these rates to be unreasonable, and instead finds that an hourly rate of **$120** per hour to be appropriate given their years of experience.

### 3. Attorney's Fees Conclusion

Based on the foregoing, the Court finds that Arlington is entitled to a total of **$1,429,244.23** in attorney's fees based on a reasonable number of hours spent and the prevailing rates for the work performed in the Middle District of Pennsylvania.

### D. Costs and Expenses

Federal Rule of Civil Procedure 54(d)(1) provides, in pertinent part, that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs--other than attorney's fees--should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). The determination of which costs will be awarded to the prevailing party is a matter left to the sound discretion of the district court. *Bowers v. Foto-Wear, Inc.*, No. 3:CV-03-1137, 2007 WL 4086339, at *4 (M.D. Pa. Nov. 15, 2007) (citing *Farmer v. Arabian Am. Oil Co.*,

---

[9]     Mr. Tribeck specifies the year that each associate graduated from law school but not the number of years of legal experience each possesses. Therefore, the Court cannot meaningfully differentiate between them in terms of designating an appropriate hourly rate.

26

379 U.S. 227, 232, 85 S. Ct. 411, 13 L. Ed. 2d 248 (1964). "Although that discretion is not unbounded it allows the district court a wide range within which its determination will not be upset by an appellate court." *Copperweld Steel Co. v. Demag- Mannesmann- Bohler*, 624 F.2d 7, 8 (3d Cir.1980). In addition, Rule 54(d)(2) allows claims for "related non-taxable expenses" which may include "costs for postage, telephone, expert fees, travel, deposition transcripts, shipping, parking, lodging and food." *Bowers*, 2007 WL 4086339, at *5.

Arlington seeks reasonable costs in the amount of **$268,187.63** pursuant to 28 U.S.C. § 1920, as well as additional non-taxable expenses. This amount is broken down into a total of $183,909.36 in consultant fees: $148,237.50 for Arlington's technical expert, Dr. Rahn, $11,878.40 for Duff & Phelps, LLC, which employs Arlington's damages expert, and $23,793.46 for Resonant Legal Media, LLC, a trial graphics firm that provided demonstratives. (*Clune Decl.*, Doc. 222-3, ¶ 36(a).) In addition, Arlington requests a total of $33,456.37 for travel expenses during the litigation. *Id.* at ¶ 36(b). Next, Arlington requests a total of $31,916.03 for legal research and court reporter fees paid by Arlington during the litigation. *Id.* at ¶ 36(c). Finally, Arlington requests a total of $18,905.87 for non-taxable expenses including duplication of documents, telephone charges, and Federal Express and other postage charges. *Id.* at ¶ 36(d). *See also Clune Decl.*, Doc. 222-3, Ex. F-I and *Tribeck Dec;.* Doc. 222-20, Ex. B.

Bridgeport contends that Arlington's request for costs must be rejected because Arlington has not provided sufficient information to establish the compensable nature of the requested costs. *See Perri v. Respons. Intern. Hotel, Inc.*, No. 10-cv-4489, 2014 WL 201520, at *3 ("A party seeking reimbursement for costs 'must provide sufficient information' to establish the compensable nature of the requested costs.'"). While Arlington has not submitted invoices from vendors or third parties to substantiate its alleged costs, the Court finds that the records submitted are sufficiently detailed and that the above costs are reasonable. Therefore, the Court will grant the costs in total.

27

### **CONCLUSION**

As explained above, Arlington shall be awarded **$1,527,632.35** in attorney's fees and **$282,839.55** in costs and expenses.  Arlington will also be awarded **$495,648.79** in lost profits, plus **$33,918.61** in prejudgment interest to date.

An appropriate order follows.

_____                    _____

Date                                              A. Richard Caputo

United States District Judge

28

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

ARLINGTON INDUSTRIES, INC.,

    Plaintiff,

        v.

BRIDGEPORT FITTINGS, INC.,

    Defendant.

CIVIL ACTION NO. 3:02-CV-0134

(JUDGE CAPUTO)

**ORDER**

**NOW**, this 23rd day of June, 2014, **IT IS HEREBY ORDERED** that:

(1)    Plaintiff Arlington Industries, Inc. is awarded **$495,648.79** in lost profits, plus **$33,918.61** in pre-judgment interest.

(2)    Plaintiff Arlington Industries, Inc. is awarded **$1,527,632.35** in attorney's fees plus **$282,839.55** in costs and expenses.

(3)    The Clerk of Court is directed to mark this case as **CLOSED**.

        /s/ A. Richard Caputo
        A. Richard Caputo
        United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ARLINGTON INDUSTRIES, INC.,

    Plaintiff,

        v.

BRIDGEPORT FITTINGS, INC.,

    Defendant.

