# United States Court of Appeals
# for the Federal Circuit

ARLINGTON INDUSTRIES, INC.,

*Plaintiff-Cross Appellant,*

*v.*

BRIDGEPORT FITTINGS, INC.,

*Defendant-Appellant.*

*Appeal from the United States District Court for the Middle District of Pennsylvania in Case No. 3:02-cv-0134, Judge A. Richard Caputo.*

## NONCONFIDENTIAL CORRECTED PRINCIPAL AND RESPONSE BRIEF OF CROSS APPELLANT ARLINGTON

KATHRYN L. CLUNE
*COUNSEL OF RECORD*
CROWELL & MORING LLP
1001 Pennsylvania Avenue., NW
Washington, DC 20004
(202) 624-2500

CARTER G. PHILLIPS
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000

JACOB Z. ZAMBRZYCKI
CROWELL & MORING LLP
275 Battery Street, 23rd Floor
San Francisco, CA 94111
(415) 986-2800

ERIC A. SHUMSKY
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC 20005
(202) 339-8400

*Counsel for Plaintiff-Cross Appellant Arlington Industries, Inc.*

January 13, 2015

# CERTIFICATE OF INTEREST

Counsel for Plaintiff-Cross Appellant Arlington Industries, Inc. certifies the following:

1.     The full name of every party or amicus represented by me is:

Arlington Industries, Inc.

2.     The name of the real party in interest represented by me is:

Arlington Industries, Inc.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

None

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Crowell & Moring LLP:          Kathryn L. Clune, Jacob Z. Zambrzycki, Amir D. Katz, Scott L. Bittman

Dorsey & Whitney, LLP:          Christopher S. Casieri

Greenberg Traurig, LLP:          Mark L. Hogge

Rhoads & Sinon LLP:          Robert J. Tribeck, Amanda J. Lavis

Sidley Austin LLP:          Carter G. Phillips, Rachel H. Townsend

Orrick, Herrington & Sutcliffe LLP:     Eric A. Shumsky

Wormuth, Mey & Sulla, LLP:          Michael R. Mey

January 13, 2015                    Respectfully submitted,


                                    */s/ Kathryn L. Clune*
                                    KATHRYN L. CLUNE
                                    *COUNSEL OF RECORD*
                                    CROWELL & MORING LLP
                                    1001 Pennsylvania Avenue, NW
                                    Washington, DC 20004
                                    (202) 624-2500 (Telephone)
                                    (202) 628-5116 (Facsimile)
                                    kclune@crowell.com

                                    *Counsel for Plaintiff-Cross Appellant*
                                    *Arlington Industries, Inc.*

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ..............................................................i

TABLE OF AUTHORITIES ................................................................vi

TABLE OF ABBREVIATIONS ............................................................xi

INTRODUCTION ................................................................................1

STATEMENT OF RELATED CASES ....................................................3

JURISDICTIONAL STATEMENT ........................................................4

ISSUES PRESENTED..........................................................................4

STATEMENT OF THE CASE................................................................5

STATEMENT OF FACTS ....................................................................7

I.      Arlington Revolutionized the Electrical Connector Industry..........................7

II.     Bridgeport's Two Decades of Copying ........................................9

III.    Bridgeport's Contempt ................................................................13

        A. Dr. Rahn's Colorable Imitation and Infringement Analysis and
           Conclusions................................................................................14

           1. No Significant Modifications to the "Leading End Cylindrical
              Surface" Limitation ................................................................15

           2. The Accused Connectors Continue to Meet the "Leading End
              Cylindrical Surface" Limitation ..............................................20

           3. Bridgeport Made No Significant Modifications Related to the
              "Surrounding Said Leading End Cylindrical Surface" Limitation,
              Which Continues to Be Met by the Accused Connectors......................21

        B. The District Court's Claim Construction ......................................22

           1. "Cylindrical"..........................................................................22

           2. "Surrounding"........................................................................22

        C. Bridgeport's Irrelevant Patents..................................................23

        D. The District Court's Contempt Order..........................................23

        E. The Sanctions Hearing and Award ............................................23

           1. Lost Profits ............................................................................23

           2. Costs and Expenses ..............................................................25

3. Attorney Fees..................................................................25

SUMMARY OF THE ARGUMENT ....................................................27

ARGUMENT ....................................................................................28

I. Standard of Review....................................................................28

II. The District Court Properly Found Bridgeport in Contempt for Violating the '488 Injunction. ........................................................29

 A. A Contempt Proceeding Was Appropriate. ................................30

 B. Bridgeport's Modification of the "External Cylindrical Surface" Was Insignificant in Form, Application and Function. .........................................31

  1. "External Cylindrical Surface."..............................................32

  2. The District Court Heard Substantial Evidence That the Accused Connectors' "External Cylindrical Surface" Was a Colorable Imitation..................................................36

  3. Designing Around Non-Patented Features..............................43

 C. The District Court Did Not Clearly Err in Finding That Bridgeport Made Only an Insignificant Modification to How the Adapter "Surround[s]."..................................................45

 D. Arlington Presented Undisputed Evidence That Bridgeport Marketed Both the Enjoined and Accused Connectors as Functional Equivalents to Arlington's Products..................................................46

 E. Bridgeport's "Patents" Are Irrelevant. ........................................49

III. The Court Correctly Construed the Claims. ................................50

 A. "Cylindrical."..................................................51

  1. The Ordinary Meaning of "Cylindrical" Is Not Limited to a Perfect Cylinder. ..................................................51

  2. The Specification Supports the District Court's Construction and Contradicts Bridgeport's. ..................................................53

  3. The District Court's Construction Is Consistent with Bridgeport's Previous Admission of Infringement. ..................................................57

  4. The Court Did Not Base Its Construction on Its Previous Construction of the '831 Patent..................................................59

  5. The District Court's Construction Does Not Render Other Claim Terms Superfluous..................................................60

B. "Surrounding." ...........................................................63

    1. The Previous Construction of "Surrounding" Has Preclusive Effect. .................................................................63

    2. The Intrinsic Evidence Supports the District Court's Construction and Contradicts Bridgeport's. ...............................67

IV. The Findings of Direct and Indirect Infringement Should Be Affirmed. ..............................................................69

V. Bridgeport's Challenge to the Scope of the Injunction Is Misplaced. .........73

VI. The District Court Was Correct to Award Arlington 100% of Its Lost Profits, Costs, and Expenses. .........................................74

  A. Arlington Demonstrated Its Entitlement to Lost Profits under Both the Two-Supplier Market and *Panduit* Tests. ....................75

  B. The District Court Did Not Err by Awarding Arlington Its Costs and Expenses. ..........................................................80

VII. Rather Than Be Made Whole, Arlington Was Effectively Punished $750,000 for Bridgeport's Contempt as a Result of Two Legal Errors Made by the District Court in Applying the Forum-Rate Rule for Reasonable Hourly Rates. ................................................84

  A. Institutional Knowledge Qualifies for the Special Expertise Exception to the Forum Rate Rule. ...............................................88

  B. The Special Expertise Exception Does Not Impose a Bright Line Rule Requiring a Showing of Unsuccessful Attempts to Obtain Local Counsel. .............................................................91

VIII. The District Court Abused Its Discretion by Setting Reasonable Hourly Rates for the Middle District of Pennsylvania at Rates Not Found in the Record and Lower than Arlington Paid Its Local Counsel. .............................................................94

CONCLUSION ................................................................97

CERTIFICATE OF SERVICE .....................................................99

CERTIFICATE OF COMPLIANCE ................................................100

**Confidential Material Omitted on page 84:** The monetary value to Arlington of enjoining Bridgeport's Accused Connectors for the next five years.

# TABLE OF AUTHORITIES

Page(s)

CASES

*Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.*,
340 F.3d 1298 (Fed. Cir. 2003) .................................................... 62, 63

*Anderson v. Bessemer City*,
470 U.S. 564 (1985) ..........................................................................28

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 13-1357,
759 F.3d 1333 (Fed. Cir. July 17, 2014) .................................... passim

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
477 F. App'x 740 (Fed. Cir. 2012)......................................................64

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
632 F.3d 1246 (Fed. Cir. 2011) .......................................................7, 8

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
290 F. Supp. 2d 508 (M.D. Pa. 2003) ......................................... 63, 64

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
692 F. Supp. 2d 487 (M.D. Pa. 2010) ...............................................12

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 3:01-cv-0485,
2010 WL 817519 (M.D. Pa. Mar. 9, 2010).........................................12

*Arthrex v. Parcus Med.*, No. 2:11-cv-694,
2014 U.S. Dist. LEXIS 1033330 (M.D. Fla. July 29, 2014)........................ 52, 53

*AT&T v. JMC Telecom*, No. 99-cv-2578,
2005 WL 2086194 (D.N.J. Aug. 26, 2005).........................................93

*Baldwin Graphic Systems v. Siebert*,
512 F.3d 1338 (Fed. Cir. 2008)..........................................................56

*Bendix Commercial Vehicle, Sys. v. Haldex Brake Prods.*, No. 1:09-cv-176,
2011 WL 871413 (N.D. Ohio Mar. 1, 2011)......................................................90

*Blum v. Stenson*,
465 U.S. 886 (1984) ..................................................................... 94, 95

*Brine, Inc. v. STX, L.L.C.*,
367 F. Supp. 2d 61 (D. Mass.)..............................................................71

*Bowers v. Foto-Wear*, No. 3:03-cv-1137,
2007 WL 4086339 (M.D. Pa. Nov. 15, 2007)...........................................80

*Bywaters v. United States*,
670 F.3d 1221 (Fed. Cir. 2012) .................................................... 93, 94

*Child Evangelism Fellowship of N.J. v. Stafford Twp. Sch. Dist.*, No. 02-cv-4549,
2006 U.S. Dist. LEXIS 62966 (D.N.J. Sep. 5, 2006)...........................93

*Chiuminatta Concrete Concepts v. Cardinal Industries*,
145 F.3d 1303 (Fed. Cir. 1998) .............................................................72

*Copperweld Steel v. Demag-Mannesmann-Bohler*,
624 F.2d 7 (3d Cir. 1980) ......................................................................80

*Cybor Corp. v. FAS Technologies, Inc.*,
138 F.3d 1448 (Fed. Cir. 1998) .............................................................28

*Edwards Lifesciences v. CoreValve*,
699 F.3d 1305 (Fed. Cir. 2012) .................................................... 51, 53

*Evans v. Port Authority of N.Y. & N.J.*,
273 F.3d 346 (3d Cir. 2001) ......................................................... 95, 96

*Fiskars, Inc. v. Hunt Manufacturing Co.*,
221 F.3d 1318 (Fed. Cir. 2000).............................................................50

*Funai Electric Co., Ltd. v. Daewoo Electronics Corp.*,
616 F.3d 1357 (Fed. Cir. 2010) ............................................. 51, 55, 69

*Halderman v. Pennhurst State Sch. & Hosp.*,
49 F.3d 939 (3d Cir. 1995) ................................................... 73, 74, 87

*Hensley v. Eckerhart*,
 461 U.S. 424 (1983) .........................................................................................83

*International Rectifier Corp. v. IXYS Corp.*,
 361 F.3d 1363 (Fed. Cir. 2004)................................................................ 53, 54

*Interfaith Cmty. Org. v. Honeywell Int'l*,
 426 F.3d 694 (3d Cir. 2005) ("*Interfaith I*") ............................................... passim

*Interfaith Cmty. Org. v. Honeywell Int'l*,
 808 F. Supp. 2d 744 (D.N.J. 2011) ("*Interfaith II*") .................................... passim

*Interfaith Cmty. Org. v. Honeywell Int'l*,
 726 F.3d 403 (3d Cir. 2013) .................................................................... 87, 90

*John Mezzalingua Assocs. v. Arris Int'l*, No. 03-cv-353,
 2003 U.S. Dist. LEXIS 24730 (W.D. Wis. Nov. 14, 2003).................... 37, 52, 53

*KSM Fastening Systems, Inc. v. H.A. Jones Co., Inc.*,
 776 F.2d 1522 (Fed. Cir. 1985)..................................................................... passim

*Kumho Tire Co., v. Carmichael*,
 526 U.S. 137 (1999) .........................................................................................39

*Lichtenstein v. Lichtenstein*,
 425 F.2d 1111 (3d Cir. 1970) ............................................................ 80, 81, 83

*Lucent Technologies, Inc. v. Gateway, Inc.*,
 580 F.3d 1301 (Fed. Cir. 2009).................................................................. 71, 72

*Markman v. Westview Instruments, Inc.*,
 52 F.3d 967 (Fed. Cir. 1995)...........................................................................53

*Merial Ltd. v. Cipla Ltd.*,
 681 F.3d 1283 (Fed. Cir. 2012)................................................................... passim

*Micro Chemical, Inc. v. Lextron, Inc.*,
 318 F.3d 1119 (Fed. Cir. 2003)................................................................. 75, 78

*Mycogen Plant Science, Inc. v. Monsanto Co.*,
  252 F.3d 1306 (Fed. Cir. 2001) ..................................................... 64, 66

*National Presto Industries, Inc. v. W. Bend Co.*,
  76 F.3d 1185 (Fed. Cir. 1996) ............................................................50

*Norian Corp. v. Stryker Corp.*,
  432 F.3d 1356 (Fed. Cir. 2005) ..........................................................56

*Omega Engineering, Inc, v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ..........................................................64

*Peloro v. United States*,
  488 F.3d 16 (3d Cir. 2007) .......................................................... 63, 64

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ............................................. 50, 52, 63

*Pineda v. Ford Motor Co.*,
  520 F.3d 237 (3d Cir. 2008) ...............................................................29

*Planned Parenthood of Cent. N.J. v. Attorney Gen. of State of N.J.*,
  297 F.3d 253 (3d Cir. 2002) ...............................................................29

*Proveris Scientific v. Innovasystems*,
  739 F.3d 1367 (Fed. Cir. 2014) ..........................................................30

*Raza v. Biase*, No. 07-cv-02576,
  2008 U.S. Dist. LEXIS 20526 (D.N.J. Mar. 14, 2008) .......................83

*Robin Woods, Inc. v. Woods*,
  28 F.3d 396 (3d Cir. 1994) ....................................................... passim

*Saint-Gobain Autover USA v. Xinyi Glass N. Am.*,
  707 F. Supp. 2d 737 (N.D. Ohio 2010) ..............................................90

*Salve Regina Coll. v. Russell*,
  499 U.S. 225 (1991) ...........................................................................28

*Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*,
  637 F.3d 1269 (Fed. Cir. 2011) ............................................. 76, 77, 78

*Stumbo v. Eastman Outdoors, Inc.*,
   508 F.3d 1358 (Fed. Cir. 2007) ..............................................................63

*Sundance v. DeMonte Fabricating*,
   550 F.3d 1356 (Fed. Cir. 2008) ..............................................................53

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
   247 F.3d 1316 (Fed. Cir. 2001) ..............................................................65

*Teva Pharms. USA v. Sandoz*,
   No. 13-854 (argued Oct. 15, 2014) ....................................................3, 28

*TiVo Inc. v. EchoStar Corp.*,
   646 F.3d 869 (Fed. Cir. 2011) ......................................................... passim

*TiVo, Inc. v. Echostar Communications*,
   516 F.3d 1290 (Fed. Cir. 2008) ........................................................ 56, 57

*Valenti v. Allstate Ins.*,
   243 F. Supp. 2d 200 (M.D. Pa. 2003) ............................................... 90, 91

*Yurman Designs v. PAJ*,
   125 F. Supp. 2d 54 (S.D.N.Y. 2000) ................................................ 83, 96

STATUTES

28 U.S.C. § 1295(a)(1) .............................................................................4

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| '488 Patent | U.S. Patent No. 6,335,488 (the patent at issue) |
| '050 Patent | U.S. Patent No. 5,266,050 |
| '106 Patent | U.S. Patent No. 5,373,106 |
| '164 Patent | U.S. Patent No. 5,171,164 |
| '831 Patent | U.S. Patent No. 6,521,831 |
| '933 Patent | U.S. Patent No. 6,080,933 |
| Arlington | Arlington Industries, Inc. |
| Bridgeport | Bridgeport Fittings, Inc. |
| 0485 Action | *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 3:01-cv-0485 (M.D. Pa.) |
| Duplex Action | *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 3:06-cv-1105 (M.D. Pa.) |
| '488 Judgment and Injunction or '488 Injunction | The Confession of Judgment and Injunction entered by the court in this case on January 18, 2012 |
| '164 and '050 Judgment and Injunction | The Confession of Judgment and Injunction entered by the court in the 0485 Action in 2006 |
| '050 Injunction | The 0485 injunction on the '050 Patent entered in 2010 after jury trial against 30 Whipper-Snap connectors |
| Enjoined Connectors or Speed-Snap connectors | Bridgeport 590-DCS, 590-DCSI |
| Accused Connectors | Bridgeport's 38ASP, 380SP Whipper-Snap connectors |
| Snap-In Connectors | Bridgeport's entire quick-connect product line enjoined in the original 0485 Action |

Snap2IT® Connectors                         Arlington's 38AST, 380ST connectors

BBr.                                           Bridgeport's Brief for Defendant-Appellant

All emphasis in this brief is added unless otherwise indicated.