CIVIL ACTION NO. 3:02-CV-0134

(JUDGE CAPUTO)

**FILED**
**SCRANTON**

JUL 0 2 2014

PER _____
        DEPUTY CLERK

## MEMORANDUM ORDER

In a telephone conference with the Court held on June 30, 2014, Arlington Industries, Inc. ("Arlington") sought the vacation of the Court's June 23, 2014 Order (Doc. 284) so as to allow Arlington to submit an application for fees for the presentation of the ruled upon fee petition as well as additional costs paid directly by Arlington's counsel, namely expert fees of Dr. Rahn and Resonant Legal Media, LLC. Bridgeport Fittings, Inc. ("Bridgeport") opposed this motion on the basis that it would be more efficient to allow the appeal of the June 23, 2014 Order filed in the Federal Circuit on June 27, 2014, and thereafter, if necessary, have this Court entertain Arlington's motion for the additional counsel fees above noted and the costs above noted.

The Court agrees with Bridgeport, and will deny Arlington's Motion to Vacate the June 23, 2014 Order (Doc. 284).

In addition, the Court notes that page 26 of the Memorandum entered on June 23, 2014 (Doc. 283) which states that Arlington is entitled to "$1,429,244.23" in attorney's fees is in error. It should instead state "$1,527,632.35," as the Order (Doc. 284) does. Arlington correctly noted that this amount in fees does not include 7.5 hours for the work of paralegal John Lund. This amount was excluded because his work on this case as well as his level

of experience was factually unsubstantiated by Arlington. See *Decl. of Kathryn L. Clune*, Doc. 222-3, ¶¶ 24-26.

Therefore, **NOW** this 2nd day of July, 2014, **IT IS HEREBY ORDERED** that:

(1)    Page 26 of the Court's June 23, 2014 Memorandum (Doc. 283) should read "$1,527,632.35" instead of "$1,429,244.23."

(2)    Arlington's Motion to Vacate the June 23, 2014 Order (Doc. 284) in support of additional fees and costs is **DENIED without prejudice.**

(3)    Arlington's Motion to supplement the Court's June 23, 2014 award for the services of Mr. Lund is **DENIED.**


A. Richard Caputo
United States District Judge

2



US006335488B1

(12) **United States Patent**     (10) **Patent No.:**     **US 6,335,488 B1**

Gretz     (45) **Date of Patent:**     *Jan. 1, 2002

(54) **SNAP IN CABLE CONNECTOR**

(75) Inventor:     **Thomas J. Gretz,** Clarks Summit, PA (US)

(73) Assignee:     **Arlington Industries, Inc.,** Scranton, PA (US)

( * ) Notice:     Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/603,756**

(22) Filed:     **Jun. 26, 2000**

**Related U.S. Application Data**

(63) Continuation of application No. 09/165,530, filed on Oct. 2, 1998, now Pat. No. 6,080,933.

(51) Int. Cl.[7] ................................................. **H02G 3/18**
(52) U.S. Cl. .............. **174/65 R**; 174/65 G; 174/152 G; 174/153 G; 16/2.1; 16/2.2
(58) Field of Search ............................ 174/65 R, 65 G, 174/64, 135, 152 G, 153 G, 151, 31 R, 167, 153 R; 16/2.1, 2.2; 439/411, 439, 460, 98; 285/194, 921, 154.1, 140.1

(56)     **References Cited**

U.S. PATENT DOCUMENTS

4,021,604 A * 5/1977 Dola et al. .................... 174/51

| | | | | |
|---|---|---|---|---|
| 4,970,350 A | * | 11/1990 | Harrington | 174/65 G |
| 5,171,164 A | * | 12/1992 | O'Neil et al. | 174/65 R |
| 5,422,437 A | * | 6/1995 | Schnell | 174/65 R |
| 5,731,543 A | * | 3/1998 | Jorgensen | 174/65 R |
| 6,034,325 A | * | 3/2000 | Nattel et al. | 174/65 R |
| 6,034,326 A | * | 3/2000 | Jorgensen | 174/65 R |
| 6,043,432 A | * | 3/2000 | Gretz | 174/65 R |
| 6,080,933 A | * | 6/2000 | Gretz | 174/65 R |
| 6,133,529 A | * | 10/2000 | Gretz | 174/65 R |
| 6,162,995 A | * | 12/2000 | Bachle et al. | 174/151 |

* cited by examiner

*Primary Examiner*—Dean A. Reichard
*Assistant Examiner*—Angel R. Estrada

(57)     **ABSTRACT**

A snap in locking cable connector is composed of two mating pieces that snap together and provide a connector for armored or metal clad electrical conducts. One piece includes a die cast member including a smooth outer cylindrical section having an inner diameter that may accommodate a spring steel adaptor with flanges to hold the spring steel adaptor in place. The spring steel adaptor is used in conjunction with an electrical junction box to fix the location of the locking cable connector with respect to the junction box. Another piece includes a spring steel locking ring provided to receive an armored cable and lock into the die cast member. The spring steel locking ring has tangs allowing unidirectional insertion into the die cast member and restricting withdrawal motion from the die cast member. The spring steel locking ring also includes oppositely directed tangs to permit reception of the armored cable in one direction and restrict its movement in the reverse direction.