# INTRODUCTION

More than a decade ago, Bridgeport recognized the significance of Arlington's revolutionary Snap-Tite® and Snap$^2$It® lines of connectors, which for the first time allowed electrical cable to be installed in junction boxes without tools. Bridgeport realized that without Arlington's patented technology it would quickly lose market share to Arlington and made the calculated business decision to impinge on Arlington's intellectual property in order to compete in the two-supplier market.

For years, Bridgeport introduced successive lines of infringing products to the market, which it designed to be functional equivalents of Arlington's patented connectors so that it could thereafter trade on that functional equivalence. Though Bridgeport was found to infringe Arlington's Snap-Tite® patents four separate times (this is the fifth) and ordered to pay Arlington's lost profits, this was a small price to pay to remain on the market. Injunctions likewise did not hinder Bridgeport's repeated infringement, as it made insignificant modifications to its products and released them under the guise of a "good faith" re-design, despite admittedly failing to ensure the "new" products were outside the scope of the injunctions and Arlington's patents. To the contrary, Bridgeport continued to trade on its products' equivalence to the innovative functionality of Arlington's patented products.

That is precisely what happened here, except that instead of bringing another infringement action as in 2006, Arlington moved for contempt of an injunction Bridgeport stipulated to as part of a settlement in 2004, prohibiting Bridgeport from making or selling its infringing Enjoined Connectors or colorable imitations thereof. Despite a 2009 jury verdict finding Bridgeport's Accused Connectors to be colorable imitations of the Enjoined Connectors, Bridgeport nevertheless reintroduced the Accused Connectors to the market without any further modifications when a related Snap-Tite® patent expired.

The district court here rightly found Bridgeport in contempt of the 2004 injunction and sanctioned Bridgeport for its contemptuous actions. While it correctly awarded Arlington all of its lost profits, costs and expenses, and granted Arlington's attorney's fees petition, it declined to award Arlington the out-of-forum rates for its long-time lead counsel. Despite agreeing that Arlington's counsel had institutional knowledge of the parties, patents, and products, the district court erred as a matter of law because of a fundamental misunderstanding of Third Circuit precedent. In doing so, the district court effectively failed to make Arlington whole for Bridgeport's contempt by more than $750,000, failing to put Arlington back in the position it would have been in had Bridgeport abided by the injunction or to meaningfully sanction Bridgeport.

## STATEMENT OF RELATED CASES

The Court previously dismissed Bridgeport's premature appeal in this matter for lack of jurisdiction. *Arlington Indus. v. Bridgeport Fittings*, No. 13-1357, 759 F.3d 1333 (Fed. Cir. July 17, 2014)(Chen, Clevenger, Hughes).

The Supreme Court is presently considering whether factual findings underlying claim construction should be reviewed only for clear error, rather than *de novo*. *Teva Pharms. USA v. Sandoz*, No. 13-854 (argued Oct. 15, 2014).

## JURISDICTIONAL STATEMENT

The Court has jurisdiction over Arlington's Cross-Appeal pursuant to 28 U.S.C. §1295(a)(1). A29a-31a.

## ISSUES PRESENTED

1.    Did the district court abuse its discretion in finding Bridgeport in contempt?

2.    Did the district court properly construe the claim terms?

3.    Did the district court clearly err in awarding Arlington its lost profits, costs and expenses?

4.    Did the district court err in holding that institutional knowledge, no matter how significant, cannot qualify for the special expertise exception to the forum-rate rule as a matter of law, and for creating a bright-line rule requiring demonstrated searches for local counsel no matter how futile?

5.    Did the district court abuse its discretion in ignoring the only record evidence of local forum rates for patent litigators?

# STATEMENT OF THE CASE

In 2001, Arlington brought the 0485 Action against Bridgeport for its Snap-In connectors. In 2002, Arlington brought the instant action against the Speed-Snap connectors, a subset of the Snap-In connectors. In 2004, the parties settled both actions, and Bridgeport consented to infringement judgments being entered against the accused connectors in both cases for all three valid patents. It also agreed to two separate injunctions enjoining all sales of the accused products and any colorable imitations. In late 2005, Bridgeport launched its infringing "Whipper-Snap" connectors, which included the Accused Connectors. Arlington immediately filed suit and, in 2009, a jury found *inter alia* that the Accused Connectors infringe Arlington's related '050 Patent, and are colorable imitations of the Enjoined Connectors. The district court entered judgment and an injunction against the Accused Connectors, which this Court affirmed.

Bridgeport re-launched the Accused Connectors the day after the '050 Injunction expired in December 2011. Arlington moved for contempt to enforce the '488 Injunction and a hearing was held on October 25-26, December 17, 2012, and February 20, 2013. On March 19, 2013, the district court found Bridgeport in contempt of the '488 Injunction. Bridgeport filed a premature appeal from that finding, which this Court dismissed for lack of jurisdiction.

The district court awarded Arlington all of its requested lost profits, costs, and expenses. The district court also granted Arlington's petition for attorneys' fees, but did not apply the special expertise exception to the forum rates rule and, instead, reimbursed Arlington for all its attorneys at hourly rates lower than what Arlington actually paid its local counsel and that had no support in the record.

**STATEMENT OF FACTS**

**I.    Arlington Revolutionized the Electrical Connector Industry**

Before Arlington invented its patented Snap-Tite® connectors, the most common electrical connectors required a threaded lock nut (shown below) to connect electrical cables to a junction box.  A1; *Arlington Indus. v. Bridgeport Fittings*, 632 F.3d 1246, 1249 (Fed. Cir. 2011).  Users were required to hold the connector in one hand and the lock nut in the other.  A4457(1:24-28).  Matching the lock nut to the connector was difficult and further complicated by difficult-to-reach junction boxes.  A4457(1:30-37).  Only after the connector was attached to the junction box could the electrical cable be secured by a screw that tightened a clamp against the cable:



**Arlington SG38**

A37(1:13-26); A3944.

In 1992, Arlington's SnapTite® connectors revolutionized the industry by introducing a spring steel adapter surrounding the leading end of the connector, allowing the connector to easily snap into a round hole in the junction box using

one hand, reducing the time and effort required for installation while offering good electrical continuity:



**Arlington Snap-Tite® SG38AST**

A3943; 632 F.3d at 1249. Arlington obtained several patents covering its Snap-Tite® connectors, including the '164 Patent, in 1992, and the '050 Patent (a continuation of the '164 Patent), in 1993.

In 1998, Arlington further revolutionized the industry with its Snap[2]It® connector:



**Arlington 38AST**

A3942;A1;A3944;A2253:1-54:11;A3915(1:13-25). The patented internal spring steel locking ring inside the trailing end of the Snap$^2$It® connector eliminated the need for tools, significantly reducing labor costs by allowing cables to be snapped into the connector, and the connector snapped into the box. A3915(1:8-11). Arlington obtained several patents on its Snap$^2$It® products, including the '488 Patent at issue here. A41(9:20-22). Arlington's marketing illustrates the two "snaps" of its invention:



A223.

## II.     Bridgeport's Two Decades of Copying

In 1992, Bridgeport's President, Delbert Auray, obtained a sample of Arlington's first Snap-Tite® connector, the SG38AST. A2586:22-88:7. He found it interesting that the leading end was not threaded and was designed to receive the surrounding spring steel adapter. A2588:9-19. He showed Arlington's new product to the "executives in Bridgeport's organization" (A2588:2-7) and to Bridgeport's engineering manager, Kenneth Kiely, to examine how it worked (A2588:20-89:4). Despite being "concerned about" Arlington's '050 Patent,

Bridgeport "wanted to be able to make a product [them]selves," and "did not want to be excluded." A2590:6-19. Bridgeport brought its infringing Snap-In product line to market despite knowing that Arlington's Snap-Tite® products were patented. A2589:5-11. In 2001, Arlington brought the 0485 Action against Bridgeport's entire line of Snap-In connectors for infringement of the '164 and '050 Patents. A2.

Shortly thereafter, Bridgeport launched its Speed-Snap connectors to compete with Arlington's Snap²It® connectors, specifically advertising the "faster, easier installation" and "no tools" benefits of Arlington's two-snap invention:

**Arlington's Snap²It®**        **Bridgeport's Speed-Snap**

    

A219        A3227

In January 2002, Arlington brought this action, asserting claim 1 of the '488 Patent against the Speed-Snap products (the Enjoined Connectors), a subset of Bridgeport's products accused in the 0485 Action. A2. Both actions were settled in April 2004. *Id.*; A3920-35;A3922¶2.5. In the 0485 Action, Bridgeport submitted to the '164 and '050 Judgment and Injunction, covering the entire line of Snap-In connectors (including the Enjoined Connectors). A2. Bridgeport separately submitted to the '488 Judgment and Injunction in this case, covering only the Enjoined Connectors. A3;A63-64. In the '488 Judgment and Injunction, Bridgeport agreed that the '488 Patent was infringed by the "manufacture, sale and offer of sale" of the Enjoined Connectors. A63-64. Bridgeport thereafter agreed to be permanently enjoined from "directly or indirectly making, using, selling, offering for sale or importing" the Enjoined Connectors, or colorable imitations thereof (and from causing or inducing others to do the same). *Id.* The injunction "applied to all uses of these products, and did not create an exception for certain permissible uses of these products." A2a-A3a.

When Bridgeport submitted to the injunctions, the Speed-Snap and Snap-In connectors were its only quick-connect electrical fittings and "a fairly important line of products to Bridgeport." A2664:5-12. Believing it would lose business if it did not reenter the market (A2608:8-13), Bridgeport launched the infringing Whipper-Snap products, including the Accused Connectors, just 16 months later,

without making any effort to comply with the injunction. A2;A2650-54. Bridgeport designed this line of products "to include all the Arlington applications" (A2630:10-11), to be "functional equivalents" of or interchangeable with Arlington's Snap[2]It® connectors (A2684:4-85:2), and to "perform the same function when inserted into a junction hole" as Arlington's products (A2626:4-28:4). A4041-42.

After a trial in 2009, a jury found that Bridgeport's Whipper-Snap connectors infringe the '050 Patent, and that 26 of them, including the Accused Connectors (A321), were mere colorable imitations of Bridgeport's previously enjoined products, including the Enjoined Connectors. A2(citing 0485 Action, 2010 WL 817519, at *2 (M.D. Pa. Mar. 9, 2010)). The jury awarded Arlington lost profits for 100% of Bridgeport's infringing sales. 0485 Action, 692 F. Supp. 2d 487, 515-17 (M.D. Pa. 2010). The court permanently enjoined the entire Whipper-Snap line for the remaining term of the '050 Patent, which expired in December 2011. *Id.*

The week before the '050 Patent expired, Arlington reminded Bridgeport that the Accused Connectors remain subject to the '488 Injunction until 2018 as colorable imitations of the Enjoined Connectors. A2-3. Without making any additional modifications, Bridgeport began selling the Accused Connectors anyway. A3.

## III.  Bridgeport's Contempt

The same day the '050 Injunction expired, Bridgeport posted a promotional video on YouTube featuring its technical sales manager, Eric Cerasale, performing every step of claim 1 of the '488 Patent using the Accused Connectors and instructing customers to do the same.  A1226-32;A3968.  Bridgeport also instructed its customers to use the Accused Connectors in an infringing manner in other marketing materials, including its own website.  A3966-69;A8165-82. Bridgeport's advertising made no mention of any differences between the Enjoined and Accused Connectors, and instead highlighted the same patented features previously touted for the Enjoined Connectors.  A3957;A3954.

Bridgeport sought to capitalize on the similarity of its products to Arlington's corresponding patented products, marketing them as equivalents. A2684:12-24.  Bridgeport's employees testified that both the Accused and Enjoined Connectors were interchangeable with Arlington's patented products (A2614:22-15:16;  A2684:13-85:2;  A2630:10-11;  A2626:4-28:4),  and  that Bridgeport cross-referenced them as such on its website (A2684:12-24; A2290:12-91:20; A2683:13-23; A4208-09), informing users that they were interchangeable (A2643:15-44:4).  Bridgeport even "change[d] [its] catalog numbers to be more identifiable with Arlington's."  A332:20-33:9.  These strategies were successful, as Bridgeport made significant sales of the Accused Connectors.  A1054;A1240;

A26-27. Based on Bridgeport's blatant violation of the '488 Injunction, Arlington moved for contempt.

### A. Dr. Rahn's Colorable Imitation and Infringement Analysis and Conclusions

In support of its motion, Arlington retained Dr. Christopher D. Rahn ("Rahn") to analyze whether the Accused Connectors were colorable imitations of the Enjoined Connectors and still infringed the claim. Rahn is a Professor of Mechanical Engineering and Director of the Mechatronics Research Laboratory at the Pennsylvania State University. A123¶2;A156. He has published over 150 technical conference and journal papers and has been honored with awards from various institutions, including the American Society of Mechanical Engineers ("ASME"), where he is an esteemed fellow. A157-68;A170. In addition to this case, Rahn has been recognized as an expert in several district court litigations between the parties (A123¶3; 0485 Action; Duplex Action), wherein his opinions have all been affirmed by this Court.

Rahn conducted a *TiVo*-based analysis on the Enjoined and Accused Connectors, first determining whether the modifications Bridgeport purportedly made were significant or merely colorably different. Rahn then conducted an infringement analysis on the Accused Connectors. Rahn submitted his opinions in support of Arlington's motion for contempt in the form of two detailed declarations. A122-99;A1058-1103;A1166-1203.

The district court properly limited the testimony of the experts to the "leading end external cylindrical surface" and "surrounding said leading end external cylindrical surface" limitations of claim 1, as those were the only limitations related to Bridgeport's asserted modifications to the Accused Connectors. A8-9;A1770-72.

### 1. No Significant Modifications to the "Leading End Cylindrical Surface" Limitation

The '488 Patent refers to the entire surface between the lip and the flange of the connector as the cylindrical surface. A3050:5-51:7;A4473-78.



A36(Fig.15);A40(7:33-38);A139.

The patent describes the entire surface as accommodating the spring steel adapter (orange, below) required by claim 1 to "surround" the "cylindrical" surface. A40(7:36-38);A41(10:1-3).



A3994(Fig.22)(incorporated by reference at A38(4:6-10)).

When the '488 Patent's claim language and disclosures are read onto the admitted-infringing Enjoined Connectors, their leading end cylindrical surface is likewise everything forward of the flange, excluding the lip. A3050:24-51:7;A2212:1-17;A128-29¶¶14-15;A3939 (below, blue).