**3 Claims, 5 Drawing Sheets**



A31



*FIG. 2*

*FIG. 1*



*FIG. 3*

*FIG. 4*

*FIG. 5*



*FIG. 6*



*FIG. 7*



*FIG. 8*





US 6,335,488 B1

1

# SNAP IN CABLE CONNECTOR

This application is a continuation of application Ser. No. 09/165,530 filed Oct. 2, 1998, now U.S. Pat. No. 6,080,933.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to cable terminations and more particularly to locking cable terminations which snap into place and require no screws or twisting for locking.

### 2. Related Prior Art

There has been an extensive number of various types of cable connectors that have been designed since the initial use of electricity prior to the turn of the century. Many types are still in use in some form. The most common initial design that is in use today is a form that was first patented in the mid-twenties. This form includes a screw that is tightened once the cable or electrical wire is in place. The electrical cable is fed into a hole or slot in a junction box through an oversized fitting that has provision for receiving a screw. In the early design the screw was configured to press directly against the electrical cable. This presented problems with the screw penetrating the insulation covering on the wire.

Presently, the screw type securement is one where the screw tightens a clamp that presses against the wire covering. The screw is normally fitted into the wall of a junction box and pulls the clamp closer to the wall as the screw is tightened. These clamps are designed so that even at their tightest when the screw pulls a portion of the clamp against the wall, there is a space between the portion of the clamp pressing against the wire and the wall of the junction box. In more recent years, there have been several patents that involve snap type fittings, of which the following patents are representative.

U.S. Pat. No. 3,858,151, titled "Flexible Conduit Connector", issued to J. H. Paskert, relates to a connector for securing a helically grooved flexible electrical conduit with a junction box that is formed as a one piece metal clip. The clip has a tubular body with tabs and barbs which engage the helical groove in the conduit to prevent the conduit from being pulled out of the clip and to electrically interconnect the clip conduit. The barbs and tabs are disposed along a common helical path to facilitate turning or screwing of the clip onto one end of the conduit. A collar on the inner end of the clip encloses the end of the conduit to protect wires in the conduit against engagement with any burrs which may be formed on the end of the conduit. Resiliently deflectable retaining arms and flanges clampingly engage a wall of the junction box to hold the clip and conduit in place. The retaining arms are provided with pointed end portions which are pressed against the wall of the junction box to electrically interconnect the clip and junction box.

U.S. Pat. No. 4,012,578, titled "One Piece Connector For Flexible Conduit", issued to T. M. Moran et al., relates to a one piece connector clip for securing a helically grooved flexible electrical conduit within generally round apertures in a junction box. The body of the clip comprises a plurality of generally flat sides and is provided with tabs which engage the helical groove in the conduit to prevent the conduit from being pulled out of the clip and to electrically interconnect the clip and conduit. A collar on the inner end of the clip encloses the end of the conduit to protect the wires contained therein against any burrs which may be present on the end of the conduit. Resiliently deflectable retaining arms and flanges clampingly engage a wall of the junction box to

2

hole the clip and conduit in place and to electrically interconnect the clip and the junction box. In one embodiment of the invention, the body of the clip has a generally square cross-sectional configuration, in another embodiment, the body has a genally truncated equilateral triangular shape, while in still another embodiment the body has a generally hexagonal shape.

U.S. Pat. No. 4,880,387, titled "Connector For Flexible Electrical Conduit", issued to Allan Stikeleather et al., relates to a connector for joining flexible electrical conduit to a housing such as a junction box, fixture or the like which is formed cylindrically from light metal and includes relatively flexible arms depending from a relatively stiff face portion, retaining members flaring from the extending for a substantial portion of the length of the flexible arms. Multiple barbs are formed on the flexible arms to engage the conduit and flanges are formed at the extremity of the flexible arms to cooperate with the retaining members to clamp the connector to the housing.

U.S. Pat. No. 5,422,437, titled "Electrical Connector Assembly", issued to Kenneth Schnell, relates to an electrical connector assembly for coupling non-metallic electrical connector assembly includes a snap nut adaptor with an annular groove at one end forming a first mating member, and a conduit connector with resilient latch tabs forming a second mating member. Upon inserting the snap nut adaptor through a hole or knockout opening in an electrical box, the conduit connector is securely coupled thereto by inserting it over the snap nut adaptor until the latch tabs engage the annular groove via a snap fit.

## SUMMARY OF THE INVENTION

The present invention provides a snap in locking cable connector composed of three mating pieces that snap together and provide a connector for helically wound armored or metal clad electrical conductors. A spring steel adaptor is used in conjunction with an electrical junction box to fix the location of the locking cable connector with respect to the junction box. A first piece of the snap in locking cable connector is a die cast member including at the inbound end a smooth outer cylindrical section, having an outer diameter with flanges that accommodates a spring steel adaptor. Another piece is a spring steel locking ring provided to receive a helically wound shielded cable and inserted into the out end of the die cast member. The locking ring has outwardly directed tangs which allow insertion into the die cast member but restricts withdrawal from the die cast member. The locking ring also has oppositely directed tangs to receive the armored cable and restrict its movement in a reverse direction.