That part of the Enjoined Connectors' leading end accommodates the "surrounding" adapter (below).  A3048:24-51:7;A3939.



The district court therefore found that the leading end surface of the Enjoined Connectors consists of "everything forward of the back flange of the leading ends, except for the lip—what Bridgeport has described as 'the three cylinders.'"  A9-10.

The leading end cylindrical surface of the Accused Connectors likewise consists of everything forward of the flange, excluding the lugs.  A2216:20-25; A3940 (below, blue).



As with the '488 Patent's disclosures and claims, and the Enjoined Connectors, this portion of the Accused Connectors accommodates the "surrounding" adapter. A2216:14-19;A3940 (below).



Both the lip and the lugs (orange, below) serve the function of preventing the adapter from falling off and therefore neither is part of the claimed leading end cylindrical surface which simply provides a seat for the adapter. A2216:14-17:4; A3939;A3940 (below).



The district court thus agreed that the leading end cylindrical surface of the Accused Connectors consists of everything forward of the flange, excluding the lugs. A10n2.

A physical inspection revealed no significant differences between the Enjoined Connectors' "stepped" leading end surface and the "tapered" leading end surface on the Accused. A2227:1-30:23;A127-29;A1063-68.

Measurements of the connectors showed that the surfaces of both the Enjoined and Accused Connectors deviate from a perfect cylinder in insignificant amounts. A2213:22-19:16; A129-31¶¶16-18; A198; A1068-73; A3081:1-84:23; A3950-51. Arlington demonstrated that this was true regardless of whether Arlington's or Bridgeport's measurements or methodology was employed. A129-31; A1071-73; A2217:5-25; A2218:24-19:16; A2220:3-21:8; A3074:16-75:19; A3076:18-78:1; A3946; A3950; A3952-53. The accuracy of Arlington's measurements and calculations was undisputed. A2870:18-25.

Rahn testified that there was no difference in the function, way, or result that the leading end surfaces on the Enjoined and Accused Connectors performed. A2221:14-31:3. An industry-required electrical resistance test comparing samples of the Accused Connector with and without a taper showed that the tapered surface performed the same function, in substantially the same way, to produce substantially the same result as the surface with the taper removed. A4064-66; A2231:4-37:22; A3198:12-22; A1099-103; A4154. Bridgeport's expert, Dr. Williamson, admitted that the taper on the Accused Connectors had no significant effect in terms of electrical resistance (A2857:15-58:6) or in terms of the Accused

Connector's mechanical connection (A2858:13-22). He also admitted to having conducted no tests on the electrical function of the Connectors himself. A2854:17-24. While Williamson claimed other differences between the Enjoined and Accused Connectors, such as the number of tensioning tangs on their adapters or their angles of misalignment, he admitted that none of these features were required by the claim. A2833:1-41:10.

The district court found the Accused Connectors were no more than colorable imitations of the Enjoined Connectors with respect to the "leading end cylindrical surface" limitation. A10-17.

### 2. The Accused Connectors Continue to Meet the "Leading End Cylindrical Surface" Limitation

A visual inspection and measurements of the Accused Connectors' leading end surface showed that the surface has "the approximate form of a cylinder" and infringes the "cylindrical" limitation, as construed by the Court. A2283:10-86:8; A3139:2-40:9; A3950; A3952. Measurements of the infringing Enjoined Connectors' surface confirmed as much. A2281:23-86:8;A3139:2-41:2;A2217:5-A19:5; A2220:3-21:8. The district court agreed. A25-27.

### 3. Bridgeport Made No Significant Modifications Related to the "Surrounding Said Leading End Cylindrical Surface" Limitation, Which Continues to Be Met by the Accused Connectors

Arlington demonstrated that the function, way, and result of how the adapter "surrounds" the leading end cylindrical surface is the same in both the Enjoined and Accused Connectors, and that the products are no more than colorably different with respect to that limitation. A2238:19-42:22;A132-33¶¶20-21.

**Enjoined Connectors**        **Accused Connectors**



Arlington also showed that the Accused Connectors continue to meet the "surrounding" limitation, as construed. A2286:9-88:20;A149-50;A1096. The court agreed on both counts, A17-20. While Bridgeport disputes the claim construction for surrounding (BBr.66-67), it does not challenge the colorable imitation findings or dispute that the Accused Connectors infringe as construed.

During the hearing, Bridgeport's experts did not present a separate defense to induced or contributory infringement other than its defenses to direct infringement with respect to either limitation disputed below. A2818:23-19:6.

### B.  The District Court's Claim Construction

#### 1.  "Cylindrical"

The court interpreted the term "cylindrical" to mean "having the approximate form of a cylinder."  A22.  It based this construction "on the '488 Patent specification and accompanying embodiments, which portray an external cylindrical surface on the leading end of a connector that has varying cross-sections along its axial length" (*id.*), and rejected Bridgeport's proposed construction, which excluded these embodiments.  A22-23.  Thus, the court found that the '488 Patent supports the conclusion that "cylindrical" does "not limit the claim to only external surfaces that have a circular cross-section which remains constant along their axial length."  A23.  "In short," "cylindrical" is "not the equivalent of a perfect cylinder."  *Id.*

#### 2.  "Surrounding"

The court construed the term "surrounding" to mean that the spring steel adapter "significantly borders" the connector's leading end external cylindrical surface.  A24.  This construction was supported by the "embodiments in the '488 and the '106 Patents" incorporated by reference.  *Id.*  The court further found its claim construction supported by the prior claim construction of the same term in the '050 and '164 patents in the '0485 Action.  *Id.*  It rejected Bridgeport's proposal to limit the term to require that it "[completely] encircles" the external cylindrical surface.  *Id.*

22

### C.    Bridgeport's Irrelevant Patents

Although Bridgeport argued that its patents have relevance to the colorable imitation determination, it offered no evidence that its Accused Connectors practice the patents, or that the patent claims encompass any non-colorable differences between the Enjoined and Accused Connectors.

### D.    The District Court's Contempt Order

After listening to the three days of live testimony, holding the Enjoined and Accused Connectors in its hand, and watching videos (and animations) of the Accused Connectors performing the infringing method, the court weighed the evidence and determined by clear and convincing evidence that the Accused Connectors are colorable imitations of the Enjoined Connectors and infringe claim 1. *Id.* The court entered an injunction mirroring the scope of the '488 Injunction agreed to by Bridgeport in 2004, and expressly enjoined the Accused Connectors. A29-30; A63-64. As this Court has found, in terms of the injunction, "nothing has changed from that to which Bridgeport agreed." *Arlington*, 759 F.3d at 1338.

### E.    The Sanctions Hearing and Award

The district court held a hearing on June 4, 2014, regarding Arlington's request for sanctions, and issued its decision on June 23, 2014. A1a-A31a.

#### 1.    Lost Profits

Just as it did in the 0485 Action (*see* A4830-33), Arlington submitted its evidence of lost profits for the contempt period (December 5, 2011-March, 19,

2013) under both the two-supplier market theory and the *Panduit* test. A4827-34; A4837-67; A5188-90; A5860-85; A6022-49; A6050-84.

During the contempt period, Arlington and Bridgeport continued to compete in a two-supplier market lacking acceptable non-infringing substitutes. A4830-31; A5874-75; A5878-83; A6051-65; A5188-89; A6033-38. Though Bridgeport claimed that other acceptable non-infringing substitutes existed, each of those products was already considered and rejected in the 0485 Action, lacked the advantages and selling features of Arlington's and Bridgeport's products, or both. A6051-65(incorporating by reference A6070-84); A5874-75; A5878-83; A6033-35; A6045-46. Bridgeport's own customer admitted that he preferred the advantages and selling features of the patented connectors over any other products on the market. A4811-12; A6064-65.

Arlington's damages expert calculated the amount of Arlington's lost profits using the same formula and methodology he used in the 0485 Action, which the jury accepted, this Court affirmed, and Bridgeport does not dispute. A4838-42; A6023-25; A6039; A4855-67; A5876-77. Though Bridgeport attempted to rebut Arlington's entitlement to recover lost profits for 100% of Bridgeport's sales, Arlington addressed each of Bridgeport's challenges and showed that none affected Arlington's right to a complete recovery. A6063-67; A6027-29; A6039-46; A5876-77.

### 2.    Costs and Expenses

In support of its request for costs and expenses, Arlington submitted the monthly invoices it paid along with summary tables and a declaration detailing all of the costs and expenses it sought to recoup, as well as its attorneys' contemporaneous time entries, which detailed the attorneys' work in any given month, including work with consultants (none of whose work overlapped).  A27a; A4893-95; A4917-18; A4926-5092; A5135-42; A5200-36; A6178-80.  The district court found the documentation Arlington submitted was "sufficiently detailed"; determined the costs and expenses were "reasonable"; and awarded Arlington all of its costs and expenses.  A27a.

### 3.    Attorney Fees

Due to the importance and complexity of the case, which required patent expertise and institutional knowledge of Arlington's decade-long dispute with Bridgeport (A7102; A7111-15; A17a; A24a n.8; A6168-69), and because of her record of success, Arlington hired Ms. Clune and her Crowell & Moring LLP ("C&M") colleagues as lead counsel.  A7106-09.  Ms. Clune has worked on Arlington's cases since 2001, including the 2002 case underlying this contempt proceeding and the 0485 Action jury trial where the Accused Connectors were found to be colorable imitations of the Enjoined Connectors.  A4877-78;A4898-99;A6188; A6192-94.  She has gained specialized knowledge regarding the

interplay among the various actions, including familiarity with the '488 Patent, the Accused and Enjoined Connectors, Bridgeport's counsel, the experts, witnesses, and all relevant facts underlying Bridgeport's contempt, all of which were instrumental to the successful outcome of this contempt proceeding. A7106-08; A6188; A6192-94. No other attorney possesses her patent litigation expertise and institutional knowledge to handle this case. A4898-99;A6188-94;A5189-90;A7106-10;A7322-26; A5146-50; A7085-87; A4876-80; A6159-63.

Nevertheless, the district court declined to award Arlington prevailing Washington, D.C. hourly rates for C&M's work pursuant to the "special expertise" exception to the forum rule and awarded rates that had no support in the record and were lower than what Arlington paid its local counsel.

# SUMMARY OF THE ARGUMENT

The court correctly found Bridgeport in contempt after Arlington showed by clear and convincing evidence that the modifications from the Enjoined to the Accused Connectors were insignificant and that the Accused Connectors continued to infringe Arlington's '488 Patent.

The court correctly construed "cylindrical" in accordance with the term's ordinary meaning in view of the '488 Patent specification, and consistently with Bridgeport's previous admission of infringement. Bridgeport's proposed construction contradicted both. As to "surrounding," the court's construction was both necessitated by a previous construction of that term in a related patent (affirmed by this Court), and consistent with the intrinsic record.

The court's findings of direct and indirect infringement were supported by ample evidence and not clearly erroneous. Bridgeport's time to appeal the scope of the court's injunction—the terms of which Bridgeport bargained for and agreed to in 2004—has long passed. Nor has Bridgeport established other than mere conjecture any non-infringing activity being enjoined.

While the district court did not abuse its discretion in awarding Arlington its lost profits, costs, and expenses, it committed two legal errors when it held as a matter of law that (1) an attorney's institutional knowledge—no matter how significant, impressive, related, or necessary to the actual case—cannot qualify for

27

the "special expertise" exception to the Third Circuit's forum-rate rule; and (2) that a petitioner is foreclosed from recovering out-of-forum rates unless it can demonstrate having conducted a search for counsel in the forum, regardless of how futile that search might be. The district court further abused its discretion when it awarded Arlington's attorney fees at arbitrary hourly rates lacking support in the record, and even below what was paid to Arlington's local counsel.

## ARGUMENT

### I. Standard of Review.

This Court reviews a contempt decision for abuse of discretion. *Merial v. Cipla*, 681 F.3d 1283, 1292-93 (Fed. Cir. 2012). The underlying fact findings are reviewed for clear error, "[i]n deference to the unchallenged superiority of the district court's fact finding ability." *Salve Regina Coll. v. Russell*, 499 U.S. 225, 233 (1991). If "the district court's account of the evidence is plausible in light of the record viewed in its entirety," this Court "may not reverse it." *Anderson v. Bessemer City*, 470 U.S. 564, 573-74 (1985).

Claim construction is reviewed *de novo*, *Cybor v. FAS Techs.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998)(en banc), but the Supreme Court is presently considering whether it should be reviewed for clear error, *Teva*, No. 13-854 (argued Oct. 15, 2014).

The Third Circuit reviews decisions to admit or exclude evidence for abuse of discretion. *Pineda v. Ford Motor*, 520 F.3d 237, 243, 247 (3d Cir. 2008).

The decision to impose sanctions for contempt, and what type, is reviewed for abuse of discretion. *Robin Woods, Inc. v. Woods*, 28 F.3d 396, 399 (3d Cir. 1994). Factual findings underlying an award for lost profits, *Home Sav. of Am. v. United States*, 399 F.3d 1341, 1347 (Fed. Cir. 2005) and awards of costs and attorney fees are reviewed for clear error, and the underlying legal determinations *de novo*. *Planned Parenthood of Cent. N.J. v. Attorney Gen. of State of N.J.*, 297 F.3d 253, 265 (3d Cir. 2002).

## II. The District Court Properly Found Bridgeport in Contempt for Violating the '488 Injunction.

A party is liable for contempt of a patent injunction if (1) it markets a new product that is no more than "colorably different from the [enjoined] product found to infringe" and (2) the new product infringes. *TiVo v. EchoStar*, 646 F.3d 869, 882 (Fed. Cir. 2011)(en banc). Conducting the analysis required by *TiVo*, the court found Bridgeport in contempt of the '488 Injunction by clear and convincing evidence. A5; A9-19. Bridgeport erroneously argues that the district court did not properly apply the colorable-difference test. BBr.24 But because the only modifications Bridgeport alleged to have made to the Enjoined Connectors concerned limitations two ("a leading end with an external cylindrical surface") and three ("a spring steel adapter "surrounding" that surface) of claim 1 (A1770-

78), the court correctly limited the contempt hearing to those two limitations. A8; A1253-55; A1524-31.

## A. A Contempt Proceeding Was Appropriate.

Relying on pre-*TiVo* case law, Bridgeport incorrectly argues that this contempt proceeding was inappropriate because the "arguments were based upon limitations, proposed claim constructions, and infringement arguments that were never alleged let alone successful in the original case." BBr.36-37.

First, this Court in *TiVo* "eliminate[ed] the separate determination whether contempt proceedings were properly initiated," *TiVo*, 646 F.3d at 881, thus, "[a]llegations that contempt proceedings were improper in the first instance do not state a defense to contempt." *Id.* Second, there is simply no prohibition against conducting claim construction during a contempt hearing, even if the term was not disputed in the underlying proceeding because infringement was conceded. *Proveris Scientific v. Innovasystems*, 739 F.3d 1367, 1371 (Fed. Cir. 2014)(affirming colorable imitation determination, but holding court erred "in failing to construe the disputed claim language" not previously in dispute due to concession of infringement); *cf. Arlington*, 759 F.3d at 1338 ("In expressly providing the claim constructions, the district court simply interpreted or clarified the meaning of those claim terms.").

Third, regardless of whether the '488 Judgment "included an exhaustive infringement analysis, it necessarily and conclusively established that [the enjoined product] met each limitation recited in the asserted claims." *Merial*, 681 F.3d at 1300; *KSM Fastening Sys., Inc. v. H.A. Jones Co.*, 776 F.2d 1522, 1529 (Fed. Cir. 1985). Bridgeport's complaints about the infringement proceedings are misguided as the second prong of *TiVo* explicitly requires the court perform a limited infringement analysis. *TiVo*, 646 F.3d at 882.