The die cast member may have one or more flat surfaces around its periphery forming a hexagon on one of the flanges to allow gripping by a wrench or other tool for tightening or loosening or making minor adjustments in the positioning of the armored cable in the member once the armored cable is inserted into the steel locking ring. Rotating the die cast member in one direction will pull the armored cable and advance it further into the member.

The spring steel locking ring has a cut out section to permit slight compression so that the locking ring may be easily inserted into the die cast member. Once inserted, the locking ring is able to expand to the full inner diameter of the die cast member to provide a tight fit.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an exploded view of a junction box, a first embodiment of a spring steel adaptor and a snap in cable connector;

US 6,335,488 B1

3

FIG. 2 is a sectional view of a snap in cable connector having a first embodiment of a die cast member and a first embodiment of a spring steel locking ring,

FIG. 3 is a sectional view of a first embodiment of the spring steel locking ring of FIG. 2;

FIG. 4 is a side sectional view of the spring steel locking ring taken along lines 4—4 of FIG. 3;

FIG. 5 is a top view of the spring steel locking ring of FIG. 4;

FIG. 6 is a side view of the die cast member of FIG. 2;

FIG. 7 is a side sectional view of the die cast member of FIG. 6;

FIG. 8 is an end view of the die cast member of FIG. 6 taken along lines 8—8.

FIG. 9 is a plan view of a die-cut blank which will be formed into the second and preferred embodiment of the spring steel locking ring.

FIG. 10 is an end view of the second and preferred embodiment of the spring steel locking ring 100 from the trailing edge.

FIG. 11 is a top view of the spring steel locking ring 100 of FIG. 10.

FIG. 12 is a side view of the spring steel locking ring of FIG. 10.

FIG. 13 is a cross-sectional view of the spring steel locking ring 100 taken along lines 13—13 of FIG. 10.

FIG. 14 is an end view of the preferred embodiment of the spring steel locking ring as viewed from the forward edge.

FIG. 15 is a side view of the second and preferred embodiment of the die cast member.

FIG. 16 is a cross-sectional view of the die-cast member 128 as taken along lines 16—16.

FIG. 17 is a perspective view of the die-cast member 128 of FIG. 15.

FIG. 18 is an end view of the die-cast member 128 as viewed from the right side of FIG. 15.

FIG. 19 is a cross-sectional view of the assembled die-cast member and spring steel locking ring including an inserted cable held in place by the staggered cable tangs.

FIG. 20 is a cross-sectional view of the die cast member taken along lines 20—20 of FIG. 18.

DESCRIPTION OF THE INVENTION

A continual problem in building construction is the problem of running armored cable for electrical connections. Many connectors require that there exist enough room with the junction box to permit insertion of a screw driver to tighten the cable and fix its position with respect to the junction box. Still other connectors can fix the position of the cable with respect to the junction box. However, once the connection is made, the cable cannot be backed out without the connection to the junction box being taken apart, which may not always be done easily.

In practicing the present invention, a three piece snap in cable connector is configured for use with a helically wound cable that locks into the junction box. The snap in cable connector is arranged to grip the helical grooves in an armored cable securely to lock it in position with respect to the cable connector.

Referring now to FIG. 1, an exploded view of a junction box 12, a snap in cable connector 16 with spring steel adapter 14, a first embodiment of a die cast member 18, and a first embodiment of a spring steel locking ring 20 is

4

illustrated. Spring steel adapter 14 includes a slot 22 to permit expansion prior to being fitted over the reduced diameter area 28. Adapter 14 fits into aperture 24 of junction box 12. Adapter 14 also includes a plurality of tangs 15 to prevent removal of adapter 14 once inserted into aperture 24. A more detailed operation of adapter 14 may be found in U.S. Pat. No. 5,373,106, "Quick-Connect Fitting For Electrical Junction Box", assigned to the same assignee as the present invention and is incorporated herein by reference in its entirety.

FIG. 2 is a cross-sectional view of cable connector 16 illustrating the interconnection of die cast member 18 and spring steel locking ring 20 and the locking function of spring steel locking ring 20 around an armored cable 26.

A first embodiment of the die cast member 18 is illustrated as having a reduced diameter area 28 for receiving adapter 14. A lip 30 prevents adapter 14 from slipping out once inserted. Lip 30 has a slight incline to permit insertion into aperture 24 of junction box 12. On the other side of area 28 is a perpendicular face 31 as part of an enlarged hexagonal section 32. The diameter of face 31 is greater than the diameter of lip 30 to prevent over insertion into aperture 24. Die cast member 18 with adapter 14 can be inserted into aperture 24 only up to the face 31 of section 32. Section 32 with its flat parallel surfaces forms a hexagonal shape when viewed from the end. When steel locking ring 20 is inserted with its cable gripping tangs, this hexagonal shape allows gripping with a standard fixed or adjustable wrench to draw armored cable 26 into the steel locking ring 20. In this manner, minor adjustments to the position of armed cable 26 can be effected. The inner diameter of die cast member 18 reduces on the inside of section 32 to form face or should 34 to restrict insertion of steel locking ring 20. Thus, the inside diameter of the locking ring is approximately the same as the inside diameter of the shoulder 34.