Finally, the contempt proceeding here was particularly fair given that a jury in 2009 found that *the same* Accused Connectors were colorable imitations of *the same* Enjoined Connectors and infringed a related Arlington patent, a verdict this Court affirmed. A2. Bridgeport's claim of a "good-faith effort" to redesign (BBr.33-34) is both untrue (A2650-54) and irrelevant because "a defendant's diligence and good faith efforts are not a defense to contempt." *TiVo*, 646 F.3d at 880. If ever there was a case for a summary proceeding, this was it.

## B. Bridgeport's Modification of the "External Cylindrical Surface" Was Insignificant in Form, Application and Function.

Arlington established that "the change from the stepped shape of the Enjoined Connectors' leading end external cylindrical surface to the sloped shape of the Accused Connectors' leading end external surfaces is insignificant." A16-17. The court found that "Arlington has demonstrated by clear and convincing evidence" that the leading end external surfaces of both the Accused and Enjoined

Connectors "perform substantially the same function in substantially the same way with substantially the same result."  A17; *see KSM*, 776 F.2d at 1527-28("they are the same, even though different in name, form or shape").

Specifically, the court held that "[b]oth leading end external surfaces connect the spring steel adapter to the connector's leading end (function) by providing a surface area for the adapter to surround (way) so that the adapter is mechanically and electrically connected to the leading end (result)."  A17; A4150-55.

Arlington's expert established that the change to the Accused Connectors' external cylindrical surface was insignificant in (1) "form," (2) "application" and (3) "function."  A11-14; A131; A2206:2-14; A2210:2-24:3.  The court did not clearly err in its colorable imitation finding.

### 1.    "External Cylindrical Surface."

As required by *TiVo*, the court first identified the aspect of the Enjoined Connectors corresponding to the "external cylindrical surface" limitation to determine if the modification to that surface on the Accused Connectors was significant.  A4-5(citing *TiVo*); A9-10n.2.  The court identified the "external cylindrical surface" as "everything forward of the back flange of the connectors' leading ends, except for the lip."  A10.  This is the same part Arlington identified as the infringing feature of the Enjoined Connectors in the underlying proceedings

before the parties settled. A284-6("Bridgeport's spring steel locking ring significantly borders *the cylindrical surface of the leading end* of Bridgeport's member."); A285(arrow pointing to the cylindrical surface being surrounded).

The court also reviewed the intrinsic evidence from the '488 Patent, citing embodiments that depicted the "lip" and the "central flange" as defining the boundaries of the "external cylindrical surface." A10(citing A40(7:34-38); A36(Fig.15); A39(6:2-4); A34(Fig.6)); *see also* A40(7:34-38)("[t]he seat 132 will later accommodate a spring steel adapter"); A3994(Fig.22)(surface blue; adapter orange).



In analyzing the Enjoined Connectors, the court noted the admittedly infringing connectors must contain an "external cylindrical surface." A10. The court agreed with Rahn that the external cylindrical surface was the entire portion of the leading end between the lip and flange that the adapter "surrounds" (A9;

A129-30; A1063-65; A2212:1-17), but excludes the lip and flange because those features merely hold the adapter in place. A10n.2; A2216:10-17:4.

The court rejected Bridgeport's identification of the "external surface" on the Enjoined Connectors, noting that Bridgeport had advanced inconsistent theories throughout the proceeding. A9-10. In its opposition to the contempt motion, Bridgeport claimed there was "one cylindrical surface" on the leading ends of the Enjoined Connectors composed of three cylinders. *Id.*(citing A347-48). But at the hearing, and here on appeal (BBr.51-52), Bridgeport argues that the three "cylinders" annotated below on the Enjoined Connector (Front Step, Rear Step, and Recessed Area) "are in fact separate external cylindrical surfaces." A10.



A3939 (with and without adaptor). Bridgeport's appellate argument (BBr.51-52) is also inconsistent with Williamson's Declaration, which analyzed the same drawing included in Bridgeport's appellate brief. *Compare* BBr.51("the Old Connectors clearly had *three separate external cylindrical surfaces...*") *with*

A408("the three cylinders that compose *the 'cylindrical surface'* on the old design").

At trial, Williamson changed his theory again, which is also inconsistent with Bridgeport's current theory, as he refused to refer to the Front and Rear Step of the Enjoined Connectors as their own cylindrical surfaces or part of the "cylindrical surface," despite those being the only portions of the surface contacted by the "surrounding" adapter. A2865:3-22 ("Q. ...[Y]ou ignored the measurements on the front step and back step, correct? A. Yes, I applied the measurements to *the external cylindrical surface*."; A:"You are correct I did not apply [the measurement formula] to the bits [front and rear steps] which I *don't think are part of the cylindrical surface*"); A2845:9-21.

Bridgeport's new theory is further contradicted by the claim limitation related to "surrounding." The adaptor clearly surrounds the entire external cylindrical surface, not just the recessed area. Indeed, the "steps" on the Enjoined Connectors (shown above), are the only portions the claimed "surrounding" adapter actually contacts. A3938; A2212:18-13:3. Thus, the court did not clearly err in concluding that the identified cylindrical surface encompasses the entire portion in front of the flange (except for the lip), including the raised steps, which are the only portions of the connector contacted by the "surrounding" adapter.

In determining the external surface on the Accused Connectors, the court similarly agreed with Arlington that the "lugs on the Accused Connectors are not a part of 'an…external surface' because, like the lips of the Enjoined Connectors' leading ends, they hold the adapter in place." A10n.2; A2216:14-17:4; A1065.

The court's identification of the claimed external surface did not constitute a "piecemeal construction," as Bridgeport claims, nor did the court "conflate three surfaces to form one." BBr.49-52. To the contrary, the court was required to determine what constitutes the leading end external surface that claim 1 requires to be cylindrical on both the Enjoined and Accused Connectors in order to compare "the features relied upon to establish infringement and the modified features of the newly accused products." A5(quoting *TiVo*, 646 F.3d at 882). The court correctly identified that surface on both sets of products (as discussed above), and did not violate the "indefinite article rule" in doing so, as Bridgeport claims (BBr.49-51,57-60). *See infra* Part III.A.2.

> ## 2. The District Court Heard Substantial Evidence That the Accused Connectors' "External Cylindrical Surface" Was a Colorable Imitation.

Based on the proper identification of the external cylindrical surface, Dr. Rahn established and the district court agreed that: (1) the external surfaces of the Accused Connectors are not "conical" but cylindrical; (2) the surfaces of the Enjoined and Accused Connectors deviate from a perfect cylinder in an

insignificant amount, and (3) that the cylindrical surfaces of the Enjoined and Accused Connectors performed substantially the same function, in substantially the same way, to achieve substantially the same result. Bridgeport shows no clear error in the district court's findings.

### a. The Leading End External Surface of the Accused Connectors Was Neither a "Cone" Nor "Conical."

Bridgeport baselessly asserts that because the Accused Connector has a slight taper, it must be conical, not cylindrical. BBr.20. But as Rahn testified, one skilled in the art knows that cylindrical objects can have a slight taper. A3036-37; *see also John Mezzalingua Assocs. v. Arris Int'l*, No. 03-cv-353, 2003 U.S. Dist. LEXIS 24730, at *24-25 (W.D. Wis. Nov. 14, 2003)(rejecting defendant's argument that the "ordinary meaning of 'cylindrical' excludes objects that are tapered," stating "*[a] tapered object can still be 'cylindrical'*").

And as Rahn illustrated, the taper from front to back on the Accused Connectors is a mere forty thousandths of an inch. A3940; A3949. Rahn further showed, using drawings of the Accused Connectors, (1) that the Accused Connectors' leading ends are **five inches** from becoming a cone, and only **.040"** away from a perfect cylinder (A2206:15-10:1;A2208:18-09:1) and (2) that on a scale of 1 to 20, where 1 represented a perfect cylinder, and 20, a perfect cone, the Accused Connectors were 18 steps away from being a cone.



**Perfect Cylinder**                    **Perfect Cone**

A3949; A127-29; A2206:15-08:8; A4138-39; A3949; A2209:2-10:1; A1063-68;

A4479-81.

> **b.    The Surface of the Accused Connectors Differed Insignificantly from the Surface of the Enjoined Connectors.**

Rahn also measured the surfaces of the connectors themselves to compare

the degree to which each deviated from a perfect cylinder.  A2213:22-19:5; A129-

31; A198; A1068-73; A3950-51.  He did so by employing a standard deviation

methodology.  A2214:10-15.  Rahn explained that this method would be the most

accurate for determining the surface of the types of products at issue (A2214:16-20; A129; A1069) and why Bridgeport's methods, including using a CMM machine, were inappropriate (A3081:1-84:23; A1068-71). The district court did not abuse its discretion in admitting Rahn's standard deviation measurements. A1766 at 17-19(holding that "[s]tandard deviation is a reliable methodology"); A1782-84; *Kumho Tire v. Carmichael*, 526 U.S. 137, 152 (1999).[1]

Using his measurements, Rahn determined that the surfaces of the Enjoined and Accused Connectors deviate from a perfect cylinder by 5% and 3-4%, respectively (A129-31; A1071-73; A2217:5-25; A3946; A3950), and opined that this difference is insignificant (A2218:24-19:5). Rahn also calculated the surface deviation of the Enjoined and Accused Connectors using the ASME standard proposed by Dr. Williamson and came to the same conclusion. A1071-73; A2219:6-16; A2220:3-20:1; A3952-53. Using Bridgeport's own measurements, and its preferred cylindricity method, Rahn further calculated that the cylindricity deviation for the Enjoined and Accused Connectors differed by an insignificant

_____

[1] Bridgeport's claim that Rahn "presented no evidence" (BBr. 49) that the standard deviation has been tested is false. A1783; A2169:24-71:22; A1479-80¶6; A1508-19. Rahn met Rule 702's liberal policy of admissibility.

.001 inches. A1071-73; A3074:16-75:19; A3076:18-78:1. Williamson did not dispute the accuracy of Rahn's measurements or calculations. A2870:18-71:19.

### c. The Court Properly Rejected Williamson's Cylindricity Measurements.

The court correctly rejected Williamson's "relative cylindricity calculation," which included the lugs on the Accused Connectors but not the lips of the Enjoined Connectors and thus resulted in an inconsistent comparison." A17n.8.



A3073:11-74:14. Rahn testified, and the court agreed that "an accurate comparison between the Accused and Enjoined Connectors must either include or exclude both the lips and lugs." *Id.*;A17n.8;A1962.

Making the "apples to apples" comparison that the court adopted (A17n.8), Rahn compared the entire area of the Enjoined Connectors forward of the flange excluding the lip against the entire area of the Accused Connectors forward of the flange excluding the lips:

 

A3072:10-73:10. Rahn achieved the same insignificant results using Williamson's own measurements. A3074:16-75:19; A3076:18-78:1.

> **d.    The External Cylindrical Surface of the Accused Connectors Has the Same Function, Way, and Result as in the Enjoined Connectors.**

Two products are colorable imitations if they "do the same work in substantially the same way, and accomplish substantially the same result." *KSM*, 776 F.2d at 1527. Rahn examined the function, way, and result of the external cylindrical surface and found insubstantial differences between the two Connectors. A2221:9-38:4; A131. The function of the surface is to "connect[] the spring steel adapter to the leading end of the die cast connector body." A2221:22-22:1. The Enjoined and Accused Connectors both achieve that function "by providing the surface area for the adapter to surround and contact." A2223:8-17.

And the result in both Connectors is that "the adapter is mechanically and electrically connected to the leading end of the member." A2223:22-24:3.

Rahn also presented the results of electrical tests showing an insignificant difference in the function of how the Accused Connector conducted electrical current with and without the taper. A2230:24-38:4; A1099-102¶¶57-59; A4154. Rahn took an Accused Connector and removed the taper (which also illustrates how minimal at 0.040" taper is on the connectors):



A4064; A4066; A2231:12-33:12. He then conducted a "standard test [run] on electrical connectors to see how well they conduct electricity," tests which are required before connectors may be sold. A2235:1-16; A3198:12-22. The average drop in voltage for the Accused Connector with and without the taper was an insignificant difference of 1.7%. A2235:17-36:1. Rahn additionally showed an insignificant change in mechanical connection: "[t]here was a very good strong mechanical connection, even without the taper." A2235:2-7. Williamson admitted

the taper had no effect on either electrical or mechanical connection. A2857:15-58:22. He further admitted having conducted no tests on the electrical function of the Enjoined or Accused Connectors himself. A2854:17-24.

### 3. Designing Around Non-Patented Features.

Bridgeport points to a laundry list of changes it refers to as "significant." But these changes are irrelevant to contempt as a matter of law because, as Bridgeport admitted, these modifications are "themselves not required by the claim." Appeal No. 13-1357, Dtk.31 at 38; *TiVo*, 646 F.3d at 882.

Bridgeport failed to demonstrate how their "significant changes" were "tied" to the only two limitations at issue in the contempt proceeding: the "external cylindrical surface" or "surrounding" limitations of claim 1. Nearly every one of Bridgeport's purported modifications relates to the spring steel adapter of its connectors, which Bridgeport's expert admitted need only be made of "spring metal." A2836:1-15. Indeed, Williamson admitted that Arlington would not need to prove the existence of any of the randomly-chosen features listed in Bridgeport's brief to prove infringement of claim 1:

| Bridgeport's Purported Modification | Dr. Williamson's Admission |
|---|---|
| "Tolerance for misalignment." BBr.39. | Not required to prove infringement. A2841:2-10. |
| Accused Connectors can be "inserted at an angle." BBr.39. | Not required to prove infringement. A2839:4-14. |
| The Accused Connectors "can be easily | Not required to prove infringement. |

43

| Bridgeport's Purported Modification | Dr. Williamson's Admission |
|---|---|
| removed." BBr.40. | A2834:1-13. |
| A "new way in which to attach the adaptor." BBr.42. | Not required to prove infringement. A2840:17-41:1. |
| Accused Connectors have an "adaptor [that] contacts the aperture via the two large anchor tabs and the four tensioning tangs." BBr.44. | Only structure of adapter required to prove infringement is that it be made of spring metal. A2836:7-25. |
| "Greater long-term reliability." BBr.44. | Not required to prove infringement. A2839:15-23. |
| The Accused Connectors "grip the aperture in a new way." BBr.44. | Not required to prove infringement. A2835:16-23. |
| "Grommet is carried by the…adaptor." BBr.45. | Not required to prove infringement. A2838:6-13. |

Bridgeport tries to portray a feature it calls the "ramps" as a "significant structure" that "did not exist" in the Enjoined Connectors. BBr.38-39. To the contrary, Rahn testified how the additional material Bridgeport added to the cylindrical surface made the Accused Connectors less conical and even closer to a perfect cylinder. A2377:6-80:2. As shown below, Rahn demonstrated the progression of the Accused Connector: (1) a figure from Bridgeport's '272 Patent filed in 2005 shows a tapered connector; (2) a 2004 drawing of the Accused Connectors shows how the surface became less tapered by cutting off the end portion and adding more zinc (i.e., the ramps); and (3) a 2008 drawing of the

Accused Connectors shows how the diameter at the base of the surface was reduced.



| Bridgeport patent figure (A1074-75) | Accused Connectors 2004 (A3948) | Accused Connectors 2008 (A3949) |

A2377:22-79:23. Thus, far from being "conical," the surfaces of the Accused Connectors have become closer and closer to a straight cylinder over time.

*     *     *

In view of the substantial evidence that the cylindrical surface of the Accused Connectors is a colorable imitation of that of the Enjoined Connectors, the court did not clearly err in so finding.

### C. The District Court Did Not Clearly Err in Finding That Bridgeport Made Only an Insignificant Modification to How the Adapter "Surround[s]."