A first embodiment of a steel locking ring 20 is illustrated as inserted into die cast member 18 with a first tang 36 in a corresponding opening 38 in die cast member 18. As is seen, the spring steel tang 36 has an outward extending angle which permits the tang to be depressed inward as the steel locking ring is inserted into the outer aperture 49 of the member 18, yet spring outward into openings 38 and 38A to prevent withdrawal. Also illustrated is cable tang 40 in steel locking ring 20, gripping the bottom of the helical recesses of armored cable 26 at point 42 in helical groove 44. Shoulder 34 of die cast member 18 is positioned such that the end of tang barely clears the end of opening 38 before steel locking ring 20 reaches a place where it cannot be inserted further.

As is seen in FIG. 2, the armored cable 26 is cut at the end 27 of the connector which is just inside the inner end. The wires 29 are connected on the inside of the junction box. Also shown in FIG. 2 is a plastic grommet 60 which has flange 62 preventing full insertion into the inner end of the connector. The grommet has a reduced diameter section 64 and latch 66 which fit over a ridge 68 on the connector. The grommet can be pushed into the connector until the latch 66 catches on the ridge 68. The grommet prevents chafing of the wires 29 and helps retain the armored cable 26 in the connector.

Referring now the FIG. 3, an end view of the first embodiment of a steel locking ring 20 is illustrated as having two tangs 36 and 36A to provide locking stability when inserted into die cast member 18. It is to be noted that tangs 36 and 36A have angled outward surfaces and relatively flat axial surfaces since the force that needs to be exerted on die

US 6,335,488 B1

5

cast member **18** is in direct line with the direction of insertion and removal. Generally cylindrical spring steel locking ring **20** is provided to receive armored cable **26** and lock it into die cast member **18**. Steel locking ring **20** has a first set of tangs **36** and **36**A to allow insertion into die cast member **18** while restricting withdrawal of locking ring **20** from die cast member **18**. The first set of tangs **36** and **36**A includes a pair of tangs located at one end of locking ring **20** with the pair of tangs spaced on opposite side from each other. In an alternate arrangement, the first set of tangs includes three tangs (not shown) located at one end of locking ring **20**. The three tangs may be equally spaced along the circumference of the generally cylindrical spring steel locking ring **20**.

Also illustrated are two cable gripping tangs **40** and **40**A for securely holding armored cable **26** in position. The surfaces of tangs **40** and **40**A have a relatively flat axial surface with the tangs angled inward toward the inner end of the member **18**. As is seen, the tangs **36**, **36**A, **40** and **40**A are lanced from the cylindrical wall of the locking ring **20**. The inside end **41** of cable gripping tangs **40** and **40**a are bent on a radial direction and jagged with points since the force that needs to be exerted is helical or twisting in nature and a flat surface would slide along groove **44** of armored cable **26**. In FIG. 3, steel locking ring **20** shows the second set of tangs oppositely directed from the first set of tangs to receive armored cable **26** and prevent its removal in a reverse direction. The second set of tangs includes a pair of tangs **40** and **40**A, centrally located from the ends of locking ring **20**, the pair of tangs **40** and **40**A are spaced one hundred twenty degrees apart from each other along the internal circumference of locking ring **20**. This arrangement pushes armored cable **26** against one side of steel locking ring **20** when there is an attempt to pull armored cable **26** from snap in cable connector **26**, reducing the effective diameter of steel locking ring **20** to the diameter of armored cable **26**. In an alternate embodiment, the second set of tangs may include three tangs (not shown) centrally located in locking ring **20**, the three tangs may be spaced one hundred twenty degrees apart from each other along the internal circumference of locking ring **20**. In this arrangement the tangs evenly distribute the force that may be exerted to remove the cable around the outside of armored cable **26**, with the tangs digging into groove **44**.

FIG. 4 illustrates an arrangement of the steel locking ring having a slot **50** with an offset piece or tongue **52** on one side of slot **50** that fits into a concomitant cutout **54** on the other side of slot **50**. Slot **50** permits compression of steel locking ring **20** to an outer diameter smaller than the inner diameter of die cast member **18**. This arrangement allows easy insertion of steel locking ring **20** into die cast member **18** and expansion of the outer diameter of steel locking ring **20** to fit tightly into the inner diameter of die cast member **18**. Slot **50** with offset piece **52** on one side with concomitant cutout **54** on the other side assures that tangs **36** and **36**A of steel locking ring **20** remain aligned with openings **38** and **38**A of die cast member **18**. Without offset piece **52** and cutout **54**, compression of steel locking ring **20** permitted by slot **50** may result in a sliding of one side of slot **50** with respect to the other or deforming of a locking ring **20** so that one tang, for example, tang **36**, may align with opening **38** while due to deformation, tang **36**A is still outside die cast member **18** and does not align with opening **38**A.