Arlington demonstrated the Accused Connectors were colorable imitations of the Enjoined Connectors with respect to the "surrounding" limitation. A19-20;

A2216:20-17:4; A2238:19-42:22. Rahn testified to the function (A19; A2240:23:417), way (A19; A2241:8-16), and result (A19; A2241:17-42:1). A4157-62. Bridgeport does not appeal (BBr.2,33-56), and therefore waives, its right to challenge the court's finding of colorable imitation of the "surrounding" limitation.

### D. Arlington Presented Undisputed Evidence That Bridgeport Marketed Both the Enjoined and Accused Connectors as Functional Equivalents to Arlington's Products.

In addition to the evidence set forth above, there was substantial record evidence that Bridgeport marketed both its Enjoined and Accused Connectors as functional equivalents to Arlington's patented embodiments. *KSM*, 776 F.2d at 1527. Bridgeport's engineering manager, Kenneth Kiely, testified that the Enjoined Connectors are functionally interchangeable with Arlington's patented products (A2614:22-15:16), which Bridgeport's executive Paul Suzio admitted to be, in turn, functional equivalents of the Accused Connectors. A2684:4-85:2. In fact, Bridgeport designed the Accused Connectors "to include all the Arlington applications," and "perform the same function" as Arlington's products, even specifically cross-referencing the Accused Connectors with Arlington's patented products. *Supra* SOF §III. Additionally, Bridgeport used catalog numbers (38ASP and 380SP) similar to Arlington's (38AST and 380ST), which Mr. Suzio admitted

was "not a coincidence" but rather "an intentional decision" to make the catalog numbers "more identifiable with Arlington's product."  A332:20-33:9.

Bridgeport's marketing materials are powerful visual evidence that Bridgeport "explicitly traded on…the equivalence" between its products and Arlington's patented features.  *See Merial*, 681 F.3d at 1301.  And if the Enjoined and Accused Connectors are equivalent with the patented products, performing the method steps in substantially the same way to achieve substantially the same result, they are equivalent to each other:



A4255-62; *Merial*, 681 F.3d at 1301.

This advertisement for the Enjoined Connectors highlights the "two snap" functionality of Arlington's invention:



A3956. And the Accused Connectors are advertised nearly identically ("snap the cable into the connector;" "snap the assembly into...the electrical box"):



A3966-68. The same is true of the Connectors' specification sheets:



Simply push 14/2 to 10/3 AC/MC or 3/8"
flexible metal conduit into the connector
push connector into 1/2" knockout.

**A3954**



Push cable or conduit into the
connector and snap the
connector into the box.

**A3959**

And both connectors have the same result of snapping into a junction box:



A3939; A3940; A3945.

Nowhere in any of its marketing materials did Bridgeport mention the purported significant features cited in its brief. BBr.37-45.

Bridgeport cannot show clear error in the court's findings. A17-19.

### E. Bridgeport's "Patents" Are Irrelevant.

Bridgeport claims that it "has obtained twelve patents" on some electrical connector design. BBr.13,56. But, whether Bridgeport's products are separately patentable is not a defense to colorable imitation (which uses the same test as

doctrine of equivalents, *see KSM*, 776 F.2d at 1527), or infringement. *Fiskars v. Hunt Mfg.*, 221 F.3d 1318, 1324 (Fed. Cir. 2000)("separate patentability does not avoid equivalency as a matter of law"); *Nat'l Presto Indus. v. W. Bend Co.*, 76 F.3d 1185, 1191 (Fed. Cir. 1996)(an accused device does not avoid infringement merely because it is patented).

Moreover, notwithstanding almost ten years of litigation between the parties, Bridgeport has never established that the Accused Connectors practice any claims in Bridgeport's patents. Bridgeport's claim that Williamson "opined that these patents cover the [Accused Connectors]" (BBr.56) is simply unsupported by the record. The alleged opinion cited by Bridgeport (A407¶30) consists of a single sentence with no explanation as to how the Accused Connectors are covered by the claims. Because Williamson failed to opine on this alleged defense, the court shut down this line of questioning. A2790:19-95:22; A2797:24-25.

*       *       *

Because Arlington presented significant record evidence that the Accused Connectors are colorable imitations, the court did not clearly err in its decision.

## III. The Court Correctly Construed the Claims.

The court's claim construction followed *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)(en banc). The court gave the terms at issue their ordinary and customary meaning. *Id.* at 1313. Moreover, the court recognized that

Bridgeport's construction would exclude preferred embodiments, which "is rarely, if ever, correct." *Funai Elec., v. Daewoo Elecs.*, 616 F.3d 1357, 1371 (Fed. Cir. 2010). The court's construction was additionally consistent with the previous admission of infringement.

## A. "Cylindrical."

The second limitation of claim 1 requires a member having a "leading end with an external *cylindrical* surface." A41(9:30-32). The court correctly construed "cylindrical" to mean "having the approximate form of a cylinder" (A23), rather than "an elongated body that has a circular cross-section which remains constant along the body's axial length," as Bridgeport proposed (BBr.56-66). Only the court's construction is consistent with (1) the term's ordinary meaning; (2) the specification; and (3) Bridgeport's previous admission of infringement.

### 1. The Ordinary Meaning of "Cylindrical" Is Not Limited to a Perfect Cylinder.

The ordinary meaning of "cylindrical" is "having the approximate form of a cylinder." A20-21; A141-42; A2264:16-73:5. Nothing in claim 1 supports Bridgeport's restrictive construction (BBr.56-66), which effectively rewrites "cylindrical" as "a perfect geometric cylinder." *See Edwards Lifesciences v. CoreValve*, 699 F.3d 1305, 1311-12 (Fed. Cir. 2012)("cylindrical" does not require "a cylinder with a diameter that is constant along its length or longitudinal axis," i.e., "a perfect geometric cylinder").

The claim does not refer to a "cross-section," much less a constant one. A41(9:27-10:12). Nor does it mention the surface's "axial length." *Id.* While the claim also requires a "spring steel adapter *surrounding said leading end external cylindrical surface*" (A41(10:1-3)), there is nothing about the "surrounding" adapter that requires it or the "cylindrical surface" to have a constant cross-section. *Id.* Rather, the "cylindrical surface" need only be able to accommodate the "surrounding" adapter. A40(33-38); A2266:20-67:7.

The definition of "cylindrical" in *Webster's Dictionary* further supports the court's construction. A21; *Phillips*, 415 F.3d at 1322-23 (court may "rely on dictionary definitions"). Bridgeport argues that the "ordinary meaning of 'cylindrical' is exactly what Webster's says it is – 'having the form of a cylinder.'" BBr.61. But Bridgeport omits part of the *Webster's* definition, which actually defines "cylindrical" as "*relating to or* having the form or properties of a cylinder." A142(quoting *Webster's Third International Dictionary* (1993)); A21.

In other words, *Webster's* defines "cylindrical" as encompassing not only cylinders, but also forms "relating to" cylinders. *Accord Arthrex v. Parcus Med.*, No. 2:11-cv-694, 2014 U.S. Dist. LEXIS 1033330, at *15-18 (M.D. Fla. July 29, 2014)(the *Webster's* definition does not require a "geometric cylinder"); *Mezzalingua*, 2003 U.S. Dist. LEXIS 24730, at *24-25(nothing in the *Webster's*

definition requires "perfect circular cylinders. *A tapered object can still be 'cylindrical.'*").

**2. The Specification Supports the District Court's Construction and Contradicts Bridgeport's.**

Like the claim, the specification *never* refers to a "cylindrical" leading end surface consisting of a perfect cylinder with a constant diameter along the axial length. Instead, "the specification and accompanying embodiments" "portray an external cylindrical surface...that has varying cross-sections along its axial length" and demonstrate that "cylindrical" is "not the equivalent of a perfect cylinder." A22-23.[2] *See Edwards*, 699 F.3d at 1311-12; *see also Mezzalingua*, at *24-25; *Arthrex*, at *15-18.

Bridgeport's reliance on *International Rectifier* (BBr.64) is therefore misplaced for several reasons, including the fact that it addressed an entirely different claim term ("polygonal"). *Int'l Rectifier v. IXYS*, 361 F.3d 1363, 1371 (Fed. Cir. 2004). Notably, in considering a second term, "annular," which

---

[2] Bridgeport seeks to support its construction with Mr. Herbst's opinion. BBr.23; BBr.61-63(citing A463-66). But Herbst admitted he is neither an expert nor one of ordinary skill in the art (A2435:2-8; A2443:13-45:3) and it is therefore "contradictory to Rule 702" to permit him to testify from the perspective of one of ordinary skill. *Sundance v. DeMonte Fabricating*, 550 F.3d 1356, 1363 (Fed. Cir. 2008); *see* A3346-63. Moreover, expert testimony may not contradict intrinsic evidence in construing claims. *Markman v. Westview Instruments*, 52 F.3d 967, 981 (Fed. Cir. 1995).

*Webster's* defined as "of, or relating to, or forming a ring," the court in *Rectifier* did not limit the definition of annular only to a "ring." *Id.* at 1372-73. Most importantly, the court in *Rectifier* found that slight manufacturing variances were not enough to overcome the specification's otherwise consistent portrayal of "polygonal" regions as "closed plane figure[s] bounded by straight lines." *Id.* at 1371-72. In contrast, the '488 Patent never portrays "cylindrical" leading end surfaces as having a constant diameter along their axial length—i.e., as perfect cylinders.



As shown in annotated Figure 15 (above), the seat 132, with boundaries defined by "the lip 138 and central flange 130," depicts the claimed leading end external cylindrical surface as having a raised portion and therefore does not have a constant cross-section along its axial length. A36(Fig.15); A40(7:33-38); A139. Annotated Figure 6 (below) further discloses corners rounded inward and outward

at the edges of the seat's raised portion, which result in additional variations in diameter (28).  A1080-81.



A34(Fig.6).  Numerous other embodiments of the '488 Patent depict raised portions on the leading end of surface of the connector.  A39(6:1-5); A32-36(Figs. 2,7,16,19,20); A1080-82.  These "embodiments do not meet Bridgeport's proposed construction, and claim interpretation that excludes a patentee's preferred embodiment is rarely the correct interpretation."  A23(citing *Funai*, 616 F.3d at 1371).

Bridgeport concedes that the leading end surface annotated in blue above has varying diameters.  BBr.63(describing it as consisting of "straight-sided cylinders of *different diameters*").  But Bridgeport treats that single surface in fragments by arguing that although the specification states that the flange and lip "define the boundaries" of *the surface* in those embodiments, this does not mean the surface "adjoin[s] the flange and lip."  BBr.59.  This argument is contradicted by the '488 Patent, which refers to the entire surface as a single cylindrical surface, including

one embodiment that plainly states that "*[t]he* smooth cylindrical section has flanges *at each end defining* to hold the spring steel adaptor in place." A41(9:4-8). This surface is intended to accommodate a spring steel adapter. A37(2:38-41).

That adapter, which is claimed to "surround[] said leading end cylindrical surface" (A41(10:1-4)), is likewise depicted as "surrounding" the entire area, and not only a fragment of the surface:



A3994(Fig.22)(orange indicates adapter).

Thus, the court did not violate the "indefinite article rule," as Bridgeport claims (BBr.57-60), when it identified the entire surface in front of the flange—but excluding the lip—as the external surface in both the '488 Patent embodiments and on the Enjoined Connectors. A9-17. While it is true that the use of "'a' or 'an' *can* mean 'one or more'" (*Baldwin Graphic Sys. v. Siebert*, 512 F.3d 1338, 1342 (Fed. Cir. 2008)), that rule does not apply when the specification "shows that the term was used in its singular sense." *Norian v. Stryker.*, 432 F.3d 1356, 1359 (Fed. Cir. 2005). Thus, the indefinite article "a" or "an" should not be construed as "one

or more" when "the context clearly evidences that the usage is limited to the singular." *TiVo v. Echostar Commc'ns*, 516 F.3d 1290, 1303 (Fed. Cir. 2008).

Such is the case here, where the '488 Patent claims and specification consistently refer to a singular leading end, having a single external surface that is required to be cylindrical, and that is to be surrounded by a single adapter. A9-10. Even Bridgeport's expert opined that the claim "simply has to have one, an external cylindrical surface." A2803. He also said the "patent never discusses the fact there could be numerous cylindrical sections" but only talks "about one." A2854:6-9. Bridgeport's new and distorted application of the indefinite article rule, contradicted by its own expert and the '488 Patent's specification, is nothing more than a convoluted attempt at justifying its expert's inconsistent colorable imitation analysis of only a portion of the Enjoined Connectors' leading end cylindrical surface. A9-10; A17n.8.

### 3. The District Court's Construction Is Consistent with Bridgeport's Previous Admission of Infringement.

In a contempt proceeding, infringement by the previously-enjoined device is not open to challenge. *Merial*, 681 F.3d at 1300. Accordingly, the court held that "any claim construction in this matter must be faithful to Bridgeport's admission that the Enjoined Connectors infringed the '488 Patent and thus met each limitation." A20. And here, Bridgeport's previous admission of infringement, which "necessarily and conclusively established" that the Enjoined Connectors

meet the "external cylindrical surface" limitation, lends further support to the court's construction. *Merial*, 681 F.3d at 1300.

Like the '488 Patent embodiments, the Enjoined Connectors' "external cylindrical surface" has varying cross-sections along its length. A2268:15-69:14; A2210:2-11:20; A2213:4-16; A2217:5-18:20; A1063-65; A1194; A1196. Bridgeport's engineering drawings show rounded corners, fillets, drafted (or angled) sides, and raised steps along the cylindrical surface (blue, below):



*Id.*

Contrary to its current argument that the Enjoined Connectors "had three external surfaces" (BBr.51-52), Bridgeport originally argued at the district court that the entire area identified in blue above constitutes the claimed "cylindrical

surface." A347.[3] Williamson likewise stated in his original declaration that "three cylinders...compose *the* 'cylindrical surface' on the old design." A408. Further, Williamson admitted that Bridgeport's construction would be inconsistent with its admission of infringement (A1308:16-24) and thus contrary to the established rule that infringement by the Enjoined Connectors is "not open to challenge in contempt proceedings." *Merial*, 681 F.3d at 1300.

### 4. The Court Did Not Base Its Construction on Its Previous Construction of the '831 Patent.

The district court did not base its construction of "cylindrical" on its previous construction of the term in Arlington's '831 Patent (BBr.65-66) but rather expressly stated its construction is "based on the '488 Patent specification and accompanying embodiments." A22. The court merely summarized, but did not adopt, Arlington's argument that the construction of "cylindrical outbound end" in claim 1 of the '831 Patent supports the construction of "cylindrical" here. A21. Had the court relied upon the previous construction, it would have been justified in

---

[3] The district court noted Bridgeport's constantly changing positions (A9) and was in the best place to make a credibility determination. As described more fully above, *see supra* §II.B.1., Williamson argued that *only* the recessed area on the Enjoined Connectors, and not the raised areas, constitutes a "cylindrical surface" (A2864:4-65:22), despite the raised areas being the only portion on which the adapter seats (A2853:13-18) and contradicting his previous admission and Bridgeport's current position.

doing so, as both patents share the same inventor and disclosure and relate to the same technology. The inventor's use of "cylindrical" in the '831 Patent to describe the entire "outbound end," which includes the lip and the flange (BBr.66; A21; A111-12; A142-43), demonstrates even more clearly that "cylindrical" clearly "encompasses something other than a cylinder." A111;A23;A2887-88

### 5. The District Court's Construction Does Not Render Other Claim Terms Superfluous.

Claim 2 contains a "generally cylindrical" limitation, referring to the spring steel locking ring in the connector's trailing end, not the leading end of the zinc die cast connector referred to in claim 1. A41(10:13-18). Bridgeport contends that the court's construction of "cylindrical" renders superfluous this use of the term "generally" in claim 2. BBr.62-63.