FIG. 5 is a top view of steel locking ring **20** of FIG. 3 with cable holding and tangs **40** and **40**A shown in phantom with inside end **41** shown. As can be seen, tang **40** is displaced from tang **40**a approximately one hundred twenty degrees along the inner circumference of steel locking ring **20**.

6

Referring now to FIG. 6, a side view of die cast member **18** is illustrated as having reduced diameter area **28** for receiving adaptor **14**. Reduced area **28** is defined by lip **30**, which prevents adaptor **14** from slipping out once inserted, and enlarged flat face **31**. As stated previously, lip **30** has a slight incline to permit insertion into aperture **24** of junction box **12**. Also previously stated, face **31** is greater than the diameter of lip **30** to prevent over insertion into aperture **24**. As can be seen by a comparison of the diameters of lip **30** and face **31**, die cast member **18** with adaptor **14** can be inserted into aperture **24** only up to the edge of section **32**.

FIG. 7 is a sectional view of the die cast member **18** illustrating first opening **38** to receive tang **36** of steel locking ring **20** and a second opening **38**a to receive tang **36**A of steel locking ring **20**.

FIG. 8 is an end view of die cast member **18** illustrated in FIG. 6. As described previously and illustrated more clearly in FIG. 8, section **32** with its flat parallel surfaces forms a hexagon shape when viewed from the end. The hexagon shape is provided to allow gripping with a standard fixed or adjustable wrench. By rotating the wrench, (not shown) armored cable **26** may be drawn into the locking ring **20**. In this manner, minor adjustments to the position of armored cable **26** can be performed.

FIG. 9 is a plan view of a die-cut blank which will be formed into the second and preferred embodiment of the spring steel locking ring **100**. A plurality of lateral slots **102** are formed in pairs along the blank. Adjacent pairs of the lateral slots **102** are joined by cuts **103** extending between them. U-shaped cutouts **104** are also formed in the blank. The blank has a forward edge **124** which will be positioned toward a junction box (not shown) and a trailing edge **126** which will be positioned away from the junction box. As shown in FIG. 9, both the lateral slots **102** and U-shaped cutouts **104** are positioned at staggered distances from the forward edge **124**. The blank also includes a triangle cut **106** positioned near the trailing edge **126** and an aperture **108** which will be used to hold the blank in a mandrel (not shown) while the blank is formed into the tubular shaped spring steel locking ring **100**. When the blank is formed into its tubular shape, tongue **114** will partially enter the groove **116** formed on the opposite end of the blank. Lateral slots **102** and cuts **103** define staggered tangs **110**a, **110**b, **110**c which are positioned at varying precalculated distances from the forward edge **124**.

FIG. 10 is an end view of the second and preferred embodiment of the spring steel locking ring **100** from the trailing edge **126** after it has been formed into its tubular shape. A gap **118** remains between the two ends of the locking ring where the tongue **114** (not shown) approaches but does not contact the groove **116** (not shown). The purpose of the gap **118** is to depart a collapsible action to the spring steel locking ring **100** so that slight pressure on the outer periphery of the locking ring **100** will collapse it thereby allowing it to interact with and enter the chamber of a separate piece of the invention, a die-cast member (not shown). FIG. 10 depicts the orientation of the staggered tangs **110**a, **110**b, **110**c, outward projecting tangs **112**a, **112**b and triangle-shaped cable gripper **122** on the tubular shaped locking ring **100**. The outward projecting tangs **112**, **112**b are defined by the U-shaped cutouts **104** (not shown) and are positioned essentially 180° apart on the outer periphery of the locking ring **100**. The triangle-shaped cable gripper **122** and the staggered tangs **110**a, **110**b, **110**c are all oriented inwardly on the tubular-shaped locking ring **100**.

FIG. 11 is a top view of the spring steel locking ring **100** of FIG. 10. As shown in FIG. 11, the edge **111** of the

7

8

staggered cable tangs (110c depicted) are oriented toward the forward edge 124 which will be oriented toward the junction box (not shown). By being oriented toward the forward edge 124, edges 111 of the staggered cable tangs (110c depicted) will be able to grip and hold an armored cable (not shown) which will be inserted from the direction of the trailing edge 126. Conversely, the outward projecting tangs (112b shown), will be oriented with their edges 113 toward the trailing edge 126 of the spring steel locking ring 100.

FIG. 12 is a side view of the spring steel locking ring of FIG. 10. As depicted in FIG. 12, the outward projecting tangs 112a, 112b are at staggered distances from trailing edge 126. Two staggered cable tangs 110b, 110c are depicted at staggered distances from forward edge 124.