That is not so. First, there is no claim differentiation because the limitation of claim 2 relates to a different feature of the invention. Second, the word "generally" in the claim term "generally cylindrical" accounts for a variety of deviations from the "approximate form of a cylinder" in the shape of the locking ring. A1083; A2396:5-98:17; A3120:21-23:3. The specification describes and depicts various embodiments of the "generally cylindrical spring steel locking ring" all with integral tangs protruding inward and outward:



A33(Fig.3); A39(5:2-14 ("Generally cylindrical spring steel locking ring 20...has a first set of tangs 36 and 36A");



A33(Fig.4); A39(44-62 ("FIG.4 illustrates an arrangement of the steel locking ring having a slot 50 with an offset piece or tongue 52 on one side of slot 50 that fits into a concomitant cutout 54 on the other side of slot 50. Slot 50 permits compression of steel locking ring 20…"); *see e.g.*, A33(Fig.5); A35(Fig.10); A35(Fig. 12); A35(Fig.14).

These various protrusions that are "generally cylindrical" because portions are not in the approximate form of a cylinder are easily viewed in Arlington's commercial embodiment:







**A3942(view of locking**
**ring inside connector's**
**trailing end)**

**(view of locking ring removed from trailing end)**

In other words, unlike the "cylindrical leading end surface," which requires the entire leading end surface to be in the "approximate form of a cylinder," the "generally cylindrical" locking ring permits portions of the locking ring to deviate from the "approximate form of a cylinder." Because the phrase "generally cylindrical" accounts for these deviations, there is nothing superfluous about the term "generally" in "generally cylindrical" under the court's construction of "cylindrical." A1083; A2396:5-98:17; A3120:21-23:3.

Bridgeport's reliance on *Anchor Wall* and *Stumbo* is misplaced. BBr.63. In *Anchor Wall Sys. v. Rockwood Retaining Walls*, this Court held it was error to limit the claim term "generally parallel" to mean "parallel," effectively reading the term

"generally" out of the claim. 340 F.3d 1298, 1311 (Fed. Cir. 2003). In *Stumbo v. Eastman Outdoors*, this Court found that construing the term "vertical" to apply to the orientation, rather than the shape, of an opening would render other terms explicitly describing the orientation superfluous. 508 F.3d 1358, 1362-63 (Fed. Cir. 2007). Neither set of facts is applicable here and Bridgeport cannot escape the '488 Patent specification, which is "the single best guide to the meaning" of "cylindrical," and formed the basis for the court's construction. *Phillips*, 415 F.3d at 1315; A22-23.

## B.    "Surrounding."

The third limitation of claim 1 requires a "spring steel adapter *surrounding* said leading end external cylindrical surface." A23(citing A41(10:1-3)). The court correctly construed "surrounding" to mean that the adapter "significantly borders" the leading end of the connector's external cylindrical surface. A23. This construction was established in prior litigation concerning a related patent. A115-16; A149; *see* 0485 Action, 290 F. Supp. 2d 508, 521-24 (M.D. Pa. 2003). It is also consistent with the intrinsic evidence, A23-24, and should be affirmed.

### 1.    The Previous Construction of "Surrounding" Has Preclusive Effect.

Four elements are necessary for collateral estoppel. *Peloro v. United States*, 488 F.3d 163, 175 (3d Cir. 2007). There can be no dispute as to three of those elements here: the 0485 Action "actually litigated" the construction of

"surrounding"; the construction was "determined by a final and valid judgment"; and the construction was "essential to the prior judgment." *Id.* The fourth element addresses whether the claim construction "sought to be precluded" is "the same as that involved in the prior action." *Id.* It is.

In the 0485 Action, Judge Conner construed the term "surrounding" in claim 8 of the '050 Patent to mean "significantly border[ing],"  290 F. Supp. 2d at 521-22, and Bridgeport stipulated as a matter of fact that the Accused Connectors had a "circular spring metal adapter surrounding said leading end."  A18(citing 0485 Action, Doc. 129 at 15-16).  Based in part on that construction, the district court entered a final judgment of infringement against the Accused Connectors, which this Court affirmed in 2012.  477 F. App'x 750 (Fed. Cir. 2012).  Although this case involves a different patent, collateral estoppel nevertheless "applies to common issues in actions involving different but related patents." *Mycogen Plant Sci. v. Monsanto*, 252 F.3d 1306, 1310-11 (Fed. Cir. 2001).  And "the same claim term" in "related patents carries the same construed meaning." *Omega Eng'g v. Raytek*, 334 F.3d 1314, 1334 (Fed. Cir. 2003).

Claim 8 of the '050 Patent and claim 1 of the '488 Patent both use the term "surrounding" in nearly identical fashion:

| **'050 Patent** | **'488 Patent** |
|:---:|:---:|
| "a circular spring metal adaptor *surrounding said leading end* of said electrical connector..." | "...a spring steel adapter *surrounding said leading end external cylindrical surface*..." |
| **A4461(10:35-38)** | **A41(10:1-3)** |

Because the "external cylindrical surface" is a subset of the "leading end," both Patents effectively require the adapter to "surround" the "external cylindrical surface." A1088.

The '050 and '488 Patents are also closely related. The '488 Patent incorporates the '106 Patent in its entirety by reference. A38(4:6-10). By its incorporation into the '488 Patent, the '106 Patent becomes "part of the ['488 Patent] as if it were explicitly contained therein." *Telemac Cellular v. Topp Telecom*, 247 F.3d 1316, 1329 (Fed. Cir. 2001). The '106 Patent is a sibling of the '050 Patent (A1088; A24), as depicted below:



The disclosures of the '050, '106, and '488 Patents are identical in describing how the adapter "surrounds" the connector, including the same figures and embodiments disclosing an adapter that were before the court in the 0485 Action when it construed "surrounding" to mean "significantly borders." *Compare* A4450-55(Figs. 2, 5, 12) *with* A3986-91(Figs. 2, 5, 12).

Accordingly, that construction has preclusive effect. *Mycogen*, 252 F.3d at 1310-11(collateral estoppel "applies to common issues in actions involving different but related patents"). At a minimum, the court was correct to construe "surrounding" consistently with the construction in the 0485 Action, affirmed by this Court. A23-24.

### 2. The Intrinsic Evidence Supports the District Court's Construction and Contradicts Bridgeport's.

The '488 Patent identifies the "spring steel adapter 14" as an embodiment of the claimed adapter "surrounding" the cylindrical surface. A147(citing A38(4:5)). But nothing in the intrinsic record restricts "surrounding" to "require that the adapter be *entirely* on the outside of the cylindrical surface," as Bridgeport urges. BBr.67. Instead, both the claim and the specification make clear that the adapter need only "significantly border" the cylindrical surface, consistent with the court's construction.

The claim itself does not require that the adapter "completely" or "entirely" "surround" the cylindrical surface—merely that it "surround." A41(10:1-3); A23n.16. The same is true of the specification, which incorporates by reference the '106 Patent to describe the adapter. *See* A147(citing A38(4:6-10)). And the '106 Patent does not remotely limit "surrounding" to require that the adapter "be entirely on the outside of the cylindrical surface." Rather, it discloses adapters where part of the underlying leading end, including the cylindrical surface, is exposed through a gap and cannot be completely enclosed by the adapter:



**A3993(Fig.20)**          **A3994(Fig.22)**          **A3986(Fig.2)**

**(orange indicates adapter)**

*See also* A3988(Fig.5); A32(Fig.1).

Moreover, unlike claim 1 of the '488 Patent, which requires that only the "cylindrical surface" be surrounded by the adapter, the claims of the '106 Patent require the adapter to surround the *entire leading end* of the connector, which comprises the entire portion of the connector that is inserted into the junction box, including the "lip" (76) at the front end. *Compare* A4004(13:7-11) *with* A41(10:1-3). Yet, as can be clearly seen in Figure 22 of the '106 Patent, the lip at the front of the connector (element 76, below) "extends outside the adapter" and the adapter (orange) is therefore not "entirely on the outside" of the leading end:



**A3994(Fig. 22)**

Bridgeport never discusses the '106 Patent disclosure (BBr.66-68), and with good reason: Bridgeport's construction of "surrounding" would exclude each embodiment above from the scope of both the '488 and '106 Patent claims. That result contradicts basic principles of claim construction. *Funai*, 616 F.3d at 1371. By contrast, the court's construction, "significantly bordering," is consistent with these disclosures and should be affirmed.[4]

## IV. The Findings of Direct and Indirect Infringement Should Be Affirmed.

The court expressly analyzed claim construction and infringement independently of colorable imitation (A9-20; A20-25; A25-28) and did not "conflate[] infringement into colorable imitation" with regard to the "cylindrical"

---

[4] The Accused Connectors meet the "surrounding" limitation even under Bridgeport's erroneous construction since the lip or "lugs" on the Accused Connectors are not part of the "cylindrical surface" (A10,n.2), and therefore are not required to be surrounded.

limitation.  BBr.68.[5]  Arlington demonstrated "by clear and convincing evidence that the Accused Connectors have leading end external surfaces that have the approximate form of a cylinder."  A25.  Rahn provided "both visual and quantitative" analyses in support of this finding.  A25; A143-44; A183; A191; A198; A1092-96; A1184; A1194-97; A2281:23-86:8; A3139:2-41:2.  He testified that the Accused Connectors' leading end surface tapers a mere forty-thousandths-of-an-inch, meaning it has the approximate form of a cylinder.  A2283:10-85:8; A3139:2-40:9.  He further demonstrated that the surface deviates from a perfect cylinder by only 3-4% using a standard deviation methodology, or by a mere 5.54% using Williamson's methodology.  A1194; A1196; A2285:9-86:8.  Rahn therefore opined that the surface has "the approximate form of a cylinder" and meets the "cylindrical" limitation.  A2283:10-20; A3139:2-9.  And neither Rahn nor the court erred in confirming this fact by comparing this deviation from a cylinder to that of the Enjoined Connectors (5% using Rahn's method, 5.46% using Williamson's), which were admitted to be infringing and therefore met the "cylindrical" limitation as a matter of law.  A25; A2281:23-86:8; A3139:2-41:2; A2217:5-19:5; A2220:3-21:8; *see Merial*, 681 F.3d at 1301 (finding no error in

_____

[5] Bridgeport does not allege any error in the court's finding that the Accused Connectors meet the "surrounding" limitation, as construed.  BBr.68-69.

comparing newly accused product to a product known to be covered by the asserted claims as part of infringement determination); *Brine v. STX*, 367 F. Supp. 2d 61, 68 (D. Mass.)(predicating infringement finding in part on insignificant differences in measurements between enjoined and accused product), *aff'd*, 139 F. App'x 281 (Fed. Cir. 2005).

Bridgeport was also found liable for induced infringement. A26-27. Bridgeport claims that Arlington failed to provide direct evidence of underlying direct infringement by Bridgeport's customers. BBr.69. But "it is hornbook law" that circumstantial evidence is sufficient. *Lucent Techs. v. Gateway*, 580 F.3d 1301, 1318-19 (Fed. Cir. 2009). Arlington presented evidence of significant sales of the Accused Connectors (A1054; A1240; A2301:1-10) combined with Bridgeport's instructions to use the Accused Connectors in an infringing manner in its marketing materials (A26-27; A154-55; A1136-37; A2288:18-2302:3; A3966-69; A8165-82).[6] This Court has held just such evidence sufficient to establish infringement. *See Lucent*, 580 F.3d at 1317-19 (finding evidence of sales of the

---

[6] Arlington also presented evidence that Bridgeport itself is a direct infringer, which Bridgeport does not dispute. A26; *see* BBr.70. Arlington proved that Bridgeport uses the Accused Connectors in promotional videos to perform each step of the claimed method. A26; A3968; A1226-32; A8165-82; A153; A1135; A2288:18-93:24.

accused product, combined with instructions teaching the infringing use sufficient); *Chiuminatta Concrete Concepts v. Cardinal Indus.*, 145 F.3d 1303, 1312 (Fed. Cir. 1998)(finding evidence of advertisements conceding ability of the accused device to practice the claimed method and encouraging such use sufficient).

Finally, Bridgeport complains that the court limited Bridgeport's non-infringement arguments to limitations two and three of claim 1. BBr.69. But the court was correct to do so, *see* A1770-73, as "Bridgeport is not entitled to raise arguments pertaining to unmodified features of the Accused Connectors." A1771. Thus, the district court was only "required to evaluate the *modified elements* of the newly accused product against the asserted claim." *TiVo*, 646 F.3d at 883. The logic behind this rule is simple: a "contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy." A1771 (quoting *TiVo*, 646 F.3d at 889).[7] Because the only differences that Bridgeport identified

---

[7] The court did not "convert a method patent into a product patent" by following these tenets of *TiVo*. BBr.69. *TiVo*'s admonishment that only modified elements are to be considered in a contempt proceeding applies equally to a method patent, which was at issue in *TiVo*. *See* 648 F.3d at 869. In any event, Bridgeport's non-

(continued…)

since the original action involving the Enjoined Connectors "implicate[d] limitations two and three," the court was correct to limit the contempt hearing to those two limitations.  A1772.

The findings of infringement should be affirmed.

## V.    Bridgeport's Challenge to the Scope of the Injunction Is Misplaced.

Nine years after bargaining for and stipulating to the terms of the '488 Injunction, which as this Court has recognized prevents Bridgeport from selling products that are colorable imitations of the Enjoined Connectors (A2; A63-64; *Arlington*, 759 F.3d at 1338), Bridgeport attempts to challenge its scope on the theory that the injunction allegedly treats the '488 Patent as a "product patent" by prohibiting Bridgeport from "selling" the Accused Connectors and allegedly enjoining some non-infringing conduct.  BBr.69-71.

But the scope of the injunction entered by the court is identical to the scope of the injunction stipulated to by Bridgeport in 2004 (*compare* A64 *with* A29-30; *Arlington*, 759 F.3d at 1338), and the law is clear that the time "to appeal the scope of an injunction is when it is handed down, not when a party is later found to be in contempt."  *TiVo*, 646 F.3d at 889.  The injunction and "its alleged infirmities

(continued)

infringing-use argument concerns the scope of the injunction, which is not open to challenge. *See infra*, §V.

cannot be relitigated or corrected in a subsequent contempt proceeding." *Id.* This is true even if the injunction may have the potential to enjoin some non-infringing conduct. *See id.* Bridgeport is therefore prohibited from challenging the scope of the injunction.

Separately, Bridgeport's newly raised and untimely argument that its customers might use the Accused Connectors in a "non-infringing" manner (BBr.70) is without merit. Bridgeport raised its purported non-infringing-use argument for the first time in support of a failed motion for a stay, filed months after the hearing *and after Bridgeport had already filed a notice of appeal.* BBr.70(citing A3640-43). Bridgeport presented no evidence of such non-infringing use at the hearing and Arlington's evidence that Bridgeport's customers directly infringe (A26-27) was therefore uncontroverted. *See* A2818:20-19:6, A26-27. Indeed, Williamson presented no separate defense to indirect infringement. A2818:23-19:8. And as the district court found, the injunction "applied to all uses of these products, and did not create an exception for certain permissible uses." A2a-A3a.

## VI. The District Court Was Correct to Award Arlington 100% of Its Lost Profits, Costs, and Expenses.

Civil contempt sanctions are "to make reparation to the injured party and restore the parties to the position they would have held had the injunction been obeyed." *Robin Woods*, 28 F.3d at 400. The "innocent party is entitled to be made

whole for the losses it incurs as the result of the contemnors' violations."

*Halderman v. Pennhurst State Sch. & Hosp.*, 49 F.3d 939, 941 (3d Cir. 1995).