FIG. 13 is a cross-sectional view of the spring steel locking ring 100 taken along lines 13—13 of FIG. 10. Staggered cable tang 110c is depicted extending inwardly into the tubular shaped locking ring 100. An angled end 115 is shown near the end of staggered cable tang 110c.

FIG. 14 is an end view of the preferred embodiment of the spring steel locking ring as viewed from the forward edge 124. The staggered cable tangs 110a, 110b, 110c are oriented toward the forward edge 124.

A side view of the second and preferred embodiment of the die-cast member 128 is shown in FIG. 15. The generally tubular-shaped die-cast member 128 has a central flange 130 located approximately mid-way along its length. Flanking the central flange 130 are a reduced diameter seat 132 and a rear cylindrical body portion 144. The die-cast member 128 includes a forward end 150 and a rearward end 152. The forward end 150 will be oriented toward a junction box (not shown) when put in use. A lip 138 is located at the forward end 150 of the die cast member 128 and the lip 138 and central flange 130 define the boundaries of reduced diameter seat 132. The seat 132 will later accommodate a spring steel adapter (not shown) which will connect the die-cast member to a junction box (not shown). Cylindrical body portion 144 includes openings (136 shown) which will later accommodate the outward projecting tangs (not shown) of the spring steel locking ring (not shown).

FIG. 16 is a cross-sectional view of the die-cast member 128 as taken along lines 16—16 of FIG. 15. A hollow chamber 142 is formed in the rearward portion of the die-cast member 128. The chamber 142 will later accommodate the spring steel locking ring 100 (not shown). Openings 136, 136a in the tubular body of the die-cast member 128 will later accommodate the outward projecting tangs (not shown) of the spring steel locking ring. By being staggered at different distances from the rearward end 152 of the die-cast member 128, the openings 136, 136a will require that the spring steel locking ring (not shown) be oriented such that each outward projecting tang seats in its proper opening. As shown in FIG. 16, central flange 130 extends outward of the main body portion of the die-cast member 128 throughout most of its periphery except for a flat edge 146 on one side.

FIG. 17 is a perspective view of the die-cast member 128 of FIG. 15 and depicts the relative positioning of the central flange 130, rear cylindrical body portion 144, one opening 136 in the rear cylindrical body portion, and the reduced diameter seat 132.

FIG. 18 is an end view of the die-cast member 128 as viewed from the right side of FIG. 15. Central flange 130 is shown extending around most of the periphery of the tubular-shaped die-cast member 128 except for flat edge 146. Flat edge 146 will enable easier turning of the die-cast member 128 with respect to a junction box (not shown) once the two are adjoined.

FIG. 19 is a cross-sectional view of the assembled die-cast member 128 and spring steel locking ring 100 including a cable 26 inserted within the assembly and held in place by the staggered cable tangs (110b shown). To create the connector assembly 160, the installer puts gentle pressure on the outer periphery of the spring steel locking ring 100 compressing its outer diameter and closing the gap (not shown). The spring steel locking ring 100, in its compressed diameter state, is then slipped into the cylindrical chamber 142 at the rearward end 152 of the die-cast member 128. The spring steel locking ring 100 is rotated until outward projecting tang 112b snaps into opening 136 in the rear cylindrical body portion 144 and outward projecting tang 112a snaps into opening 136a. As the outward projecting tangs 112a, 112b are at staggered distances from the edge of the spring steel locking ring 100, the locking ring 100 has only one orientation with respect to the die-cast member 128 as the two are joined.

The cable 26 is then inserted within the connector assembly 160. The cable 26 is an armored clad cable having helical grooves 44 around its periphery. An installer would typically push the cable into the chamber 142 containing the spring steel locking ring 100 at the rear 152 of the die-cast member 128 and advance it until the end 154 of the cable contacted the ridge 156 at the forward end 150 of the die-cast member 128. Wires 29 typically extend through the mouth 158 of the die-cast member 128.

As it is advanced into the connector assembly 160, the staggered cable tangs (110b shown) force the cable 26 against the inner surface of the connector assembly. Referring to FIG. 10, it can be seen that the three staggered cable tangs 110a, 110b, 110c force the cable (not shown) against the cable gripper 122 on the opposite side of the spring steel locking ring 100. Referring again to FIG. 19, the staggered cable tangs (110b shown) are staggered longitudinally along the spring steel locking ring 100 at the proper distance to allow each staggered cable tang to engage one of the helical grooves 44 on the cable 26. Staggered cable tang 110b is depicted engaging the helical groove 44 of the cable 26 in FIG. 19. The angled end 115 of the staggered cable tang 110b enables the tang to bite directly into the helical groove 44. The combination of the staggered cable tangs biting into the helical grooves and the cable gripper engaging the cable surface prevent the cable 26 from being pulled out of the connector assembly 160. An adapter clip (not shown) can then be slid over lip 138 until engaging flat face 134. The adapter clip will seat on the reduced diameter seat 132 of the connector assembly 160.