**A.    Arlington Demonstrated Its Entitlement to Lost Profits under Both the Two-Supplier Market and *Panduit* Tests.**

To establish its lost profits, Arlington had to show "that 'but for' infringement it reasonably would have made the additional profits enjoyed by [Bridgeport]." *See Micro Chem. v. Lextron*, 318 F.3d 1119, 1122 (Fed. Cir. 2003). The district court found that Arlington satisfied its burden under both the two-supplier market and *Panduit* tests for doing so. A2a-A7a. The district court analyzed each element required for the necessary showing under each test and did not "ignore[] the requirements for establishing entitlement to lost profits" (BBr.72). A2a-A6a(two-supplier market factors); A7a(*Panduit* factors). Nor did the district court "wrongly [hold] that 'customer behavior during the injunction period dictates Arlington's entitlement to lost profits,'" as Bridgeport claims. BBr.72(citing A6a). To the contrary, after considering Bridgeport's rebuttal evidence, the district court was "*not persuaded* that customer behavior during the [prior] injunction period [in 2011 in the 0485 Action] dictates Arlington's entitlement to lost profits." A6a.

Bridgeport also argues, as it did below, that a two-supplier market did not exist because "a number of competing products, including the Sigma 38ADS product," were also on the market, and purportedly constituted acceptable non-

infringing substitutes to Arlington's and Bridgeport's products. BBr.73-74. But a two-supplier market analysis "excludes alternatives to the patented product with disparately…different characteristics." *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1288 (Fed. Cir. 2011). Similarly, the mere existence of a product on the market, which "lacks the advantages of the patented product," does not render it an "acceptable noninfringing substitute." *Cohesive Techs. v. Waters*, 543 F.3d 1351, 1373 (Fed. Cir. 2008).

With the exception of the Sigma 38ADS, every product identified by Bridgeport was already considered in the 0485 Action and rejected as an acceptable non-infringing substitute and a two-supplier market was determined to exist. A5875; A6051-61; A6026; A6034-35; A3a-A4a(citing 0485 Action, 2013 WL 3773836 (M.D. Pa. Jul. 17, 2013)); A7a. Each of those previously-considered products lacked the advantages and selling features of Arlington's and Bridgeport's connectors. A6051-61(incorporating A6070-84); A6026; A6034. The district court therefore correctly saw "no reason to depart from th[e] conclusion" reached in the 0485 Action and affirmed by this Court with respect to a two-supplier market and a lack of acceptable non-infringing substitutes based on Bridgeport's stale evidence. A3a-A4a; A7a.

The newly-raised Sigma 38ADS product likewise lacked the advantages that motivated purchasers to buy the patented products. A5875; A5879-83; A6052; A6060-65; A6034-38; A5a. In fact, Arlington was unaware of having lost a single sale to these products. A5881; A6063. Though Bridgeport labels the supporting declaration of Arlington's Vice President, Mr. Gretz, which established these facts, "self-serving" (BBr.75), Bridgeport offered the declaration of its own employee, Eric Cerasale, in response. *See* BBr.74(citing A4617-22). But Mr. Cerasale's experience—he has been Bridgeport's sales manager since 2007 (A4609-10)—pales in comparison to Mr. Gretz's nearly 50 years of industry experience and repeated recognition as an expert in the field (A6050). Furthermore, the only customer declaration in evidence corroborated Mr. Gretz's assertion that customers preferred the features only present in Bridgeport's infringing Accused Connectors and Arlington's patented products. A4811-12; A5882(citing A4811-12); A6064-65. It was thus well within the district court's discretion to weigh the evidence and determine that the Sigma product is not an acceptable substitute, and that a two-supplier market continues to exist.[8]

_____

[8] Bridgeport's claim that it was able to sell some Sigma connectors after being found in contempt and enjoined from selling its Accused Connectors, BBr.73, is

(continued…)

Arlington also demonstrated it had the manufacturing and marketing capability to make Bridgeport's diverted sales (A4a; A5875-76; A5883; A6038-39), as required under the two-supplier market and *Panduit* tests, and that there was demand for the patented product (A7a; A5878; A6031-33; A6065), as *Panduit* additionally requires. *Micro Chem*, 318 F.3d at 1124; *Panduit*, 575 F.2d at 1156. Bridgeport does not challenge either showing. BBr.71-74.

Finally, Arlington's damages expert calculated the amount of Arlington's lost profits, as required by both tests, using the same formula and methodology he used in the 0485 Action, which the jury accepted, the district court adopted, and this Court affirmed. A4838-42; A6023-25; A6039; A4855-67. Though Bridgeport did not challenge the arithmetic (BBr.71-74), it nevertheless attempted to rebut Arlington's entitlement to recover lost profits for 100% of Bridgeport's sales, as it does now, BBr.73-74. But contrary to Bridgeport's representation, the district court did not "ignore[]" Bridgeport's evidence of purported "brand loyalty, changed market conditions, and price elasticity." BBr.74. To the contrary, the district court explicitly considered *each* of these arguments, A5a-A6a, which were

---

(continued)

therefore a red herring since it lacked the patented products' advantages. *Siemens*, 637 F.3d at 1288; *Cohesive Techs.*, 543 F.3d at 1373.

all rebutted by Arlington, A6063-67; A6027-29; A6039-46, and was simply "not persuaded" by them.  A5a-A6a.

Finally, Bridgeport claims that the district court erred by awarding Arlington lost profits for 100% of Bridgeport's Accused Connector sales because Bridgeport presented "undisputed" evidence that 73% of its Accused Connectors are non-infringing.  BBr.73.  As an initial matter, Bridgeport presented *no evidence* of any purportedly non-infringing uses of its connectors during the three days of testimony at the contempt hearing.  A2818:20-19:6; A26-27.  Instead, Bridgeport attempted to introduce such evidence for the first time by way of a declaration from Mr. Cerasale accompanying a motion to stay after having already filed its original premature notice of appeal.  BBr.70(citing A3640-43).

Moreover, the evidence *was* disputed.  Arlington showed that Mr. Cerasale's "estimate" that 73% of Bridgeport's Accused Connectors did not infringe the method because they were purportedly used with light fixtures, not "junction boxes," not only lacked any reliable support but as also wrong, as light fixtures involved the use of "junction boxes."  A6066-67.  In fact, Bridgeport raised the same "junction box" argument in the underlying proceeding concerning the Enjoined Connectors, only to then admit that ***all*** of their Enjoined Connectors infringe, and has not identified any changed circumstances requiring a different result.  A6066-67; A308-10.  The district court was thus "unpersuaded" by Mr.

Cerasale's unsubstantiated "estimate" that 73% of Bridgeport's connectors do not infringe. A5a-A6a.

Separately, the district court was correct to find that Bridgeport was enjoined from selling its Accused Connectors, no matter the use. The agreed-to injunction prohibited Bridgeport from selling any products that were colorable imitations of the Enjoined Connectors; there was no carve-out for colorable imitations for specific uses. A2a-A3a; A5a-A6a; *accord Arlington*, 759 F.3d at 1338.

Because Bridgeport has identified no clear error underlying the district court's decision to award Arlington lost profits, it should be affirmed.

## B. The District Court Did Not Err by Awarding Arlington Its Costs and Expenses.

The determination of what costs will be awarded to the prevailing party is a matter left to the sound discretion of the district court. *Bowers v. Foto-Wear*, No. 3:03-cv-1137, 2007 WL 4086339, at *4 (M.D. Pa. Nov. 15, 2007)(citing *Farmer v. Arabian Am. Oil. Co.*, 379 U.S. 227 (1964). That discretion "allows the district court a wide range within which its determination will not be upset by an appellate court." *Copperweld Steel v. Demag-Mannesmann-Bohler*, 624 F.2d 7, 8 (3d Cir. 1980). Bridgeport comes nowhere close to demonstrating that the district court abused its "sound discretion" (BBr.74-75) by awarding Arlington the reasonable costs and expenses it incurred prosecuting the contempt proceeding, including both taxable and non-taxable costs. A27a; A4893-95; A6178-80. Such an award is

proper in a contempt proceeding so long as there is "some basis" for it "in the record." *Lichtenstein v. Lichtenstein*, 425 F.2d 1111, 1114-15 (3d Cir. 1970).

Bridgeport erroneously claims, as it did below (*see* A27a), that the award was improper because it was not supported by "<u>any</u> documentation." BBr.74-76(emphasis Bridgeport's). But as the district court found, "[w]hile Arlington has not submitted invoices from vendors or third parties," the evidence Arlington did submit was "sufficiently detailed" and "the [requested] costs [were] reasonable." A27a.[9] That evidence consisted of Arlington's invoices from its attorneys (A4926-5092; A5200-30), which included costs and expenses paid by the law firms and billed to Arlington (*see, e.g.*, A4937; A4944; A4951; A5231-36), as well as summary tables (A5135-42) and declarations (A4917-19; A5200) setting forth the costs Arlington sought to recoup up to that date: $148,237.50 (technical expert); $11,878.40 (damages expert); $23,793.46 (trial graphics firm); $33,456.37 (travel expenses); $31,916.03 (legal research and court reporter fees); $18,905.87 (various non-taxable expenses). A27a; A4893-95; A6178-80.

Bridgeport cites a number of cases for the alleged proposition that "[c]ourts will not award costs without proper documentation." BBr.75. But Bridgeport's

---

[9] Nowhere did the district court "acknowledge that Arlington failed to substantiate its expenses" (A27a), as Bridgeport argues (BBr.75).

reliance on these cases is wholly misplaced as none of them arise under the standards governing a contempt proceeding—rather, they are confined to limited categories of reimbursable costs under 28 U.S.C. §1920 or other inapplicable fee shifting statutes—and, moreover, because Arlington has submitted every invoice for the costs awarded by the district court, as set forth above. *See*, *e.g.*, *Perri v. Resorts Int'l Hotel*, No. 10-cv-4489, 2014 U.S. Dist. LEXIS 6223, at *9 (D.N.J. Jan. 16, 2014)(denying costs as not reimbursable under §1920 and because the bases for the costs were not specified); *Warner Chilcott Labs. Ireland v. Impax Labs.*, No. 08-vc-6304, 2013 WL 1876441, at *3-19 (D.N.J. Apr. 18, 2013)(only awarding costs enumerated under §1920); *Stover v. Riley*, 30 F. Supp. 2d 501, 507 (E.D. Pa. 1998)(awarding all costs except a $310 expense entitled "client's expenses" without further specifics in a Title VII action); *Cover v. Potter*, No. 05-cv-7039, 2008 WL 4093043, at *8 (S.D.N.Y. Aug. 29, 2008)(decreasing costs in civil rights action due to illegibility of receipts); *Zimmerman v. Portfolio Recovery Associates, LLC*, No. 09-cv-4602, 2013 WL 6508813, at *12 (S.D.N.Y. Dec. 12, 2013)(reducing costs under fee shifting statute due to a lack of "back-up documentation" to substantiate the claimed expenses).

Bridgeport's argument that Arlington's documentation prevented Bridgeport from challenging, for example, the "consulting fees" in a particular month (BBr. 75) is contradicted by the record. Arlington's documentation

included attorneys' contemporaneous time entries detailing their work on any given day—including work with consultants, none of whom overlapped (Arlington had one technical expert, one damages expert, and a trial graphics firm)—thus allowing a month-by-month review of Arlington's costs and expenses. A4926-5092;A5200-30;A5135-42. Notably, the invoices that Bridgeport complains are not sufficient for its purpose were the same ones sent to and paid in full by Arlington each month. A5152-53;A6230-31;A7102-03;A7114.[10]

Such evidence provided far more than the requisite "some indication of record" as to the award's reasonableness. *Lichtenstein*, 425 F.2d at 1114; *see also Robin Woods*, 28 F.3d at 401 (no error in award of costs based solely on CFO's testimony, without documentation); *Raza v. Biase*, No. 07-cv-02576, 2008 U.S. Dist. LEXIS 20526, at *14-15 (D.N.J. Mar. 14, 2008)(awarding costs supported only by counsel's invoice). The district court therefore did not abuse its discretion by finding Arlington's submission sufficiently detailed and not requiring more. A27a; *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)(a petition for fees is not to become a "second major litigation").

---

[10] *See Yurman Designs v. PAJ*, 125 F. Supp. 2d 54, 58 (S.D.N.Y. 2000)(payment of fees and costs by a sophisticated client is evidence of their reasonableness), *aff'd sub nom.*

**VII. Rather Than Be Made Whole, Arlington Was Effectively Punished $750,000 for Bridgeport's Contempt as a Result of Two Legal Errors Made by the District Court in Applying the Forum-Rate Rule for Reasonable Hourly Rates.**

This case was about much more than simply lost profits to Arlington and its selection of counsel was therefore crucial. Bridgeport's Accused Connectors, by virtue of their infringement, are the only competitor to Arlington's patented 380ST and 38AST connectors—the latter of which is one of Arlington's best-selling products. A7111. Though the monetary value alone of enjoining Bridgeport's infringing products for the next five years is worth ███████████████████████ ████████████████████████████████████████████████████████████ ████████████████████ (A7113), being able to exclude its biggest and direct competitor from unfairly competing in the market is priceless (A7114-15). Defending its intellectual property, market share, brand value, and customer good will is of utmost importance to Arlington. A7112-14.

In addition to its importance, this case was complex, as the district court recognized, even in the "highly complex and specialized field" of patent litigation. A17a; A24an.8. Over the course of 15 months, the parties engaged in full discovery with multiple depositions, briefing on claim construction, direct and indirect infringement, and colorable imitation, and dispositive motions *in limine* and *Daubert* motions requiring additional briefing and oral argument. A4886-88. The proceeding culminated in three full days of live expert testimony, the

CONFIDENTIAL MATERIAL OMITTED

playing of deposition designations, and one day of closing arguments, accounting for 1,245 pages of transcript and the introduction of over 50 exhibits. *Id.* Arlington had to prove its case by clear and convincing evidence. A4885-92.

Moreover, Arlington and Bridgeport have been litigating against each other for some 14 years. A7102. As Chief Judge Conner of the Middle District, who presided over the 0485 Action, recently put it, Arlington's litigation against Bridgeport has followed a "tortured procedural path." Duplex Action, 2014 WL 1653128, at *8 (M.D. Pa. Apr. 24, 2014). Ms. Clune, Arlington's lead counsel, and her Crowell & Moring LLP ("C&M") colleagues manage all of Arlington's interrelated litigation, which has spanned numerous district court, PTO, and appellate proceedings throughout the years. A6192-93;A7106-07. Ms. Clune is the only attorney who has worked on Arlington's cases since 2001, including on the underlying proceeding in this case. A7106; A4877; A4898-99; A6188. Indeed, Ms. Clune negotiated and drafted the Settlement Agreement and Injunction at issue. A4899; A6188.

Since then she has continued to successfully represent Arlington against Bridgeport in no fewer than seven district court cases and three appeals before this Court, including the 0485 Action in which the jury found the Accused and Enjoined Connectors no more than colorably different. A4877-78; A4898-99; A6188; A6192-94. The district court itself recognized that "Ms. Clune's

experience representing Arlington is impressive" and that "she has indeed achieved great success in doing so."  A17a.

Her long representation of Arlington in these interrelated cases has conferred her with specialized knowledge regarding the interplay among the various actions, including familiarity with the '488 Patent, the Accused and Enjoined Connectors, Bridgeport's counsel, the same experts and witnesses, and all relevant facts underlying Bridgeport's contempt, all of which were instrumental to the successful outcome of this contempt proceeding.    A7107-08;A6188;A6192-94.  Simply put, no other attorney possessed the requisite patent litigation expertise, and Ms. Clune's institutional knowledge, to handle this case, as sworn to by Ms. Clune(A4898-99; A6188-94), Mr. Gretz(A5189-90; A7106-10), Arlington's local counsel, Mr. Tribeck(A7322-26) and Arlington's fees expert, Harvey Freedenberg(A5146-50; A7085-87).  *See also* A4876-80; A6159-63.