The connector assembly 160 including an installed adapter, can then be snapped into place in the knock-out of a junction box. The connector assembly 160 will advance into the junction box (not shown) until flat face 134 of central flange 130 engages the wall of the junction box. The connector assembly is then fastened to the junction box by the adapter and the cable is locked in position with respect to the die-cast member by the combined action of the staggered cable tangs and the cable gripper.

FIG. 20 is a cross-sectional view of the die-cast member 128 taken along line 20—20 of FIG. 18. The die-cast member 128 includes a thicker wall portion 148 adjacent its forward end 150. The thicker wall portion 148 works in conjunction with the staggered cable tangs (not shown) of the spring steel locking ring to force the cable to the opposite side of the channel and against the cable gripper (not shown).

US 6,335,488 B1

9

A snap in locking cable connector has been described that is composed of three mating pieces that snap together and provide a connector for armored or metal clad electrical conductors. One piece includes a die cast member having a smooth outer cylindrical section. This section accommodates a spring steel adaptor. The smooth cylindrical section has flanges at each end defining to hold the spring steel adaptor in place. The spring steel adaptor is used in conjunction with an electrical junction box to fix and lock in the locking cable connector with respect to the junction box. Another piece includes a spring steel locking ring provided to receive a helical shielded or armored cable. The spring steel locking ring locks into the die cast member. The spring steel locking ring has tangs allowing unidirectional insertion into the die cast member and restricting withdrawal from the die cast member. The spring steel locking ring also includes oppositely directed cable gripping tangs to permit reception of the armored cable in one direction and restrict its movement in the reverse direction.

Thus, the use of the connector permits a simple assembly by snapping the helical armored cable into the connector and snapping the connector and cable to the junction box. The connector can be slightly rotated to take up any slack with the armored cable if the inside ends **41** of the tangs rest at the bottom of a groove which requires some tightening.

What is claimed is:

1. A method for attaching an armored or metal clad electrical cable to a junction box comprising:

providing a junction box having an aperture;

providing a member having a leading end with an external cylindrical surface and a trailing end with an inner diameter;

10

providing a spring steel adapter surrounding said leading end external cylindrical surface for snap fitting into said aperture;

providing a spring steel loading ring inserted into said trailing end inner diameter;

restricting rearward withdrawal motion of said spring steel locking ring from said member;

receiving an armored or metal clad cable in said spring steel locking ring; and

preventing removal of said armored or metal cable in a rearward direction from said spring steel locking ring.

2. The method according to claim 1 wherein said restricting rearward withdrawal motion includes:

providing two or more tangs located at one end of said spring steel locking ring, said tangs equally spaced around the circumference of said generally cylindrical spring steel locking ring; and

distributing a force applied for rearward withdrawal of said spring steel locking ring to said points along said locking ring.

3. The method according to claim 1 wherein said preventing removal includes:

providing three tangs centrally located in said locking ring, said three tangs spaced from each other along the internal circumference of said locking ring; and

distributing a force applied for preventing removal of said armored cable along the three points on said spring steel locking ring.

*   *   *   *   *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,335,488 B1                                    Page 1 of  1
DATED            : January 1, 2002
INVENTOR(S)  : Thomas J. Gretz

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

<u>Column 10,</u>
Line 4, the portion of the claim that reads "loading" should read -- locking --.

Signed and Sealed this

Twelfth Day of November, 2002

*Attest:*

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*

*Attesting Officer*

## <u>CERTIFICATE OF SERVICE</u>

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by ALAN ANDERSON LAW FIRM LLC, Attorneys for Appellant to print this document.  I am an employee of Counsel Press.

On October 20, 2014, Counsel for Appellant has authorized me to electronically file the foregoing **Brief for Defendant-Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

> Kathryn L. Clune
> Principal Counsel
> Crowell & Moring LLP
> 1001 Pennsylvania Avenue, NW
> Washington, DC 20004
> (202) 624-2500
> kclune@crowell.com
>
> Jacob Ziemowit Zambrzycki
> Crowell & Moring, LLP
> 23rd Floor
> 275 Battery Street
> San Francisco, CA 94111
> (415) 365-7458
> jzambrzycki@crowell.com

Paper copies will also be mailed to principal counsel for Appellee – Cross-Appellant at the address above when paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

October 20, 2014.                    /s/ Robyn Cocho
                                     Counsel Press

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that the foregoing Brief for Defendant-Appellant Bridgeport Fittings, Inc. complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a) and contains 13,818 words, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

Dated: October 20, 2014.

/s/Alan M. Anderson
Alan M. Anderson
Alan Anderson Law Firm LLC
Crescent Ridge Corporate Center
11100 Wayzata Blvd., Suite 545
Minneapolis, MN 55305
Telephone: 612-756-7010
Facsimile: 612-756-7050
aanderson@anderson-lawfirm.com