As a result of Ms. Clune's patent litigation expertise, her repeated historical success against Bridgeport, her unmatched familiarity with the parties, patents, products, experts, witnesses, and interrelated proceedings—including the original 2002 action underlying this contempt proceeding—and the importance of this case, Arlington retained Ms. Clune and her C&M colleagues as lead counsel.  A7106-09. Indeed, under these circumstances, it would have been "unreasonable to expect Arlington to change horses in midstream, and suddenly find, or need to document

the inability to find, competent local counsel to continue the litigation." *Interfaith Cmty. Org. v. Honeywell Int'l*, 808 F. Supp. 2d 744, 749 (D.N.J. 2011)("*Interfaith II*"), *aff'd in part*, *rev'd in part on other grounds*, 726 F.3d 403 (3d Cir. 2013).[11]

Yet, that is precisely what the district court held Arlington needed to do in order to recover its attorney fees and "be made whole for the losses it incur[red] as the result of the contem[pt]." *Halderman*, 49 F.3d at 941. Rather than make Arlington whole and put it back in the "position [it] would have held had the injunction been obeyed," *Robin Woods*, 28 F.3d at 400, the district court refused to award Arlington the prevailing rates in Washington, D.C. for C&M's work (A16a-A19a), effectively punishing Arlington to the tune of over $750,000 for Bridgeport's refusal to abide by an injunction to which it agreed nearly a decade ago.

The district court's decision was premised upon two legal errors. The district court correctly recognized that while attorney's fees should generally be calculated based on the rates prevailing in the litigation forum, there are two exceptions to the "forum rate" rule, only one of which is at issue here—i.e., "where a case requires the 'special expertise of counsel from a distant district.'"

---

[11] Bridgeport similarly retained its long-standing counsel, Mr. Anderson, to represent it here. A6191.

A16a(citing *Interfaith Cmty. Org. v. Honeywell Int'l*, 426 F.3d 694, 705 (3d Cir. 2005))("*Interfaith I*"). However, the court erred when it (1) held that the institutional knowledge of an out-of-forum attorney—no matter how significant, impressive, related, or necessary to the actual case—cannot qualify for the special expertise exception as a matter law and (2) established a bright-line rule that to meet the special expertise exception, "a party *must* show that it unsuccessfully attempted to retain counsel in the forum of litigation," regardless if specific evidence in the record demonstrates that such a search for counsel would have been futile. A16a-A18a.[12]

### A. Institutional Knowledge Qualifies for the Special Expertise Exception to the Forum Rate Rule.

The district court erroneously carved institutional knowledge out of the well-established special expertise exception to the forum rate rule, holding that the Third Circuit does not "recognize" institutional knowledge as qualifying for that exception. A17a-A18a. But that is not so; simply because the Third Circuit has not had the occasion to address the issue is not the same as excluding it from the exception.

---

[12] Neither party appeals the district court's determination of the reasonableness of the hours worked by Arlington's attorneys, which the district court carefully scrutinized. A9a-A16a.

To the contrary, district courts in the Third Circuit (and other Circuits applying the same general rule and exceptions) have found the special expertise exception can be established by institutional knowledge acquired through prior litigation between the parties. Indeed, in a second environmental case, arising out of the same contamination that was involved in *Interfaith I*, the district court found that petitioner's out-of-town counsel qualified for the "special expertise" exception as a result of the institutional knowledge it inherited from the *Interfaith I* litigation that made "them unique to the prosecution of all the Plaintiff[s'] interests." *Interfaith II*, 808 F. Supp. 2d at 750. *Interfaith II* involved the same non-local counsel as *Interfaith I*, although it involved a different yet related claim. *Id.* at 749-50(noting difference between study areas 5-6 and 7). Though *Interfaith II* was a separate case under a different "study area," it was nevertheless part of a "comprehensive solution" to the environmental claims arising out of the same contamination. *Id.*

The court found that as a matter of "simple exercise of common sense, it would have been unreasonable to expect Plaintiffs to change horses in midstream, and suddenly find, or need to document the inability to find, competent local counsel to continue the litigation in Study Areas 5 and 6." *Id.* at 749. Based on the fact that the non-local Terris firm had litigated *Interfaith I*, "only the Terris firm could have brought the special expertise acquired from the Study Area 7 case to

the Study Area 5 and 6 case." *Id.* at 749. Thus, the special expertise exception

applied. *Id.* at 750.[13] This was notwithstanding the *Interfaith I* court's earlier

finding that there were *hundreds* of local environmental law firms. *Interfaith I*,

426 F.3d at 706.

District courts in the Sixth Circuit that apply the same forum rate rule and

exceptions as the Third Circuit, have likewise found institutional knowledge, such

as that shown here, to constitute "special expertise" for purposes of the exception.

*See*, *e.g.*, *Bendix Commercial Vehicle, Sys. v. Haldex Brake Prods.*, No. 1:09-cv-

176, 2011 WL 871413, at *1-2 (N.D. Ohio Mar. 1, 2011)(awarding Washington,

DC rates due to difficult patent issues requiring "an intimate understanding of the

extensive history of prior litigation between the parties"); *Saint-Gobain Autover

USA v. Xinyi Glass N. Am.*, 707 F. Supp. 2d 737, 759 (N.D. Ohio 2010)(holding

that non-local counsel's rate was reasonable because of the counsel's expertise in

patent litigation and institutional knowledge of the case); *see also Valenti v.

Allstate Ins.*, 243 F. Supp. 2d 200, 207 (M.D. Pa. 2003)("It was therefore

appropriate and rational for Allstate to retain the services of counsel who were

---

[13] The Third Circuit affirmed the district court's departure from the forum-rate rule
but did not reach the "special expertise" issue. *Interfaith Cmty. Org. v. Honeywell
Int'l*, 726 F.3d 403, 414&n.5 (3d Cir. 2013).

experienced in these cases and had handled similar matters, on behalf of Allstate, in the past.").

Thus, the district court erred as a matter of law when it ruled that the "special expertise" exception to the forum rate rule does not encompass institutional knowledge.

### B. The Special Expertise Exception Does Not Impose a Bright Line Rule Requiring a Showing of Unsuccessful Attempts to Obtain Local Counsel.

The district court compounded its mistake when it erroneously interpreted a Third Circuit decision to require a bright-line rule that, to qualify for the "special expertise" exception, "a party *must* show that it unsuccessfully attempted to retain counsel in the forum of litigation." A16a-A17a. In other words, the district court held that a fee petitioner can never be made whole unless it can demonstrate having "conducted a significant search for counsel with the ability to handle the case in the forum of litigation" before each proceeding (*id.*), regardless of how many cases have been ongoing, or how futile or unnecessary the search might be.

Nothing in *Interfaith I*, on which the district court relies, requires that a fee petitioner demonstrate in every case that it unsuccessfully attempted to retain counsel in the forum litigation. Rather, the Third Circuit addressed a specific set of facts and found that the fee petitioner's unsuccessful attempt to retain environmental law counsel from six local firms was inadequate to "justify

concluding that [the fee petitioner] needed to turn to [out-of-town counsel]" because "there are *hundreds of firms* in northern New Jersey that identify themselves as practicing environmental law[.]" *Interfaith I*, 426 F.3d at 706.

Under those facts, where the affidavits merely established that the retained non-local firm "had extensive experience litigating similar environmental suits" in the face of hundreds of other local firms with the same expertise, the Third Circuit was unsatisfied that the limited search performed by petitioner was sufficient to demonstrate that the non-local firm possessed a "special expertise" lacked by local counsel. *Id.* at 705-06. The Third Circuit, however, did not announce any bright line rule requiring an exhaustive search for counsel in every case before the "special expertise" exception can apply. The need for special expertise of counsel from a distant district instead turns on the "*extent* to which other counsel practicing in [the forum of litigation] did or did not possess [that particular] 'special expertise' in order to represent [the party]." *Id.*

In fact, in the subsequent *Interfaith II* decision discussed above, the district court rejected the notion that a search for local counsel was required where—as here—the fee petitioner's out-of-town counsel had special expertise inherited from the previous litigation that made "them unique to the prosecution of all the Plaintiff's interests." *Interfaith II*, 808 F. Supp. 2d at 750. As set forth above, the district court found that in such a situation, it would have been "unreasonable to

expect Plaintiffs to change horses in midstream, and suddenly find, *or need to document the inability to find*, competent local counsel to continue the litigation." *Id.* at 749. In doing so, the district court expressly rejected defendant's arguments that the fee petitioner was required to show evidence that it was unable to find competent local counsel under the specific facts at bar, and held that the special expertise exception applied. *Id.* at 749-50.

Numerous other post-*Interfaith I* district court cases in the Third Circuit have applied the special expertise exception without requiring such a showing. *See*, *e.g.*, *AT&T v. JMC Telecom*, No. 99-cv-2578, 2005 WL 2086194, at *4 (D.N.J. Aug. 26, 2005)(special expertise exception applied based on counsel's declaration showing longstanding representation of client and substantial expertise in the subject matter); *Child Evangelism Fellowship of N.J. v. Stafford Twp. Sch. Dist.*, No. 02-cv-4549, 2006 U.S. Dist. LEXIS 62966, at *79-81 (D.N.J. Sep. 5, 2006)(special expertise exception applied based on fee petitioner's declaration that an Internet search yielded no local counsel with the level of expertise "desired and believed necessary").

In other words, the relevant determination is not whether a search for local counsel with the special expertise was undertaken, but rather whether there exists "specific evidence that no local attorneys possess the 'special expertise' necessary to take the case." *Bywaters v. United States*, 670 F.3d 1221, 1233-34 (Fed. Cir.

2012)(declining to apply special expertise exception where there was no indication of a reasonable search for local counsel, *or any other evidence* to suggest that no local attorneys were competent to handle the case).

By interpreting *Interfaith I* as setting forth a bright-line rule to the contrary, the district court erred as a matter of law.

\* \* \*

The district court's refusal to award Arlington the rates charged by C&M must be reversed because (1) the record specifically shows that that there was no other attorney with the requisite patent expertise and Ms. Clune's institutional knowledge to handle the case and (2) it is undisputed that C&M's rates are reasonable in view of the prevailing Washington, D.C. market rates "for similar services by lawyers of reasonably comparable skill, experience and reputation" in the Washington, DC community, *Blum v. Stenson*, 465 U.S. 886, 896 (1984); A8073-74.

## VIII. The District Court Abused Its Discretion by Setting Reasonable Hourly Rates for the Middle District of Pennsylvania at Rates Not Found in the Record and Lower than Arlington Paid Its Local Counsel.

The district court abused its discretion when it further removed Arlington from the position it would have held had the injunction been obeyed when it set the reasonable hourly rates purportedly prevailing in the Middle District of Pennsylvania at arbitrarily low levels lacking support in the record. A19a-A23a.

The awarded rates must be "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum*, 465 U.S. at 895 n.11. In setting the reasonable fees, the district court "must rely upon the record." *Evans v. Port Authority of N.Y. & N.J.*, 273 F.3d 346, 361 (3d Cir. 2001).

The district court agreed that "patent litigation is a highly complex and specialized field" and that this case was a "complex" patent proceeding. A17a; A24a, n.8. Arlington was the only party to offer evidence of billing rates charged by intellectual property litigators in the Middle District of Pennsylvania. A5196-97; A7332-35. Arlington's local counsel for litigating intellectual property cases in the Middle District, Mr. Tribeck, demonstrated that his regular hourly rate was $425-450 from 2011 through 2013, despite a discount he provided Arlington; his associates' rates were $275-295; and his law clerks' and paralegals' rates were $150-$165. A5196. Arlington's fees expert, Mr. Freedenberg, who also has experience litigating intellectual property in the Middle District, attested that the rates charged by Mr. Tribeck's firm were reasonable for intellectual property litigation in that District. A5157.

None of the purportedly prevailing rates that Bridgeport proffered in response was for a forum-based intellectual property litigator, nor did any of its purported fee experts have any experience with intellectual property

litigation.  A7084-85; A7317-19; A8027; A8016-18.  In other words, as the district court expressly found, Bridgeport failed to produce a single forum-based attorney with *any* experience in intellectual property litigation to rebut Arlington's showing of the prevailing rates in the forum.  A24a.

Thus, *the only evidence on record* of reasonable rates for intellectual property litigators in the Middle District of Pennsylvania showed an hourly rate of $425-450 for someone with Mr. Tribeck's experience; $275-295 for associates; and $150-165 for law clerks and paralegals.  A5196; A5157.  Despite this undisputed evidence, the district court arbitrarily adjusted these rates downward:  $375 for Mr. Tribeck; $175-250 for associates; $75-130 for paralegals and law clerks; and $450 for Ms. Clune, despite Mr. Tribeck's actual going rate being $450 and the court's finding that Ms. Clune's "extensive experience…is greater than Mr. Tribeck's."  A19a-A26a.  Arlington, the innocent party, was not even reimbursed at the rates it actually negotiated and paid, which are by definition reasonable.  *Yurman*, 125 F. Supp. 2d at 58.

This was an abuse of discretion.  Once a prima facie showing with respect to the appropriate hourly rate has been made, that rate may only be contested with appropriate record evidence.  *Evans*, 273 F.3d at 361.  Because Bridgeport failed to offer such evidence, Arlington "*must* be awarded attorneys' fees at [the] requested rate."  *Id.*

## **CONCLUSION**

Arlington respectfully requests that the court reverse the district court's reasonable hourly rate determinations but affirm in all other respects.

January 13, 2015

Respectfully submitted,

*/s/ Kathryn L. Clune*
KATHRYN L. CLUNE
*COUNSEL OF RECORD*
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
(202) 624-2500 (Telephone)
(202) 628-5116 (Facsimile)
kclune@crowell.com

JACOB Z. ZAMBRZYCKI
CROWELL & MORING LLP
275 Battery St., 23rd Floor
San Francisco, CA 94111
(415) 986-2800 (Telephone)
(415) 986-2827 (Facsimile)
jzambrzycki@crowell.com

CARTER G. PHILLIPS
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000 (Telephone)
(202) 736-8711 (Facsimile)
cphillips@sidley.com

ERIC A. SHUMSKY
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street, NW

Washington, DC 20005
(202) 339-8400 (Telephone)
(202) 339-8500 (Facsimile)
eshumsky@orrick.com

*Counsel for Plaintiff-Cross Appellant*
*Arlington Industries, Inc.*

**CERTIFICATE OF SERVICE**

Pursuant to Federal Rules of Appellate Procedure 25(b) and (d), I hereby certify that on this 16th day of January 2015, I caused the foregoing document to be electronically filed with the Clerk of the United States Court of Appeals for the Federal Circuit using the CM/ECF System and caused a true and correct copy to be sent via e-mail to:

Alan M. Anderson, Esq.
Matthew R. Palen, Esq.
    *Of Counsel*
Aaron C. Nyquist, Esq.
Alan Anderson Law Firm LLC
Crescent Ridge Corporate Center
11100 Wayzata Blvd., Suite 545
Minneapolis, MN 55305
(612) 756-7000 (Telephone)
(612) 756-7050 (Facsimile)
aanderson@anderson-lawfirm.com
mattpalen@comcast.net
anyquist@anderson-lawfirm.com

*/s/ Kathryn L. Clune*
KATHRYN L. CLUNE
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 624-2500 (Telephone)
(202) 628-5116 (Facsimile)
kclune@crowell.com

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing Nonconfidential Corrected Principal and Response Brief of Cross Appellant Arlington complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(A)(i) and contains 16,499 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point.

Dated: January 16, 2015

/s/ Kathryn L. Clune
KATHRYN L. CLUNE
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2705 (Telephone)
(202) 628-5116 (Facsimile)
kclune@crowell.com